No. 26-1736

**IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**ZENAIDA PEREZ,**

Plaintiff-Appellant,

*v.*

**FAIRFAX COUNTY SCHOOL BOARD, ET AL.**,

Defendants-Appellees.

JOINT APPENDIX
Volume I
(JA 001- JA 063)

Steven H. Aden
Danielle G. Pimentel
AMERICANS UNITED FOR LIFE
1150 Connecticut Ave., N.W., Ste. 500
Washington, DC 20036
Tel.: (703) 638-9731
steven.aden@aul.org
danielle.pimentel@aul.org

Attorneys for Plaintiff-Appellant

M. Sean Royall
Lucas M. Fields
Zoe M. Beiner
KING & SPALDING LLP
1700 Pennsylvania Ave., N.W.
Suite 900
Washington, DC 20006
Tel.: (202) 737-0500
sroyall@kslaw.com
lfields@kslaw.com
zbeiner@kslaw.com

Attorneys for Defendants-Appellees

*Additional counsel listed on reverse*

September 14, 2026

Additional Counsel

Monique A. Miles, Esquire
OLD TOWNE ASSOCIATES, P.C.
201 N. Union Street, Ste. 110
Alexandria, Virginia 22314
Tel.: (703) 519-6810
mmiles@oldtowneassociates.com

Attorney for Plaintiff-Appellant

Edward Lee Isler
Micah E. Ticatch
Isler Dare, P.C.
1945 Old Gallows Rd., Suite 650
Vienna, VA 22182
Tel.: (703) 748-2690
eisler@islerdare.com
mticatch@islerdare.com

Attorneys for Defendants-Appellees

**Table of Contents**
**Volume I**


| | Description | Filing Date | Pages |
|---|---|---|---|
| 1. | Opinion and Order Granting Motion to Dismiss (ECF No. 48) | 05/08/2026 | JA 001 - 015 |
| 2. | Transcript of Hearing on Motion to Dismiss (ECF No. 53) | 08/15/2026 | JA 016 - 063 |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| ZENAIDA PEREZ, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-2126-AJT-IDD |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, *et al.*, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Zenaida Perez, a public high school teacher, brings claims for defamation, free speech violations, and statutory whistleblower-protection violations against various school and school board officials whom she alleges retaliated against her by placing her on administrative leave after she repeatedly accused her high school's guidance counselor and other personnel of facilitating minor students' abortions without parental consent. Before the Court is Defendants' Motion to Dismiss for Failure to State a Claim [Doc. No. 22] (the "Motion") on numerous grounds, but centrally on claims of sovereign and qualified immunity. The Court held a hearing on the Motion on March 5, 2026, following which it took the Motion under advisement. Upon consideration of the Motion, the memoranda in support thereof and in opposition thereto, the argument of counsel at the hearing, and for the reasons stated herein, the Motion is **GRANTED.**

## I. BACKGROUND

The Second Amended Complaint alleges the following:

Plaintiff Zenaida Perez is a career English for Speakers of other Languages (ESL) teacher and has worked at Centreville High School since 2008. [Am. Compl.] ¶ 10. At some point in her employment, Perez became aware of facts suggesting that a guidance counselor had provided

pregnancy tests to minor students and had directed them to abortion providers, given them money, or otherwise facilitated that kind of procedure without first seeking their parents' consent in violation of Virginia law. *Id.* ¶¶ 11-12.[1]

Beginning in May 2022, Perez made a series of complaints and communications to school officials related to her concerns about the guidance counselor's activity, first, on May 5, with a verbal report to her direct supervisor George Michael Parker and assistant principal Alexis Wenzel, evidently in response to similar allegations against Perez herself. *Id.* ¶ 12. This was followed up by similar verbal and written communications from Perez to her supervisor and Principal Chad Lehman on May 13 and November 22, 2022. *Id.* ¶¶ 12, 15. Principal Lehman at first disregarded her reports, and when confronted, ultimately stated that the guidance counselor and the student in question denied the allegations. *Id.* ¶¶ 15, 17. Plaintiff alleges that from then on Lehman (who was replaced by another Principal, Eric Healey, the following school year) avoided her in the hallways and never spoke to her again. *Id.* ¶ 24.

Plaintiff alleges that beginning in the following school year (2023-2024), she began experiencing retaliation by school administrators and details a long and varied list of incidents, including that administrators (almost exclusively Healey and Brown) assigned her an abnormally onerous class schedule and repeatedly changed her schedule; accelerated her performance review cycle; directed students to "do or say things about Perez to get her in trouble;" scheduled meetings

[1] Unstated is exactly when and how Perez first learned of this information, but the more specific allegations center on two separate occasions. On one occasion, it is alleged that the guidance counselor "facilitated an abortion for a minor student [who] actually got the abortion, and that her legal guardian (her uncle) only found out about the abortion when he had to take her to the hospital because the procedure caused extensive blood loss." *Id.* ¶ 15. Perez allegedly procured a statement from this student to this effect, which also mentioned that "an envelope was given to her for the abortion clinic…which more than raises the presumption that the funds to cover the abortion were in the envelope." *Id.* ¶¶ 18-19. With respect to another incident, Perez also obtained a statement from a student claiming the guidance counselor, along with the school nurse, allegedly attempted to pressure her into getting an abortion when she was already five months pregnant; and who claimed that the school nurse told her she had previously facilitated other students' abortions. *Id.* ¶¶ 21-22. A local journalist reported on these accounts in August 2025, with Perez' participation, which included an audio interview with one of the students' relatives. *Id.* ¶¶ 20-21.

during her vacation and other scheduled time off; and falsely accused her of illicit relationships with students and other offenses. *Id.* ¶¶ 28, 32-76. Plaintiff also alleges that school board officials have issued various disciplinary sanctions against her, including twelve disciplinary memoranda and reprimands, a one-day suspension in the Spring of 2025 for insubordination, and her placement on paid administrative leave in October 2025, which came the same day that she made public statements about the abortion allegations on television. *Id.* ¶¶ 52, 67, 76; [Doc. No. 37-9]. Plaintiff alleges that her supervisor made a remark which she interpreted as acknowledging the retaliation. *Id.* ¶ 29. She also has formally complained to the School Board Office of Employee Relations ("OER"), her union, and the Equal Employment Opportunity Commission, and has attempted to transfer to another school, all to no avail. *Id.* ¶¶ 29, 34, 38, 43.

Central to her claims in this case are Perez's communications about the purported abortion scandal to school administrators and their counsel, journalists, and the public, which took place in various contexts. Plaintiff alleges that she continued to complain about the issue to school administrators and through the the OER, union, and EEOC complaints;[2] but as time went on without an official school response to the abortion allegations, Plaintiff appears to have shifted her focus toward public advocacy. In that regard, she emailed her concerns to a journalist sometime before January 2025, was interviewed for a story which was published on a conservative journalist's blog on the platform Substack in August 2025, and in October 2018 appeared on "the news" as well as on a webinar hosted by the nonprofit Americans United for Life. *Id.* ¶¶ 20, 37, 67, 95. Also, beginning in 2025, various government entities began launching investigations into Plaintiff's allegations, including the Defendant School Board, the U.S. Department of Education,

[2] Although Plaintiff's internal complaints following Lehman's 2022 investigation were more focused on the alleged retaliation against her than the underlying abortion accusations themselves, when viewed most favorably to Plaintiff, these complaints appear to relate to both issues.

and the U.S. Senate Committee on Health, Education, Labor and Pensions. *Id.* ¶¶ 59-64. Plaintiff was interviewed multiple times in connection with these investigations, including in March, May, and August of 2025. *Id.* ¶¶ 46, 53, 62.

The preliminary and final reports by the school board included findings that Perez's allegations were untrue and that she falsified evidence and refused to cooperate with the initial school investigation. *Id.* ¶¶ 59-60, 70-72. Given the media coverage and concern about the controversy among school staff and parents, Defendants (chiefly Superintendent Reid) made various written and oral statements to these government investigators and other stakeholders in which the preliminary and final investigation findings were conveyed. *Id.*

Plaintiff's Second Amended Complaint (the Complaint)[3] asserts five causes of action:

1. Retaliation in violation of the Virginia Whistleblower Protection Law ("VWPL"), Va. Code Ann.§ 40.1-27.3(A)), filed against only the school board (Count I);

2. Retaliation in violation of the Fraud and Abuse Whistleblower Protection Act ("FAWBPA"), Va. Code§ 2.2-301 l(A)), filed against only the school board (Count II);

3. Defamation per se, filed against all Defendants (Count III);

4. Retaliation in violation of her right to free speech under the Virginia Constitution, Art. 1, Section 12, filed against all Defendants (Count IV); and

5. Retaliation in violation of her First Amendment right of free speech in violation of 42 U.S.C. §1983, filed against all Defendants (Count V).

In response to the Complaint, Defendants have moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on the grounds that (1) they enjoy sovereign and qualified immunity; (2) that their

---

[3] Plaintiff filed her original complaint in state court in October 2025, which was removed to this Court on November 21, 2025; Plaintiff filed her First Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1) on November 25, 2025 [Doc. No. 6], and filed the operative Second Amended Complaint with leave of this Court on January 20, 2026. [Doc. No. 31].

statements were privileged and not defamatory; and (3) that Plaintiff's speech was not protected as being related to a matter of public concern. [Doc. No. 35].

## II. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This does not require detailed allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. (quoting *Twombly*, 550 U.S. at 555). "When a . . . complaint contains sufficient allegations of material facts to inform a defendant of the nature and character of the claim, it is unnecessary for the pleader to descend into statements giving details of proof in order to withstand [a motion to dismiss]." *Squire v. Va. Hous. Dev. Auth.*, 287 Va. 507, 517 (2014) (quoting *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 24 (1993)). The Court must accept all well-pled facts in the complaint as true and construe all facts in the light most favorable to Plaintiffs. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015).

## III. DISCUSSION

### A. <u>The VWPL Claim is Barred by Sovereign Immunity (Count I)</u>

Plaintiff's first claim for violation of the VWPL is brought only against the school board. The VWPL states, in relevant part, that an employer shall not take retaliatory action against an employee because the employee "in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official." *See* Va. Code Ann. § 40.1-27.3(A). Defendants contend that this claim is barred by sovereign immunity. In that regard, Defendants argue that the definition of "employer" from Va. Code Ann. § 40.1-2, which

is incorporated into the VWPL, omits any reference to public entities, that this omission is intentional and that sovereign immunity has therefore not been waived for purposes of the VWPL.

The Virginia Supreme Court has not addressed the issue, although other courts, both state and federal, have concluded in unpublished opinions that sovereign immunity has not been waived for claims under the VWPL. *See Konate v. Norfolk State Univ.,* No. CL 21-5224 (Va. Cir. Feb. 7, 2022) (Norfolk)). *See also Moschetti v. Office of Inspector General,* 2022 WL 3329926, at *10 (E.D. Va. 2022)); *Jordan v. School Board of City of Norfolk*, 640 F. Supp. 3d 431, 452–53 (E.D. Va. 2022). Significant in this regard is that a separate Virginia whistleblower protection statute, the FAWBPA, the basis for Plaintiff's claim under Count II, expressly applies to public-sector employees and expressly waives sovereign immunity. See Va. Code § 2.2-3011. Because sovereign immunity must be expressly waived, *see Passaro v. Virginia*, 935 F.3d 243, 248 (4th Cir. 2019), the Court concludes that sovereign immunity has not been waived for claims under the VWPL and this claim against the school board is barred and will be dismissed.

**B. <u>Plaintiff's FAWBPA Claim Fails to Plead Causation (Count II)</u>**

Plaintiff claims that the school board retaliated against her in violation of FAWBPA, a Virginia whistleblower protection statute that applies to public-sector employees. Va. Code § 2.2-3011. With respect to this claim, Defendants chiefly argue that Plaintiff does not plead facts showing a causal relationship between any protected activity and any alleged retaliation. In that regard, nearly three years elapsed between her initial report to Principal Lehman in November 2022, the only protected activity alleged, and the only adverse employment action taken against her, namely, her placement on paid administrative leave in October 2025.[4]

[4] The Second Amended Complaint highlights the temporal proximity between her placement on administrative leave and her participation in a publicly broadcast Webinar hosted by Americans United for Life." [Am. Compl.] ¶¶ 67, 100. But her publicly broadcast speech does not constitute protected activity under the FAWBPA, as that statute protects only the reporting of misconduct to an "appropriate authority," which is defined as "a federal,

Under both Title VII and most whistleblower statutes, a *prima facie* case of causation can be made based on circumstantial evidence including temporal proximity, deviation from normal practices, or evidence of concealment. *Sneed v. Montgomery Housing Authority,* 956 F. Supp. 982 (M.D. Ala. 1997), aff'd, 136 F.3d 1331 (11th Cir. 1998). Although there is no bright-line rule for when temporal proximity sufficiently alleges causation, the "rule of thumb" in Title VII cases is that a delay over two months requires additional proof or explanation. *See Laurent-Workman v. Wormuth*, 54 F.4th 201, 218-19 (4th Cir. 2022), see also *Wood v. Bristol Va. Util. Auth.*, 661 F. Supp. 3d 538, 553 (W.D. Va. 2023) (collecting cases).

Plaintiff alleges numerous acts by Healey and Brown, which she does not expressly contend were adverse actions individually, but which, she contends, show, when viewed most favorably to her, as required on a Motion to Dismiss, a slow but sufficiently unbroken progression of retaliatory actions culminating in her administrative leave, such that there is sufficient temporal proximity between her protected activity in 2022 and her placement on administrative leave in 2025. This contention finds some support within the context of a Title VII claim. In *Lettieri v. Equant Inc.* 478 F.3d 640 (4th Cir. 2007), the Fourth Circuit found the causation element satisfied for a Title VII sex discrimination claim when, over the seven months period between the plaintiff's complaints of gender discrimination and her firing by her supervisors, those same superiors "reduced her supervisory responsibilities over the sales team and took away her authority to set prices and meet directly with Sprint clients." *Id.* at 650. However, courts have been reluctant to extend the reasoning in *Lettieri* to other Title VII claims with less temporal proximity or less clear evidence, with no cases found extending temporal proximity to state-law statutory claims like

---

state, or local agency or organization having jurisdiction over criminal law enforcement, regulatory violations, professional conduct or ethics, or abuse; or a member, officer, agent, representative, or supervisory employee [thereof]." Va. Code § 2.2-3010.

Plaintiff's FAWBPA claim. *See, e.g., Walton v. Harker*, 33 F.4th 165, 178 (4th Cir. 2022) ("*Lettieri's* facts do not resemble this case. The pattern of animus there was severe and took place over a truncated period of months. Here, [plaintiff] Walton points to only one alleged comment over six years by a supervisor that did not relate in any way to her 2013 job reassignment.")

Here, the temporal proximity between Plaintiff's protected activity and her adverse employment action is much more attenuated than in *Lettieri* (almost five times longer), the ultimate adverse action less sever (administrative leave with pay as opposed to termination), and the school officials alleged to have engaged in conduct that Plaintiff contends was retaliatory are other than either those Plaintiff complained to or those she complained about,[5] as is the official who actually imposed her administrative leave.[6]

In sum, Plaintiff has failed to plead facts which, when viewed most favorably to her, plausibly give rise to a claim for whistleblower retaliation under FAWBPA.

**C. The Defamation Claim is Barred by Qualified Privilege (Count III)**

Plaintiff brings a claim for defamation *per se* against the Individual Defendants in their individual capacities only ([Opp.] at 22) for over a dozen statements, mostly within or related to the school board's investigation into her job performance and conduct with students. [Am. Compl.] ¶¶ 31-32, 35-36, 40, 45-46, 48, 56-60, 66-74. Defendants argue, *inter alia*, that this claim is barred by a qualified privilege. [Mot.] at 24–28.

---

[5] Specifically, Perez alleges that the alleged retaliation began the school year after Plaintiff complained to Lehman, Wenzel and Parker, and with the exception of Lehman, the Complaint does not allege that any of those individuals (nor the guidance counselor or the school nurse, the subjects of her complaints) participated in any of the alleged retaliation; and the only specifically described conduct claimed to be retaliatory (though still not rising to the level of an adverse employment action) are against Healy and Brown. As to Lehman, the only "retaliation" alleged is the conclusory statement that "[a]fter the 2022-2023 academic year, Perez began to experience animosity and retaliatory actions against her, first by CHS Principal Lehman… [who] never again acknowledged her or greeted her. When he saw her in the hallways, Lehman walked in the opposite direction to avoid her." [Am. Compl.] ¶ 24.

[6] The Second Amended Complaint alleges that Plaintiff was placed on administrative leave by Bill Fulton, Director of FCPS Office of Employee Relations, without any allegation of personal involvement in that decision by Plaintiff's alleged harassers (Healey and Brown). *See* [Am. Compl.] ¶¶ 52, 67.

Under Virginia law, qualified privilege attaches to communications between "co-employees and employers in the course of employee disciplinary or discharge matters." *Larimore v. Blaylock*, 528 S.E.2d 119, 121 (Va. 2000); *see also Dwyer v. Smith*, 867 F.2d 184, 195 (4th Cir. 1989) (communications relating to matters of mutual interest and employee investigations into misconduct or discipline are presumptively privileged under Virginia law). To establish defamation liability for employment-related statements, a plaintiff must overcome the presumption that the declarant's comments were not malicious. *Larimore,* 528 S.E.2d at 122. This presumption can be overcome by a showing that "(1) the statements were made with knowledge that they were false or with reckless disregard for their truth, (2) the statements [we]re communicated to third parties who have no duty or interest in the subject matter; (3) the statements were motivated by personal spite or ill will, (4) the statements included strong or violent language disproportionate to the occasion, or (5) the statements were not made in good faith." *Cashion v. Smith,* 749 S.E.2d 526 (Va. 2013) (citing *Great Coastal Express, Inc. v. Ellington,* 334 S.E.2d 846 (Va. 1985)) (cleaned up).

Plaintiff argues that the alleged defamatory statements were not privileged since they came within the exclusion from the qualified privilege for "actions taken outside the scope of [the official's] employment, or for actions within the scope of their employment that are so grossly negligent or willful and malicious that they are no longer entitled to claim the immunity that the State enjoys." [Opp.] at 23 (citing *Tomlin v. McKenzie*, 468 S.E.2d 882, 884 (Va. 1996)). Here, however, each alleged defamatory statement appears from the allegations to have been made in the context of the declarant's supervision of the Plaintiff concerning her professional conduct (and therefore squarely within the scope of employment). And as referenced above, such statements are presumed to lack malice, and the only allegations that relate to whether the statements fall within

a recognized exclusion from the qualified privilege are Plaintiff's conclusory assertions insufficient to make the required showing.[7]

That the qualified privilege applies to the alleged defamatory statements is supported by what appears to be one of the most recent, if not the most recent consideration of that privilege by a Virginia appellate court. In *Harless v. Nicely,* 80 Va. App. 678 (Va. Ct. App. 2024), after an altercation at a high school football game, various school officials conducted an investigation into a coach from a neighboring district, and their report included numerous statements to the effect that the coach had repeatedly made racist remarks and engaged in improper recruiting techniques (he was allegedly cleared of any recruiting violations before bringing his lawsuit). *Id*. at 683–85. The named coach brought defamation claims against the declarants, but the Court of Appeals affirmed the trial court's ruling that qualified privilege barred these claims because "each defendant made their respective statements in order to express their concerns about another employee who could have potentially been violating the [Virginia High School League's] policies." *Id*. at 689–90. Here, the facts alleged as to the relied upon statements are even less favorable for the Plaintiff than in *Harless*, as the declarants are Plaintiff's superiors within the same organization, rather than employees of a different school district.

For these reasons, the Individual Defendants' statements alleged to be defamatory are protected by qualified privilege, and thus Plaintiff's defamation claim will be dismissed.

---

[7] Plaintiff's conclusory allegations include that "[t]he Defamatory Statements were… false," [Am. Compl.] ¶ 104, and "necessarily hurtful." *Id*., ¶ 106, and 'Defendants knew they were false because, as just one example, they said Mrs. Perez enabled students for inappropriate sexual misconduct," *Id.* ¶ 108, or "should have known they were false," *Id.,* ¶ 109, "had the intention of inflicting harm," *Id.* ¶ 111 and "were motivated …because of their actual malice, spite, hatred, ill-will, and a grudge against Perez." *Id*. ¶ 112.

**D. Plaintiff's Free Speech Claims Likewise Fail (Counts IV, V)**

Plaintiff brings two constitutional free speech claims, one under state law (Count IV) and one under 42 U.S.C. § 1983 alleging deprivation of her federal First Amendment rights (Count V). Both claims exclusively seek damages for the deprivation of her right to speak on matters of public concern. [Am. Compl.] ¶¶ 119, 122. Article I, Section 12 of the Virginia Constitution is co-extensive with the First Amendment (s*ee McCaffrey v. Chapman*, 2017 WL 4553533, at *5 (E.D. Va. 2017)), and both free speech claims are in substance identical.

iii) *The Individual Defendants are Protected by Qualified Immunity*

Defendants argue that the Individual Defendants are protected by qualified immunity because their actions did not violate a clearly established right.[8] Even if a public employee's speech is protected, Courts are consistently reluctant to hold that their First Amendment rights were clearly established because the existence of those rights turns upon a sensitive balancing of the employee's speech rights against the government employer's right to operate effectively and efficiently. *See, e.g. DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995); *see also Myers v. Morris,* 810 F.2d 1437, 1462 (8th Cir.) ("[I]f the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual and legal precedent."). Under this so-called *Pickering* balance,[9] the official enjoys qualified immunity provided that a reasonable person could have believed the balance would be struck in favor of the government. *See Lane v. Franks*, 573 U.S. 228, 242 (2014) (holding that although state college employee's

[8] Defendants also contend that Plaintiff's free speech claims should be dismissed because her speech did not deal with a matter of public concern but rather was directed internally and focused on her dispute with a coworker (the guidance counselor.) [Mot.] at 33–34. While her dispute with the guidance counselor may have been the genesis of the dispute, the allegations concerning Plaintiff's speech, much of which was directed externally, are more consistent with a form of public anti-abortion advocacy than a mere workplace squabble blown out of proportion. *See* [Am. Compl.] ¶¶ 20, 37, 67, 95.

[9] *See Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968).

testimony under subpoena at a criminal trial is protected, the official who terminated him enjoyed qualified immunity because judicial precedent at the time did not preclude the reasonable belief that a government employer could fire an employee for testimony given under oath outside his ordinary job duties). Here, the parties posit different framings of the "right" that was violated, with Plaintiff framing it as her right to speak on a matter of public concern ([Opp.] at 30–31), and Defendants as the Plaintiff's claimed right "to make unsubstantiated accusations against coworkers." [Reply] at 20–21.

Given the required particularized framing of the right at issue for the purposes of a claim under Section 1983, "only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' that is subtle, difficult to apply, and not yet well-defined." *DiMeglio*, 45 F.3d at 806; *see also, e.g., Iglesias v. Wolford*, 667 F. Supp. 2d 573 (E.D. N.C. 2009) (finding no Section 1983 violation where administrative assistant to police chief was fired after repeatedly accusing chief of embezzling funds).

Even were Plaintiff's speech motivated more by pro-life sentiment than personal grievance against the guidance counselor, or any other school official, none of the various alleged investigations substantiated Plaintiff's claims, and the Individual Defendants could reasonably have believed that Plaintiff's speech interests were outweighed by the school system's countervailing interests, particularly in light of her failure to provide Lehman with the evidence she claimed to have, which she instead published years later through a report by a political blogger. *See* [Am. Compl.] ¶¶ 17-21.

For these reasons, even when viewing the allegations in the Complaint as a whole, and most favorably to the Plaintiff, the Court concludes as a matter of law that at all times it was

reasonable for the Individual Defendants to believe that Plaintiff's right to make her repeated accusations against her coworkers was not clearly established and the Individual Defendants are therefore protected by qualified immunity from Plaintiff's First Amendment and state constitutional free speech claims, and Counts IV and V must be dismissed as to the Individual Defendants.[10]

iii) *The School Board Is Immune from Liability Under Monell*

Defendants argue that Plaintiff's free speech claims under Section 1983 against the school board (and the Individual Defendants in their official capacities), are subject to dismissal because she failed to allege that an official policy or custom caused the alleged first amendment violation. Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663 (1978) and its progeny, a "local government may be held liable for a decision made by an individual whose edicts or acts may fairly be said to represent official policy," but not for "going along with the discretionary decisions made by [a] subordinat[e]." *See Lytle v. Doyle*, 326 F.3d 463, 472 (4th Cir. 2003). Discretionary decisions may form the basis for liability when "a practice is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law" (*Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)) or when a municipality's lack of supervision, delegation, or training amounts to deliberate indifference. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 390 (1989)). While a single decision can occasionally create liability, that decision must be made by the official with "final policymaking authority." *See Stickley v. Sutherly*, 667 F. Supp.

[10] Defendants also contend that Plaintiff's free speech claim against the school board under Article I, Section 12 of the Virginia Constitution is barred by sovereign immunity, since Virginia law permits a private cause of action under the Virginia Constitution against a governmental entity only where the provision is self-executing (which in any case is limited to claims for declaratory judgment and injunctive relief; *see Ibanez v. Albemarle Cnty. Sch. Bd.*, 897 S.E.2d 300, 311-12 (Va. Ct. App. 2024)) or where the General Assembly, by creating a cause of action, has expressly waived sovereign immunity. See *Mais v. Albemarle Cnty. Sch. Bd.*, 657 F. Supp. 3d 813, 819, 823 (W.D. Va. 2023). Given that Plaintiff's Virginia free speech claim is independently subject to dismissal on the merits, the Court need not address this alternative basis.

2d 664, 673 (W.D. Va. 2009) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 484 n.12 (1986)).

Plaintiff argues that her claim should not be dismissed because she has alleged that "[t]he actions of Defendants reflected an unconstitutional policy or custom of Defendant Fairfax County School Board to retaliate against, harass, intimidate and silence FCPS employees who report internally or who speak out publicly against unlawful conduct engaged in by other FCPS employees." [Am. Compl.] ¶ 123. But this thoroughly conclusory allegation is not supported by any allegation, conclusory or otherwise, that any of the Defendants have retaliated against any other whistleblower (let alone on similar facts). *See Johnson v. Baltimore City, Maryland*, 163 F.4th 808, 823 (4th Cir. 2026) (plaintiff police officer failed to plead municipal policy or custom of, *inter alia*, retaliating against fellow officers who stood up against police department for violations of their civil rights, where only specific instances that officer alleged in support of her *Monell* claim were her own). Second, Plaintiff alleges that FCPS failed to train its school officials in the constitutional limits on retaliatory discipline, but the Second Amended Complaint contains no particularized allegations concerning this lack of training. In any event, and as the Court has concluded, there was a reasonable basis for the Individual Defendants' belief that their disciplinary actions against Plaintiff were lawful; and Plaintiff has therefore failed to allege facts that would make plausible any claim that she was harmed by a lack of training.

In sum, Plaintiff has failed to show that municipal liability exists under *Monnell,* and her Section 1983 claim against the school board and the Individual Defendants in their official capacities must be dismissed.

## IV. CONCLUSION

For the reasons set forth above, the Motion is **GRANTED** as to all Counts, and this action is **DISMISSED**.

/s/
Anthony J. Trenga
Senior U.S. District Judge

May 8, 2026
Alexandria, Virginia

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| ZENAIDA PEREZ, | : | Civil Case |
| | : | No. 1:25-cv-2126 |
| Plaintiff | : | |
| v. | : | |
| FAIRFAX COUNTY SCHOOL BOARD, et al., | : | March 5, 2026 |
| | : | 12:00 p.m. |
| Defendants | : | |
| ............................ | : | ...................... |

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE ANTHONY J. TRENGA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF: MONIQUE ANTONIA MILES
OLD TOWNE ASSOCIATES, P.C.
201 N. Union Street
Suite 110
Alexandria, VA 22314
703-994-9367

STEVEN ADEN
AMERICANS UNITED FOR LIFE
1150 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
703-638-9731

FOR THE DEFENDANTS: EDWARD LEE ISLER
ISLER DARE P.C.
1945 Old Gallows Road
Suite 650
Vienna, VA 22182
703-748-2690

(APPEARANCES CONTINUED ON THE FOLLOWING PAGE:)

**FOR THE DEFENDANTS:** **MICHAEL SEAN ROYALL**
**LUCAS MYRON FIELDS**
**KING & SPALDING**
**1700 Pennsylvania Avenue, NW**
**Suite 900**
**Washington, DC 20006**
**202-727-0500**

**OFFICIAL COURT REPORTER:** **REBECCA STONESTREET, RPR, CRR**
**U.S. District Court, 9th Floor**
**401 Courthouse Square**
**Alexandria, Virginia 22314**
**240-426-7767**

**( Pages 1 - 58)**

**COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES**

**P R O C E E D I N G S**

COURTROOM CLERK: Civil action 25-2126, Zenaida Perez versus Fairfax County Public Schools, et al. Would counsel please note their appearances for the record.

MR. ADEN: Good morning, Your Honor. Steven Aden *pro hac vice* for the plaintiff. With me are Monique Miles of Old Towne Associates, and her law clerk, Mr. Thomas Reya (ph).

THE COURT: All right. Welcome to you all.

MS. MILES: Good morning, Your Honor.

THE COURT: Good morning.

MR. ISLER: Good morning, Your Honor. Edward Lee Isler of Isler Dare for the defendants, and with me is Sean Royall and Luke Fields of King & Spalding, who have been admitted *pro hac vice*.

THE COURT: All right. Welcome, everyone.

We're here on the defendants' motion to dismiss. I've reviewed the motion and the briefing. I'll be pleased to hear further from counsel. If you would, I would like to start with the 1983 claim.

MR. ROYALL: Yes, Your Honor. Thank you.

Beginning with the 1983 claim, it's interesting that you start there, because in preparing for the argument, I think that this is the most interesting and complex issue. Could I give a preliminary statement that I think adds some context to that claim?

THE COURT: That would be fine.

MR. ROYALL: So this lawsuit emanates from a workplace dispute at a public high school in Fairfax County. The plaintiff is a teacher at Centreville High School. I think it's fair to say, even from her own pleading --

THE COURT: She's still employed but on administrative leave?

MR. ROYALL: She is still employed. There's a reference in the pleading, plaintiff's opposition, to her being fired. She has not been fired. She is on paid administrative leave.

I think it's fair to say --

THE COURT: For how long? Is there any particular --

MR. ROYALL: She was placed on administrative leave on October 20th, and she's still in that status.

THE COURT: Is there a set time for that?

MR. ROYALL: No.

THE COURT: What is it pending?

MR. ROYALL: Pardon?

THE COURT: What is the administrative leave pending? How long is it going to be implemented?

MR. ROYALL: There's no set time. And I'll touch on this.

THE COURT: All right. All right.

MR. ROYALL: So I think it's fair to say, as

acknowledged in her own pleadings and so before the Court here in the record, that she has a demonstrated tendency, has had a demonstrated tendency, of involving herself very closely in the affairs of students. And for her, that's a matter of some pride and her generosity and involving herself with students, but for school administrators it's been a long-standing concern and something that's required monitoring, at times intervention, and at times discipline.

In early 2022, reports surfaced that the plaintiff allegedly had provided pregnancy tests to a student, which, if true, would be a clear violation of school rules. That was investigated, and she seems to have resented the fact that she was investigated. She denied these allegations. But she particularly resented the fact that one of her colleagues, a school social worker, Mrs. Carolina Diaz, had been a witness supporting those allegations. And in plaintiff's own words in her complaint, she says that Mrs. Diaz, in her view, had set her up.

In response -- and again, she pleads this, that in response to believing that the social worker had set her up for what she claimed were false allegations of purchasing or providing pregnancy tests, plaintiff accused Diaz of something far worse. She accused her of pressuring students to get secret abortions without parental knowledge or consent, and using school funds to pay for them. Very disturbing allegations to be

sure, yet the context in which they were raised and the manner in which they were raised - and we believe all of this is highly relevant to the Section 1983 claim - presented strong signals that these allegations lacked credibility. The claims appeared to be retaliatory and they were not presented in a coherent fashion.

So when she originally raised these allegations in May of 2022, plaintiff used vague words and confusing language. In fact, she never mentioned the word "abortion." It was not understood. It would not have been reasonably understood what she was referring to. But she renewed those allegations several months later, in November 2022, in a meeting with the school principal - one of the defendants, individual defendants, Defendant Lehman - and he finally understood what she was referring to. She had previously used the term "pregnancy solutions," and he finally understood that she was making a very serious allegation that the social worker had been facilitating and indeed paying with school funds for student abortions.

So what did he do? He immediately investigated. He spoke to Mrs. Diaz directly, he spoke to the school nurse. Neither corroborated the allegations. And then he promptly reported back to plaintiff that what he was hearing was that there is no truth in these allegations.

Plaintiff told the principal that she claimed to have evidence to prove her allegations. So he asked her, please

provide whatever information you may have to support these claims. She then responded that she had nothing further to provide.

Now, by all appearances --

THE COURT: Is that in the complaint?

MR. ROYALL: That is in the complaint.

THE COURT: That she has nothing further?

MR. ROYALL: That she was asked to provide information, and she -- my recollection is that she omits any allegation that she provided further information.

THE COURT: What's alleged is that she said, "I do have the evidence to prove that I'm right."

MR. ROYALL: Yes. She had said that, and that's what prompted the question, "Please provide the information."

And we've submitted, Your Honor, various documents that were incorporated by reference by her pleadings, and we have submitted, I believe, an email - one of my colleagues may tell me which exhibit that is - that demonstrates the back and forth. But she was asked -- she said she had evidence, she was asked, and she didn't provide anything.

I'll get to the Section 1983, but a very critical question here is, did the defendant act reasonably, and did the defendant have reason to understand that there was some clearly established constitutional right here. By all appearances, at that point in time, and this is late 2022, after she responded

that she had nothing further to provide, at that point --

THE COURT: Let's go back. I'm just looking at the complaint. There's alleged here, after what you said that she says, "I have the evidence," then she alleges that she provided a statement from one of the students corroborating what she was saying.

MR. ROYALL: Yes, I think her allegations, read fairly, indicate that she never revealed the existence of that statement to anyone until it was disclosed by the political blogger, Walter Curt, in August of 2025. There's no allegation in the complaint that she disclosed that information to anyone. She procured it.

THE COURT: All right.

MR. ROYALL: And that's actually an important fact, because her allegations establish that she had that statement in her possession before she met with Defendant Lehman.

So getting back to what I was saying, he asked for whatever information she had. She had in her possession at that time the statement that she had procured from the student, and also an audio recording, according to her allegations, of the uncle or relative of that student, which she claimed to be supportive.

By all appearances, at this point in time, when she failed to come forward with any further information, these appeared to be unsubstantiated retaliatory accusations by a

resentful teacher who had a known tendency to be very defensive whenever she was questioned about her own conduct. And Defendant Lehman acted reasonably, both in, once he understood the nature of the allegations, promptly investigating them, and then closing that investigation, given that there was a complete lack of any supporting evidence.

Now, again, that was late 2022, and it ended there. The investigation was closed with no proof or support of this. There was nothing further for Defendant Lehman to do. Two and a half years then passed, and during that time period, roughly two and a half years, nothing new was raised.

Now, throughout that intervening time period plaintiff continued to involve herself in personal student affairs, raising concerns within the school. There were other questions about her providing pregnancy tests to yet other students. There were issues raised about her giving students rides in her car, which, again, is a violation of school rules. Plaintiff even admits and pleads herself in her complaint that she agreed to title a student's car and insure that car in her own name. Again, a violation of school rules.

Now, she was rightly questioned by school administrators for these various types of actions, and she was subject to at least some limited discipline where appropriate. But all of those incidents, the discipline that I'm referring to, the questions, were totally unrelated, had no linkage to or

temporal nexus with her 2022 abortion allegations. These inquiries and questions and the one-day suspension that she refers to were all related to unrelated conduct or suspected conduct by her. But the 2022 abortion allegations had long since been determined to lack credible support, and she came forward with no new information.

In 2025, in January, March, and May, according to her pleadings, in the context of unrelated inquiries about her conduct, she briefly alluded, again, to her previous unsupported or unsubstantiated abortion allegations. But she added no facts, she didn't reveal any evidence. So in these interactions in January, March, and May with school representatives, there was nothing new to suggest that there was any merit or any credibility or support for these allegations, or that there was anything other than the unsupported allegations that had been the subject of a brief investigation that closed in 2022.

Now, by the spring of 2025, according to her own allegations, plaintiff's tensions with school administrators had reached a boiling point. She felt her job was at risk. She pleads that. And by her own admission in her allegations, she was emotionally distressed. And she decided in that time period, it appears, that she would strike back.

It was then or soon after that plaintiff decided to go public with information that she had been privately concealing for years. Getting back to your question, this information

included purported recordings and written statements from a student and a student's relative obtained way back in November 2022, before she met with Defendant Lehman and before telling Defendant Lehman that she had no evidence to report.

In early August 2025 --

THE COURT: Where is her statement that she had no evidence to report? Is this in emails that were contemporaneous that are not specifically referenced in the complaint?

MR. ROYALL: Exhibit F, Your Honor. Again --

THE COURT: These are emails that -- but that's not referenced in the complaint. But your view is that it's integral to the complaint?

MR. ROYALL: Yes, our view is that it's incorporated by reference to her pleadings, and we submitted it before the Court.

THE COURT: All right.

MR. ROYALL: So in this time period, August 2025, plaintiff, she didn't herself publish it, but she cooperated closely with a political blogger, Walter Curt, in unleashing what can be fairly be described as a verbal assault on Mrs. Diaz, on Defendant Lehman, and on the senior leadership of Fairfax County Public Schools. The story that he published with her cooperation included documents and images of documents that she claimed to be her evidence that had never before been revealed. In that story she accused Diaz of criminal acts, she

accused Defendant Lehman of a cover-up, and she accused FCPS of doing nothing to address what she claimed was a known problem involving what plaintiff and her social media collaborator began to term as abortion trafficking. "Student abortion trafficking" was the terminology. Naturally, or unsurprisingly, that sparked government investigations, and it prompted FCPS to hire outside legal counsel.

Now, in responding to those government investigations, which included a United States Senate committee investigation, a U.S. Department of Education investigation, and a Virginia state police investigation, but in responding to those investigations, FCPS discovered nothing to suggest that there was any truth to these allegations.

But FCPS also discovered something else: Multiple apparent forms of impropriety by the plaintiff herself, creating serious concerns about violations of school rules or school division rules, and possibly violations of state and federal law. And this is not limited to, but it included concerns based on substantial proof that she had manipulated and falsified evidence.

Now, as FCPS turned its attention to investigating now -- I mean, thoroughly investigated, although not fully completed its investigation of the student abortion allegations, FCPS was turning its attention to investigation the plaintiff and her potential misconduct, violations of school rules, and

potentially state or federal laws.

Plaintiff, at that time, through her lawyers, refused to cooperate any further. She had scheduled an interview and refused to go forward with that interview - again, her pleadings acknowledge this - and that raised yet another concern on the part of FCPS, which was employee insubordination. It's a violation of school rules to refuse to cooperate and respond to inquiries from school administrators relating to one's own conduct.

Per standard protocols, the natural next step at that point, when there was substantial evidence that this teacher had committed multiple violations of school rules, the natural next step was to place her on administrative leave while she was investigated for those violations, or suspected violations --

THE COURT: When was that? When was she placed on administrative leave?

MR. ROYALL: October 20th of 2025.

THE COURT: October 8th -- oh, the 20th.

MR. ROYALL: And I would note that that action is the same action that was taken against the individuals who she accused of wrongful conduct. Mrs. Diaz, Defendant Lehman, and another school administrator were promptly placed on administrative leave back in August of 2025, when her allegations were published through Mr. Curt's blog post.

THE COURT: Are they still on administrative leave?

MR. ROYALL: They have been released from administrative leave. I will say that sadly, and unfortunately, Mrs. Diaz, who has been traumatized by being falsely and publicly accused of criminal conduct, has not felt comfortable yet to return to the school even though she's been released from administrative leave.

Now, as FCPS was preparing -- putting someone on administrative leave needs to be carefully done, it needs to be well documented. It involves lawyers, but it also involves HR personnel. So as that was being assembled to place her on administrative leave, it was announced that Mrs. Perez would be the featured speaker in a webinar hosted by her new allies, Americans United For Life, which they announced would occur on October 20th, a webinar that included other speakers and that was titled, "Coerced Abortions;" a webinar that, as I mentioned or may have mentioned, was held on October 20th and was timed, I think it's fair to say, to coincide with the closely contested Virginia elections the following week.

Not wanting to have its own private personnel actions be a prime topic for discussion in a webinar on these issues, FCPS felt the prudent thing would be to wait until shortly after the October 20th webinar to give her notice that she was being placed on administrative leave, which was done through a letter sent by FCPS's head of employee relations within an hour after the webinar concluded that evening on October 20th. And it was

eight days later that the plaintiff filed this lawsuit.

And what you have before you today, Your Honor, is plaintiff's third attempt to plead her claims. She initially filed in state court; that claim was removed. We consented to plaintiff amending her complaint yet again here in federal court, and in connection with that she had an opportunity to see defendants' motion-to-dismiss arguments. She made amendments in direct response to those motion-to-dismiss arguments, and now you have before you the third complaint, the second amended complaint, and we're asking the Court to dismiss with prejudice.

Now, turning to the Section 1983 claims, this is Count V in the complaint, and Count V encompasses her federal constitutional free speech claims. And we believe that these claims can and should be dismissed on three grounds.

The first ground is that we believe -- and I'll acknowledge, and I'll be happy to discuss with you, I believe that this is a close question. But we believe that under these difficult circumstances -- and this has to be analyzed on a case-by-case basis. There is no bright line rule. But under these circumstances, we believe that the speech that she is asserting to be protected here did not concern -- did not involve matters of public concern.

It is, as I'll be happy to address further, a very close question.

THE COURT: I understand.

MR. ROYALL: Secondly, even if you were to determine that her speech did involve matters of public concern, we think it is extremely clear that these claims should be dismissed because the defendants are entitled to qualified immunity. And I would be happy to address that further, too, but the basic point is that all of the actions that she challenges by the defendants were reasonable under the circumstances, given what they were confronted with, given the circumstances of her conduct and her statements, and the context in which they arose.

And finally, the school board and the defendants, insofar as they're being sued because of actions taken within the scope of their official duties, are entitled to so-called *Monnell* immunity, that is, the plaintiff did not plead, has not pled, a viable *Monnell* claim, she has not challenged or clearly challenged any official policy, and the Court should not be - and there's case law to suggest the Court will not - surmise a basis for *Monnell* liability when it's not clearly pleaded. And there is no such clear allegation.

Now, I think the key issue here -- the key issues I start with are, is this a matter of public concern, are her statements a matter of public concern, and is there qualified immunity. I've struggled myself with the first question. Because there is quite a bit of case law that suggests that when issues arise in the context of an internal employment-related dispute and have the appearance of being grievances relating to

internal employment differences; in this case a complaint, or I think an admitted retaliatory complaint against someone who plaintiff accuses of having set her up for false allegations of having purchased a pregnancy test and violated school rules by purchasing a pregnancy test for students, that's the context in which this arose. And the nature of the statements that were initially made suggest that this was done in a way to respond directly to what she viewed as false claims made by a coworker. And the case law suggests that when you have issues that amount to personal grievances in the employment context, that that does not rise to a constitutional level.

Now, it is more complicated here because of the content and the nature of what's being alleged. She was alleging that not only had a coworker done these improper -- highly improper, if proven, things, and, in fact, arguably criminal things, if ever proven. But she was alleging this, implicating broader questions of a policy relating to school districts potentially using state funds or taxpayer dollars to pay for student abortions.

This never entered the public domain until early August of 2025. And I would submit that if this ever crossed the line to become a matter of public concern, it was not until then.

Prior to that time, as I said, the only activity that had occurred is, these claims had been made back in November of 2022, the first mention of an alleged school-facilitated

abortion, there was no evidence that was presented to support that, it was in the context of responding to claims that were -- or assertions against the plaintiff herself, and it didn't go any further than that. If it ever crossed the line, again, to become a matter of public concern, it was not prior to August of 2025.

If the Court were to determine that because this ultimately did become an issue that was very much in the public eyesight and the subject of investigations, that it was a matter of public concern, I would still submit that the law in this case compels dismissal of these claims on qualified immunity grounds.

And we've cited a number of cases, but the case that I would urge Your Honor to pay closest attention to is a Fourth Circuit decision, *Campbell vs. Galloway*, from 2007. And *Campbell vs. Galloway*, I believe it is highly analogous. It involves a police officer who was fired, a police officer who had made complaints, and those complaints were made in a 13-page memo that included many different allegations, and there was a shred within those many allegations that suggested that there was some broader departmental issue of sexual harassment.

The Court looked at this, and looked at it very closely, and ultimately determined that if you were to view the complaint in the light most favorable to the complainant, that it would need to be acknowledged that she at least in part

raised issues of public concern. And those issues were, again, concerns about a departmental pattern of sexual harassment.

The Court then went further, though, and said that even if Campbell's complaints were matters of public concern, they are entitled to qualified immunity because the existing case law did not clearly establish that the kind of complaints that she made, that Campbell made, were matters of public concern.

This case goes on to explain that the qualified immunity doctrine is designed to deal with these types -- very types of distinctions. In order to be found liable and subject to civil liability for one's official actions in a context like this, it needs to be extremely clear that the individual, the defendant, would have clear notice that a clear constitutional right was being implicated by the actions of the complainant. And that simply does not exist in gray areas where we are left to guess about the nature of the speech that's at issue, and whether that speech implicates some clear constitutional right.

In *Campbell vs. Galloway,* the Court went on to say -- well, I should say, the plaintiff there made exactly the same claim that plaintiff makes here, which is that the clear constitutional right that she claimed was being violated was a right not to be retaliated against or to suffer some adverse employment consequence because of expressing her First Amendment rights. That is exactly what plaintiff says here.

THE COURT: Right.

MR. ROYALL: The Court said, we can't operate on that basis. That is far too broad. And the Court said -- the Fourth Circuit said, our focus must be narrower. You can't focus a claim like this on such a high level of particularity. The Court said that when the right is defined at the proper level of particularity and the analysis is directed at what is disputed in this case, the question becomes clear that the officers in this case acted reasonably, and that there was not a clear right that they would have known -- that a reasonable officer would have known -- that Campbell's memo, the memo I mentioned, which the Court refers to as a rambling 13-page memo to her superiors, a reasonable officer would not have known that that was raising clearly established First Amendment rights that were subject to protection.

The Court goes on to say that officials are not liable for bad guesses in gray areas, they are liable only for transgressing bright lines. And the Court again had a fact-specific analysis of these circumstances, and said that this is all a gray area.

The fact that it was such a close call whether this involved matters of public concern, it all pretty much dictated the outcome of the qualified immunity question. And I would submit that that's the same situation that we have here.

THE COURT: Aren't there two pieces to this? One is whether the speech constituted speech about public concerns, and

whether that was clearly established; and secondly, even if it were, whether the conduct that they claim violated that right was -- that a reasonable person would understand --

MR. ROYALL: Yes.

THE COURT: -- that that conduct violated that constitutional right or somehow compromised that constitutional right.

MR. ROYALL: Yes, that's exactly right. And that's why I wanted to go through the facts that I started with, which is the manner -- the specific context, the manner in which this was raised, the nature of the claims. Her original claims were, I think fair to say, not coherent. Her original May 2022 allegation didn't even refer to abortion at all. It was not understood. She even says this.

In November 2022, she came back and met with Defendant Lehman; she did use the term "abortion" then. It was understood that she was making a serious allegation, but it was arising at that point without any factual support, no corroboration, and again in the context of her responding to accusations that had been made against her, that she clearly resented.

And it was -- a reasonable school administrator in these circumstances would not have clearly understood or have reason to clearly understand that she was raising, through the allegations that she made, the unsupported allegations that she

made, a matter of public concern that implicated a clearly established constitutional right. It came across at the time as a speculative, farfetched, unsupported allegation against a coworker in a situation where she was motivated to make claims against the coworker because she resented the coworker for having, quoting her complaint, "set her up" for other alleged violations of school rules.

In these gray area situations, this is a unique fact-specific situation, but one in which there was no corroboration, no clear signal that this was a matter that raised a clear constitutional right, it was reasonable for the school administrators to act in the way they did.

And by the way, they did act reasonably. They investigated this, as I said; they asked others who would be in a position to know if there were any facts to support this; reported that back to plaintiff; she said she had nothing further, and the matter was closed.

If you then flash forward to August of 2025 -- now, at this point she's blown the whole thing open. She had been concealing this evidence for years, the purported audio recording of the student's relative, and she's now laying all of this out. But there's nothing that occurred after that that was a form of retaliation, and nothing that suggests that they acted unreasonably at that point either. The clearest thing that she alleges is that she was ultimately placed on administrative

leave. But Your Honor, the case law says that administrative leave cannot be considered to be an adverse employment decision, and cannot be the subject of a retaliation claim.

But I think this qualified privilege issue, again, as laid out most clearly, I believe, in terms of factually analogous circumstances in *Campbell vs. Galloway*, it is reason alone to dismiss this claim.

THE COURT: All right.

MR. ROYALL: The *Monnell* issue as well is very clearcut. They have not pled any *Monnell* theory. They attempt, through their opposition, to supplement their pleadings and to make claims to try to latch on to some type of allegation that might support *Monnell* liability, but that's not enough. They've had three opportunities to amend their complaint, they haven't pled that there was any clear school policy here that could support *Monnell* liability, and so we believe on that ground as well that the claim should be dismissed.

THE COURT: All right. Thank you.

Good morning.

MR. ADEN: Good morning, Your Honor.

THE COURT: Just as a preliminary matter, what's your position on what the Court can consider by way of email exchanges that are not specifically referenced in the complaint but are contemporaneous and related to what's alleged in the complaint?

MR. ADEN: Your Honor, we think it's all out of court. As Your Honor is aware, the Court can only consider documents with regard to a 12(b) motion for dismissal that are either referred to and incorporated into the complaint - in which case, you know, the plaintiff is deemed to have relied on them; that's clearly not the case here - and they must be taken as true. The authenticity of the documents has to be regarded as true, and all of the statements in documents noticed under Rule 201 have to be assumed true.

But here we have literally, in all of these exhibits to Mr. Fields' declaration - the Senate Health submissions, the USDOE submissions - these are massive uncorroborated hearsay statements that the defendants want to shoehorn into the Court's consideration of the complaint.

As the Court knows --

THE COURT: Aren't they part and parcel of the whole timeline that you've laid out in the exchange between the parties that are referenced as the basis for the claim?

MR. ADEN: Your Honor, the complaint is detailed. And as Your Honor knows, under the *Iqbal-Twombly* standard, the Court has to consider the allegations of the complaint in the light most favorable to -- as true, rather. As true, as stated in the complaint.

I do not believe that the attempt to shoehorn all of these documents, all of these out-of-court statements, into the

complaint on this motion is appropriate. That's *Zak vs. Chelsea*, Your Honor, 780 F.3d 597, Fourth Circuit, warning not to consider documents that are outside the pleading. And as you know, Your Honor, Rule 201 is the only avenue through which it could be done. But plaintiff did not rely on or incorporate the October 16th submission to Senate Health, or letters or the appendices, they were not integral to the complaint, and for that reason, the Court should not consider that. The Court should confine itself to the four corners of the complaint.

Your Honor, may I, as Mr. Royall did, continue with the facts of the case, briefly?

THE COURT: Yes, please. Hold on one moment, though.

MR. ADEN: Yes.

THE COURT: All right. Please.

MR. ADEN: Thank you, Your Honor.

Your Honor, as I said in our opposition papers, the recitation of facts that defendants present to the Court really don't bear much relation to the facts as stated by the plaintiff in the complaint. The plaintiff does not state that she was under the allegations of providing a pregnancy test, the claims were not retaliatory. She in fact did not say she had nothing further to Mr. Lehman. If you look at Paragraph 17 of the complaint, what she actually said -- I'll pull that up for the Court.

THE COURT: I see it.

MR. ADEN: Thank you, Your Honor. I apologize. Just a moment.

She did respond. She did not say, "I have nothing further," she said, in a responsive email to Mr. Lehman, "In reference to Doe Number 1's abortion" - and, as you recall, she had the statement by then - "which was facilitated by Ms. Carolina Diaz, I have all the pertinent information about the case. Doe Number 1 told me that the school counselor was not aware of that situation. Evidently Mrs. Diaz is not going to agree, and, as usual, she will lie. I do have the evidence to prove I'm right."

So whether Mr. Lehman's response took him just a few minutes, as we think it did, or it took him a day, depending on the chronology - which, of course, is a question of fact - the point is, that was not enough time to investigate such a serious claim.

THE COURT: Well, according to the complaint, this started on May 5, when she was responding to allegations against her --

MR. ADEN: Yeah.

THE COURT: -- and then that carried over until June of 2022. And then nothing really happens until six months later, in November 2022. And then -- at least in terms of her interaction with the school. Then the next involvement I read

about is three years later, when she provides the statement to the journalist in August 2025. Is that accurate?

MR. ADEN: Two and a quarter years later is the chronology --

THE COURT: All right.

MR. ADEN: -- between November -- I'm sorry, Your Honor?

THE COURT: Yeah, November 19, 2022 and August of 2025.

MR. ADEN: November, and the next is the January 16th email to the journalist which was forwarded to Mr. Healey. This is Paragraph 12 of the second amended complaint, the May 5th verbal to Parker and Wenzel --

THE COURT: Right.

MR. ADEN: -- and the May 13th email to Parker and Lehman.

THE COURT: Right.

MR. ADEN: Paragraph 14, the June 9th email to Mr. Lehman.

THE COURT: Right.

MR. ADEN: Paragraph 15, the November 22nd meeting.

THE COURT: Right. That's six months later.

MR. ADEN: And, of course, between those two events, the statement from Doe Number 2. Paragraph 16 --

THE COURT: And there's no allegation that was passed on to the defendants?

MR. ADEN: That is my understanding, Your Honor.

Paragraph 16, re-forwarded the May 13th, 2022 email to Mr. Lehman again to Mr. Lehman; Paragraph 17, she was -- as I mentioned, she affirmed she was right and she had the evidence.

THE COURT: Right.

MR. ADEN: Paragraph -- if the Court will be patient with me, thank you. Paragraph 37, let me finish through this chronology. I do think it's important. January 16, 2025, she emailed to a journalist the essence of her allegation.

THE COURT: Right. That's the nearly three years later. Correct?

MR. ADEN: That's what, Your Honor?

THE COURT: Nearly three years later.

MR. ADEN: Two and a quarter. My math is not great, but that's what I got.

THE COURT: From November 2022 to August of 2025?

MR. ADEN: Yes, Your Honor. But the critical assessment for the Court is not the gap in the time between reports, between multiple reports, but what does the complaint allege happened to her in that gap. And, Your Honor, there are numerous allegations of retaliations and defamatory statements made against her in retaliation in that time period.

So that time period, a lot happens in the second amended complaint, obviously, and she pleads that it was as a result of her making this report to her superiors. March 7,

2025, the McGuireWoods interview, Paragraph 46. Paragraph 53, the May 2nd interview with James Mackie of the Office of Employment Relations. This is Exhibit N to the Fields declaration.

THE COURT: These are all in 2025. Is that right?

MR. ADEN: Yeah. And, Your Honor, you've seen the transcript of this interview. She goes on for most of two pages in extensive detail about her allegations regarding the abortion facilitation. Finally, the interview of Mary McGowan, counsel for Fairfax County Public Schools, August 11, 2025.

So there's a lot in the complaint, but much of what Mr. Royall said about the background is not in the complaint. In fact, in the complaint she alleges she had an excellent record, an excellent reputation as a teacher, that she had good performance reviews, and that there was nothing damaging on her record until she raised these allegations, until the retaliatory and defamatory statements came back against her. It was not to strike back. That phrase is not in the complaint, that's Mr. Royall's phrase.

And, Your Honor, with respect to my friend on the other side of the court, I really have to take issue on the record with his statement that the timing of her statement on October 20th to the public in an Americans United for Life podcast had anything do with the Virginia election coming up. It did not. As the Court would appreciate, that would be a

violation of Internal Revenue Code 501(c)(3) rules related to participating in an election.

And so I have to vigorously deny that assessment. There's nothing in the record that even comes close to suggesting there was a coordination there.

So, Your Honor, finally, with regard to the facts, and then, if you want, I'll go into the Section 1983 claim also, Mr. Royall notes that when an employee is placed on administrative leave, it is carefully done, it is well documented. That was true, undoubtedly, of the original decision to place on leave Mr. Parker, Mr. Lehman, Ms. Diaz. That was done to investigate allegations of criminal wrongdoing -- I'm sorry, of either criminal wrongdoing or violations of the school rules.

So if there was a two-and-a-quarter-year gap, why, then -- when these same allegations plus more evidence became public in August, why, then, did Fairfax County Public Schools deem that important to carefully document the possibility of wrongdoing on the part of Lehman, Parker, and Diaz, if there was nothing to it and they had already dismissed it? Clearly they thought there was possibly something to it. There was credibility to it.

That is all that plaintiff's claim requires. She made a credible report. As a matter of fact, Fairfax County seemed to agree because it put three administrators on administrative

leave as a result of her allegations, which Mr. Royall said had all been taken care, had all been done with, had all been closed. That doesn't seem to play, Your Honor, and I think we're entitled to discovery on that question.

THE COURT: Can the Court consider any of that? None of that is pled in the complaint.

MR. ADEN: I do not believe, Your Honor, that the -- yeah?

THE COURT: Is that integral to the complaint?

MR. ADEN: The fact that they placed him on administrative --

THE COURT: -- placed on --

MR. ADEN: You have Mr. Royall's offer to the Court on that. I'm happy to stand on that.

THE COURT: All right.

MR. ADEN: That is my understanding. It is consistent with my understanding. It is also consistent that Ms. Diaz is no longer employed by Fairfax County Public Schools. We don't know why. We think we're entitled to discovery on that question. Was she fired? Maybe. It seems odd that she was placed on administrative leave as a result of these allegations and then suddenly she's not employed by Fairfax County.

THE COURT: I didn't understand that she had been fired. But anyway...

MR. ADEN: Thank you, Your Honor. I don't know that

she was fired. I apologize if I misstated. I meant to state that as a question.

THE COURT: All right.

MR. ADEN: Yeah. But I think we're entitled to discovery on that question to see if she was in fact fired for misconduct.

So, Your Honor, going to the -- let me review my outline, if you don't mind, and make sure I've made the points I would like to make about the facts before I dive into Section 1983.

So, Your Honor, they claim that Mr. Lehman promptly investigated the matter. Actually, he either ignored or forgot about it or he didn't see it for six months, until November of 2022, and then he took at most less than a day to decide there was nothing to it.

They claim, defendants do, that plaintiff's public charges in August 2025 were a total surprise to them. They didn't know about her abortion allegations, despite reports about the abortion assistance to Fairfax County's OER office and two outside law firms before the public airing. Is that true? Did they know or not? I think we're entitled to discovery on that.

Thankfully, I've covered some of my outline already.

With regard to the Senate, Department of Education, and the Virginia State Police investigations, I appreciate

Mr. Royall's consideration that perhaps it was a close call, but these are clearly a matter of public interest. Two federal investigations and a Virginia criminal investigation, if that's not a matter of public interest, really, Your Honor, I don't know what is.

Superintendent Reid, with the final -- so-called final report of allegations that the plaintiff lied and fabricated witness statements published to the whole world, she published under her press release in a link to the whole world, a fact that defendants not only acknowledge, but they provide the statement and the link in their response. And now they claim it was not a matter of public interest. If it wasn't a matter of public interest, why did they give the whole world their response?

Finally, with respect to the school rules, Exhibit K to Mr. Fields' declaration - this is Document 37-11 - Fairfax County's guidance and standards, if you review them, on the face of them actually say that it's not a violation to transport a student. There are exceptions for emergencies or unusual circumstances. It's only a violation to do so without administrator approval. Were others given approval and not her? I think we're entitled to discovery on that.

Also, it's not a violation, in fact, to provide financial support to a student's family so he can attend school, which is what Mrs. Perez did; only to do so without advance

approval in emergencies or special circumstances, such as helping a student in financial need. So they do actually allow teachers to do what she did, they just say that you can't do it without administrator approval.

Finally, Your Honor, on Exhibit K, Section VI-H, I think it is, Fairfax County personnel are put on notice that they're required to report suspected misconduct or abuse on the part of other staff, and, in fact, that retaliation by any employee for doing so is prohibited. There's a whistleblower provision right in the Fairfax County rules. These rules can only be authoritatively construed by a policy-making official in a Rule 30(b)(6) deposition, and we think we're entitled to discovery on that question.

So, Your Honor, if you don't mind, I will turn to the Section 1983 claim. Your Honor, in brief, I think it's evident that a jury could plausibly find that defendants acted under color of their authority as Fairfax County officials to violate plaintiff's First Amendment rights, the deprivation to which 1983 provides a remedy. When a government employee claims unlawful retaliation in violation of alleged protected speech activity under the First Amendment, the *Pickering-Garcetti* framework applies.

Plaintiff has to allege that she was speaking as a citizen on a matter of public concern. We have covered that. Mr. Royall suggests that there is an important distinction

between the private allegations before August of 2025 and the public ones after that. But there is not in Supreme Court case law.

If you look at the case of *Givhan* in the U.S. Supreme Court, that was a case where the U.S. Supreme Court said it was a matter of public concern, even though in *Givhan* it was completely within the walls of the school. This was a staffer who walked into her superior's office and said there was discrimination going on in the school, and that was held to be a matter of public concern. Even though it wasn't aired publicly, it received First Amendment protection.

Where speech is intended to expose wrongdoing rather than to advance a purely private interest, it doesn't matter whether it was internal or external. It is protected under the *Pickering-Garcetti* rule.

THE COURT: Let's assume for a moment, even assuming -- let's assume that the evidence, at least as alleged here, is sufficient to establish that she was speaking on a matter of public concern, and that it was a constitutional right to do so. Let's assume it's even a clear constitutional right. What evidence are you relying on for the purposes of establishing that the defendants engaged in a knowing violation of her right to speak about public matters?

MR. ADEN: We believe that is fairly clear-cut, Your Honor --

THE COURT: Because there's no evidence that she withheld speaking in any fashion as a result of anything these defendants did, is there?

MR. ADEN: I'm sorry, that she what, Your Honor?

THE COURT: That she refrained from speaking on matters of public concern as a result of anything that these defendants were doing.

MR. ADEN: Your Honor, this is not a case alleging that she refrained from speaking, this is a case alleging that she engaged in speech --

THE COURT: Yes.

MR. ADEN: -- and that she was retaliated against for it.

THE COURT: Well, that's what I'm asking. What is the conduct that you're relying on that establishes that by engaging in whatever you're relying on constituted a knowing violation of her right to speak about matters of public concern?

MR. ADEN: Your Honor, we believe that it was quite clear, should have been, to personnel administrators at Centreville High School that subjecting plaintiff to retaliation for making a good faith report was a well established right, and that they could not do it.

The First Amendment article on Section 12 of the Virginia Constitution says no retaliation of Virginia statutes, Counts I and II. The case law was *Vlaming* case in 2024, no

retaliation allowed for expressing First Amendment speech.

And then finally, the Fairfax County policies that I covered a few minutes ago say that there can be no retaliation for reporting.

THE COURT: And what is the retaliation?

MR. ADEN: Your Honor, the retaliation is listed in our memorandum in opposition. And I want to refer to all of the adverse events that followed her disclosure of her allegations.

THE COURT: I understand one claim is placing her on administrative leave. Correct?

MR. ADEN: Yes, Your Honor.

THE COURT: Okay. What else?

MR. ADEN: Forgive me. These are all referred to in the complaint. Essentially, Your Honor, we're relying on all acts and defamatory speech against her from and after May of 2022. We believe that all of that was in retaliation, and singling her out because she was considered a problem, as she was pointing out illegal activity on the part of Centreville High School personnel.

THE COURT: All right.

MR. ADEN: So it's listed by paragraph in the complaint in Counts I and II, Your Honor.

THE COURT: All right.

MR. ADEN: And finally, Your Honor, with regard to Section 1983, they're not entitled to qualified immunity because

a reasonable person would have known that they could not retaliate against her. As I mentioned, federal and state constitutional authority, the two Virginia whistleblower statutes say this; Fairfax County's own policies say no retaliation can be taken. So it is a very well established fact.

With respect to *Monnell* liability, Your Honor, the second amended complaint, Paragraph 123, alleges that, "The actions of defendants reflected an unconstitutional policy or custom to retaliate against, harass, intimidate, and silence employees who report internally or speak out publicly against unlawful conduct engaged in by other Fairfax County employees."

The authority that we cited to the Second Circuit -- I could not find any in the Fourth Circuit, but the Second Circuit says in *Lee vs. Syracuse*, 446 Fed Appendix 319, that a complaint that alleges a policy or custom of systemic retaliation against whistle-blowing employees on the part of a defendant municipality is sufficiently pled.

So we think that is sufficient pleading --

THE COURT: Well, are there any factual -- is there any factual support in the complaint for that beyond the allegations pertaining to the interactions between these defendants and the plaintiff?

MR. ADEN: Not beyond the plaintiff's own situation and the facts that go to it, Your Honor.

THE COURT: All right.

MR. ADEN: I would point out, Your Honor, also, that a failure-to-train theory is viable here because they had a policy -- they had a policy that reporting was required, and no retaliation could be taken against an employee for reporting. And clearly, after that, numerous acts, numerous defamatory statements happened that the plaintiff alleges were the result of retaliation against her. So there was an obvious lack of training, so inadequate that it was apparent, and the city consequently can be held liable for it.

Finally, Your Honor, we allege that Superintendent Reid is a policy-making official, and that she made policy with respect to retaliation and with respect to the plaintiff, and that the county, as a result, had to be deemed to have ratified and acquiesced in the unconstitutional actions. And we cited case law, including *Kirby* and *City of St. Louis vs. Prapotnik*.

Your Honor, as you would recall, you ruled in the *McCaffrey* case that a deputy sheriff was -- and I may have to give this to your clerk, because it may take a minute or few to find it. But you ruled that a deputy sheriff was a policy-making employee. That was a different context. That was for the purpose of determining whether he could be fired as a political appointee, but I think the principle is the same. If a deputy sheriff, deputy county sheriff, is a policymaker, then I think clearly Superintendent Reid is.

Your Honor, do you have any questions?

THE COURT: I don't. Thank you.

MR. ADEN: I'll provide that *McCaffrey* cite for you, Your Honor. I'm sure you remember the case.

THE COURT: All right. Thank you.

Mr. Royall, I'll give you the last word on this.

MR. ROYALL: Yes, thank you, Your Honor. Just a few points.

Starting with the public concern question, Your Honor, the Section 1983 question, as I said before, I would acknowledge that there may be some point where this did cross the line to become an issue of public concern. I think it's a very close question because of the inherent employment dispute nature of this, and there's a lot of case law suggesting that grievances raised in the employment context don't rise to a constitutional level, and that there would be policy concerns with allowing that. But in this case, the plaintiff was making allegations about school policy around disturbing allegations that ultimately did spill out into the public forum and lead to investigations.

And so this may have crossed the line at some point to becoming an issue of public concern, but if it did, that did not occur, I submit, until August of 2025. Because prior to that time, no evidence had been offered to support this. Nothing suggested that this was anything more than an unsubstantiated

claim that was raised in a context in which it at least suggests that it was raised for a retaliatory motive.

But even if this were true, that this did become a matter of public concern at some point, that is exactly the situation where qualified immunity kicks in. And again, I would submit that the *Campbell vs. Galloway* case from the Fourth Circuit is really very closely on point here.

Now, you asked a question about the Court's ability to consider materials that have been incorporated by reference. One thing that I would note -- and I know, Your Honor, that you've addressed this issue in the defamation context in prior decisions, but, as you know, courts are permitted to consider materials in a 12(b)(6) context that were incorporated by reference by the complaint. And we submit that everything that we have lodged with the Court qualifies, including the submissions to the United States Senate committee, the two reports that were shared.

And I believe that you have said in *New York Public Radio* and perhaps other decisions that it may be particularly important in the defamation context, where the plaintiff's claim appears to be based on statements and publications that are outside the record but are referenced in the complaint, for the Court to consider those materials and to take notice of them. And that's what we've asked. The Senate committee reports that we've referenced are incorporated by reference in the

complaint's specific allegations, and we believe it's appropriate for you to consider them.

I think the only limitation is that when you consider materials of that nature that are incorporated by reference, you generally assume the truth. That's *Fairfax vs. CBS Broadcasting*, that such extrinsic materials, that generally the Court is to assume the truth of them except to the extent that they conflict with specific allegations in the complaint.

And I would submit that there's nothing that we have shared with Your Honor and lodged with the Court and asked for you to consider as incorporated by reference that contradicts the complaint. We would submit that these materials merely supplement and add clarity to the complaint's allegations.

Now, you had asked a question -- some questions about, is there a clear allegation that plaintiff declined to provide information to Defendant Lehman. I think that the Court can infer that from the allegations. There's a clear allegation about procuring statements in November 2022; there's also a clear allegation that the defendant was asked by -- or that the plaintiff was asked by Defendant Lehman to provide any supporting information. There's no allegation that she did provide that information, and then there is later a clear allegation that that information was published in the August 2025 blog posting. I think the Court can infer from these allegations that this information was not shared with the

school, and it was not made public or otherwise shared until she shared it with Mr. Curt for his publication in August of 2025.

And again, that timeline -- if the Court does take notice of and consider the Senate submissions, these facts are laid out in great detail in the timeline that's discussed in those Senate submissions. But even if the Court doesn't consider that, I believe it can be reasonably inferred from the complaint and the chronology that that information was never shared with the school division prior to it being published in August of 2025.

I may have said in my earlier argument that the complaint pled that plaintiff alleged that Mrs. Diaz set her up for the pregnancy test inquiry. I'm not sure that is in the complaint. What is in the complaint, and it's in Paragraph 12, is a clear allegation by plaintiff that she made her student abortion allegations in response to the pregnancy test issue. That is again in Paragraph 12.

And I do think that it's fair to infer from the facts that are pled that she raised this in a responsive, and, I would submit, retaliatory manner, having herself felt that she had been wrongfully accused of violating school rules, and desiring to draw attention to her colleague, Mrs. Diaz, and suggesting that she had done something far more serious.

With respect to Mrs. Diaz, I did not say that Mrs. Diaz is no longer employed by FCPS. She is employed by FCPS. What I

stated to the Court earlier is that she's no longer on administrative leave, but unfortunately, given the trauma of what she's been put through because of being falsely accused of such serious allegations, she is not prepared at this point in time to return to the school.

And I would just note, just for context, Your Honor, that we take that aspect of this very seriously. And I know that you will rule based on the law and the arguments and your interpretation of what's right to do in terms of following the law, but we do very much hope that this matter can be brought to a close in part because of the trauma it's caused unfairly and unnecessarily and unjustifiably to Mrs. Diaz.

Now, on Section 1983, just to return to that, Mr. Aden argued that this is a matter of public concern. As I've already said, if it did become a matter of public concern, that doesn't change the fact that qualified immunity applies here under *Campbell vs. Galloway*.

You asked -- speaking of qualified immunity, you asked Mr. Aden why it was clear, why it was so clear, very clear, that the public officials here, the student administrators, would have been placed on clear notice that a constitutional right was being implicated here. And his answer, which I thought was telling, is exactly what the Court in the *Campbell vs. Galloway* case rejected.

I understood Mr. Aden to say, as I said earlier, that

the clear right here was that you, one, shouldn't be subjected to retaliation or adverse employment consequences because of expressing their First Amendment rights. The Fourth Circuit said that is not of the right level of particularity, and that when one analyzes whether there's a clear right in the context very analogous to this, you have to probe deeper and you have to look at the factual circumstances.

In that case the Court said you have to ask the question whether someone would have been placed on reasonable notice that a 13-page rambling memo would have been raising constitutional issues. And I think in this case you would similarly ask whether one was put on notice because of what seemed to be a fairly incoherent, unsupported, unsubstantiated, and perhaps retaliatory claim of what seemed to be farfetched allegations about school funds being used to pay for student abortions, and asking, would you be placed on reasonable notice in those circumstances that a constitutional right was being implicated. And the *Campbell* case suggests that the answer to that question is no. And that just as in that case, I would submit that the actions that were taken here in response to the concerns that were raised were at all times reasonable.

Now, as for retaliation, one thing I would say is, the implication of this not becoming a matter of public concern any time before August 5th, if at all, suggests that if there's a retaliation here that would be cognizable, it would have to have

occurred after August 5th.

The only thing that plaintiff really alleges as a form of retaliation occurring after August 5th, 2025 is the administrative leave. And yet there is case law, clear case law in this circuit - I would refer you to *Lacasse vs. Didlake*, 194 F.Supp 3d.494, Eastern District of Virginia, 2016 - where the Court said that paid leave is not an adverse employment action. So I don't think that even if you were to credit that there's a matter of public concern here, that there's any cognizable retaliation following that that has been pled.

Now, finally, on *Monnell*, I think this matter is pretty clearcut and straightforward. There is no allegation in the complaint of any policy or custom that has been used or enforced here to violate any right of the plaintiff. And I understood Mr. Aden to admit that there are no allegations beyond the allegations that plaintiff herself -- that there were actions taken here that they're relying on for *Monnell*, other than actions related to plaintiff herself. And the law in the Fourth Circuit and elsewhere suggests that such circumstances will not support a *Monnell* claim.

Thank you, Your Honor. Nothing further.

THE COURT: Thank you. I want to thank all counsel for their argument. I'll take it under advisement and get a decision to you just as soon as I can.

All right. Thank you. Counsel are excused.

We're going to take a 15-minute recess before the last case.

(Off the record at 1:13 p.m.)

**CERTIFICATE OF OFFICIAL COURT REPORTER**

**I, Rebecca Stonestreet, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.**

**___//Rebecca Stonestreet//___ __8/4/26_____**

**SIGNATURE OF COURT REPORTER DATE**