No. 26-1736

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

ZENAIDA PEREZ,
*Plaintiff-Appellant*,

v.

FAIRFAX COUNTY SCHOOL BOARD, ET AL.
*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 1:25-cv-2126-AJT-IDD

# APPELLANT'S OPENING BRIEF

STEVEN H. ADEN
*Counsel of Record*
DANIELLE G. PIMENTEL
AMERICANS UNITED FOR LIFE
1150 Connecticut Ave., N.W., Ste. 500
Washington, DC 20036
(703) 638-9731
steven.aden@aul.org
danielle.pimentel@aul.org

MONIQUE A. MILES
OLD TOWNE ASSOCIATES, P.C.
201 N. Union Street, Ste. 110
Alexandria, Virginia 22314
(703) 519-6810
mmiles@oldtowneassociates.com

*Counsel for Plaintiff-Appellant*

**CORPORATE DISCLOSURE STATEMENT**

Plaintiff-Appellant Zenaida Perez is an individual citizen and Virginia resident. See Plaintiff-Appellant's Disclosure Statement filed herein June 23, 2026. Appeal No. 26-1736, Docket No. 15.

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ....................................................................... iv

STATEMENT OF JURISDICTION ............................................................... 1

STATEMENT OF ISSUES .......................................................................... 1

STATEMENT OF THE CASE ..................................................................... 2

SUMMARY OF ARGUMENT ...................................................................... 11

STANDARD OF REVIEW .......................................................................... 13

ARGUMENT ............................................................................................ 14

**I. THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFF-APPELLANT'S COUNT II BECAUSE SHE SUFFICIENTLY PLED CAUSATION UNDER VIRGINIA'S FAWBPA.** ........................................ 14

**II. THE DISTRICT COURT ERRED IN DISMISSING APPELLANT'S COUNT IV AND COUNT V BECAUSE PLAINTIFF-APPELLANT PLED SUFFICIENT FACTS TO SHOW THE DEFENDANTS VIOLATED A CLEARLY ESTABLISHED RIGHT.** ...................................... 25

**A. Plaintiff-Appellant's Reports About Illegal Abortion Activity Are Matters of Public Concern** ................................ 27

**B. Individual Defendants Violated Plaintiff-Appellant's Clearly Established Right to Speak on a Matter of Public Concern** .................................................................... 32

CONCLUSION ........................................................................................ 48

REQUEST FOR ORAL ARGUMENT ............................................................. 48

CERTIFICATE OF COMPLIANCE ........................................................................50

CERTIFICATE OF SERVICE..............................................................................51

# TABLE OF AUTHORITIES


**Constitutional Provisions**

U.S. Const. amend. I........................................................................................2, 12

Va. Const. art. I, § 12 .......................................................................................1, 12

**Statutes**

*Adams v. Trustees of the University of North Carolina-Wilmington,*
640 F.3d 550 (4th Cir. 2011)...........................................................28, 38, 39

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011).......................................................................................34

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).........................................................................3, 11, 13, 25

*Ballou v. McElvain*,
29 F.4th 413 (9th Cir. 2022) ..........................................................................29

*Barbour v. Garland*,
105 F.4th 579 (4th Cir. 2024) ......................................................17, 19, 22, 25

*Bell Atlantic Corporation v. Twombly*,
550 U.S. 544 (2007).......................................................................................24

*Bevill v. Fletcher*,
26 F.4th 270 (5th Cir. 2022) ..........................................................................40

*Blankenship v. Manchin*,
471 F.3d 523 (4th Cir. 2006)..........................................................................35

*Booker v. South Carolina Department of Corrections*,
855 F.3d 533 (4th Cir. 2017)..........................................................................33

*Brewster v. Board of Education*,
149 F.3d 971 (9th Cir. 1998)..........................................................................34

*Brooks v. Arthur*,
685 F.3d 367 (4th Cir. 2012)....................................................................27

*Campbell v. Becton, Dickinson & Co.*,
No. 1:22-CV-03043-ELH, 2024 WL 1299354 (D. Md. Mar. 27, 2024) 15, 21

*Connick v. Myers*,
461 U.S. 138 (1983)...........................................................................28, 29

*Cromer v. Brown*,
88 F.3d 1315 (4th Cir. 1996)..................................................................38

*Crouse v. Town of Moncks Corner*,
848 F.3d 576 (4th Cir. 2017)...........................................................27, 28, 45

*Davison v. Loudoun County Board of Supervisors,*
267 F. Supp. 3d 702 (E.D. Va. 2017)........................................................26

*Dodge v. Evergreen School District #114*,
56 F.4th 767 (9th Cir. 2022) ............................................... 30-31, 35, 41, 46

*Doriety for Estate of Crenshaw v. Sletten*,
109 F.4th 670 (4th Cir. 2024) ..................................................................13

*Garcetti v. Ceballos*,
547 U.S. 410 (2006)...................................................................................27

*Givhan v. Western Line Consolidated School District*,
439 U.S. 410 (1979)...........................................................................30, 37

*Grutzmacher v. Howard County*,
851 F.3d 332 (4th Cir. 2017)......................................................................29

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982)...........................................................................32, 33

*Harris v. Victoria Independent School District*,
168 F. 3d 216 (5th Cir. 1999)....................................................................29

*Holloway v. Maryland*,
32 F.4th 293 (4th Cir. 2022) ..............................................................18, 22

*Hope v. Pelzer*,
536 U.S. 730, (2002) .......................................................................33, 34

*Ibanez v. Albemarle County School Board*,
897 S.E.2d 300 (Va. Ct. App. 2024) .........................................................26

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) .......................................................................27

*Kentucky v. Graham*,
473 U.S. 159 (1985) .......................................................................32

*Kirby v. City of Elizabeth City*,
388 F.3d 440 (4th Cir. 2004).......................................................................28

*Laurent-Workman v. Wormuth*,
54 F.4th 201 (4th Cir. 2022) .......................................................................16

*Lettieri v. Equant Inc.*,
478 F.3d 640 (4th Cir. 2007).......................................................................passim

*Love-Lane v. Martin*,
355 F.3d 766 (4th Cir. 2004).......................................................................passim

*Massaro v. Fairfax County*,
95 F.4th 895 (4th Cir. 2024) .......................................................................16

*McCullars v. Maloy*,
No. 6:17-cv-1587-Orl-40GJK, 2018 WL 1583639 (M.D. Fla. Apr. 2, 2018) .......................................................................48

*McVey v. Stacey*,
157 F.3d 271 (4th Cir. 1998).......................................................................34

*Megaro v. McCollum*,
66 F.4th 151 (4th Cir. 2022) .......................................................................13

*Mellen v. Bunting*,
327 F.3d 355 (4th Cir. 2003).......................................................................32

*Oakes Farms Food & Distribution Services, LLC v. School District of Lee County,*
541 F.Supp.3d 1334 (M.D. Fla. 2021) ............................................48

*Owens ex rel. Owens v. Lott*,
372 F.3d 267 (4th Cir. 2004).......................................................33

*Perry v. Sindermann*,
408 U.S. 593 (1972)...................................................................33

*Pickering v. Bd. of Educ.*,
391 U.S. 563 (1968)..............................................................passim

*Rankin v. McPherson*,
483 U.S. 378 (1987)...................................................................33

*Ray v. Roane*,
948 F.3d 222 (4th Cir. 2020).......................................................13

*Ridpath v. Board of Governors of Marshall University*,
447 F.3d 292 (4th Cir. 2006)..................................................passim

*Rivera-Jimenez v. Pierliusi*,
362 F.3d 87 (1st Cir. 2004) ........................................................40

*Settlegoode v. Portland Public Schools*,
371 F.3d 503 (9th Cir. 2004)..................................................34, 48

*Smith v. Gilchrist*,
749 F.3d 302 (4th Cir. 2014).......................................................47

*Starnes v. Butler County Court of Common Pleas*,
971 F.3d 416 (3d Cir. 2020).........................................................34

*Stroman v. Colleton County School District*,
981 F.2d 152 (4th Cir. 1992)..................................................26, 29

*Strothers v. City of Laurel*,
895 F.3d 317 (4th Cir. 2018).......................................................15

*Tachias v. Sanders*,
130 F.4th 836 (10th Cir. 2025) ....................................................................40

*Thomas v. City of Beaverton*,
379 F.3d 802 (9th Cir. 2004)........................................................................31

*Tutt v. Wormuth*,
No. 19-2480, 2021 WL 4076729 (4th Cir. Sept. 8, 2021) ......................18, 22

*Vlaming v. West Point School Board*,
895 S.E.2d 705 (Va. 2023)...........................................................................26

*Wang v. University of Pittsburgh*,
181 F.4th 301 (3rd Cir. 2026) ......................................................................24

*West v. City of Charlottesville*,
No. 3:24-CV-00027, 2025 WL 256998 (W.D. Va. Jan. 21, 2025)...............16

*White v. Pauly*,
580 U.S. 73 (2017) .......................................................................................34

*Wilkins v. West*,
571 S.E.2d 100 (Va. 2002)...........................................................................26

*Willis v. City of Virginia Beach*,
90 F. Supp. 3d 597 (E.D. Va. 2015)............................................................26

*Wilson v. Layne*,
526 U.S. 603 (1999) .....................................................................................32

*Zak v. Chelsea Therapeutics International, Ltd.*,
780 F.3d 597 (4th Cir. 2015)...............................................................4, 14, 44

*Zamora v. City of Houston*,
798 F.3d 326 (5th Cir. 2015)...................................................................18, 21

**Statutes**

28 U.S.C. § 1291 ..............................................................................................1

28 U.S.C. § 1331 ..............................................................................................1

28 U.S.C. § 1367 .......................................................................................1

42 U.S.C. § 1983 .......................................................................................1, 12

Va. Code Ann. § 16.1-241(W) (2026)...............................................................4, 6

Va. Code Ann. § 2.2-3011 (2014) ..................................................................1, 14

Va. Code Ann. § 40.1-27.3 (2020) ....................................................................19

**Regulations**

34 C.F.R. § 99.3 (2025) ...............................................................................4

**Federal Rules**

Federal Rule Civil Procedure 12(d)...................................................................13

## STATEMENT OF JURISDICTION

Plaintiff-Appellant Zenaida Perez here appeals a retaliation claim under Virginia's Fraud and Abuse Whistle Blower Protection Act ("FAWBPA"), Va. Code Ann. § 2.2-3011 (2014), a free speech and retaliation claim under Va. Const. art. I, § 12, and a free speech and retaliation claim under 42 U.S.C. § 1983. The district court had jurisdiction over those claims pursuant to 28 U.S.C. §§ 1331 and 1367.

The district court entered an order granting Defendants' motion to dismiss, dismissing Plaintiff's claims on May 8, 2026. Plaintiff timely filed her Notice of Appeal on June 5, 2026.

This Court has jurisdiction to review the district court's order granting a motion to dismiss under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

I. Whether the district court erred in granting Defendants-Appellees' motion to dismiss Count II alleging retaliation in violation of the FAWBPA, Va. Code Ann § 2.2-3011, because of a failure to show causation.

II. Whether the district court erred in granting Defendants-Appellees' motion to dismiss Count IV—alleging retaliation against Plaintiff-Appellant's right to free speech under Virginia Constitution Article 1, § 12—and Count V—alleging retaliation against Plaintiff-Appellant's right to free speech

under the First Amendment to the U.S. Constitution—on the ground that Defendants were entitled to qualified immunity.

## STATEMENT OF THE CASE

Plaintiff-Appellant Zenaida Perez ("Plaintiff-Appellant" or "Mrs. Perez") is a Cuban-American educator who has taught English for Speakers of Other Languages ("ESOL") in Florida and Virginia public schools for over thirty years. (JA 131 ¶ 10). Since 2008, Mrs. Perez has been employed with Fairfax County Public Schools ("FCPS") teaching ESOL to migrant students most recently at Centreville High School ("CHS"). (JA 131¶ 10). Mrs. Perez was a popular and well-respected teacher who received sterling performance reviews until she began complaining of unlawful abortion activity involving minor students at CHS. (JA 136–137 ¶¶ 26–27).

Starting in 2022, Mrs. Perez spent several years trying to bring the facts to light. (JA 131) ("Perez has reiterated her complaint of unlawful abortion activity on an ongoing basis." (emphasis omitted)). This includes direct reports of details concerning the unlawful abortion activity allegations to various FCPS officials at least seven times. *See* (JA 132–133, JA 141, JA 143, J A 145). As a result, Mrs. Perez suffered an ongoing campaign of retaliation, including defamation, adverse professional consequences and public humiliation. (JA 131).

Mrs. Perez made her first report verbally on May 5, 2022, to Assistant Principal George Parker and Assistant Principal Alexis Wenzel, advising them that a CHS social worker provided pregnancy tests and "pregnancy solutions", *i.e.*, abortion assistance, to minor students. (JA 132). She confirmed her allegations in a rebuttal memorandum sent to CHS officials, including Defendant, then-CHS Principal, Chad Lehman, on May 13, 2022. (JA 132). She further confirmed her allegations in an email to Defendant Lehman dated June 9, 2022. (JA 132).

Mrs. Perez received a statement from a CHS underage minor student, Doe #1, on November 19, 2022, which, translated from Spanish, relates in detail that the CHS social worker helped her with a "termination of [her] pregnancy," paying for the costs of the procedure and not telling her family about it. (JA 133–134). Doe #1's recounting of events was supported by a man Mrs. Perez alleges was her uncle and legal guardian, Mr. S., in an audiotaped interview from November 2022. Mr. S stated that when Doe #1 was pregnant, no one from CHS contacted him to discuss Doe #1 having an abortion. He only discovered Doe #1 had an abortion when he was transporting her to the emergency room after she experienced near fatal complications from her abortion. (JA 134).[1]

[1] In their filings, Defendants claim that Mr. S. stated that he was not her legal guardian, but this assertion is obviously hearsay, and outside the scope of litigation during a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009) ("Under *Twombly,* the relevant question is whether, assuming the factual allegations are true,

After she obtained these statements, Mrs. Perez met with Defendant Lehman and again confronted him with the allegations of unlawful abortion activity involving minors on November 22, 2022 around 12:30 p.m. (JA 132–133).[2] In that meeting, Defendant Lehman denied recalling Perez's report about a CHS social worker facilitating abortions for minors, so Mrs. Perez re-forwarded the email and rebuttal she had him sent on May 13, 2022, which stated the "pregnancy solution" allegation. (JA 133). Very shortly after their meeting at 1:05 p.m. that same day, Defendant Lehman responded in an email to Mrs. Perez, claiming to have followed up with the CHS staff listed in her reports and effectively dismissed her her

---

the *plaintiff* has stated a ground for relief that is plausible." (emphasis added)). As such, Mr. S.'s status *viz*. Doe #1 is a matter of fact for the trier's determination. *Cf.* 34 C.F.R. § 99.3 (2025) (defining "parent" under the Federal Family Educational Rights and Privacy Act); Va. Code Ann. § 16.1-241(W) (2026) (defining "authorized person" under Virginia's parental consent law).

[2] At the lower court level, the Defendants made much of the fact that Mrs. Perez did not present these witness statements to CHS officials for some time. (JA 021–026). The district court also found this argument persuasive. (JA 012–013). However, these are questions of fact for the jury. Nor can Defendants or the district court rely upon Defendants' own statements to public bodies such as the U.S. Senate Committee on Health, Education, Labor, and Pensions ("HELP") (JA 012, JA 027–028); even if they could properly be before the court on a Rule 12(b) motion to dismiss (which they cannot), they are uncorroborated and unsubstantiated. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) (holding the district court erred in considering documents submitted by defendant in conjunction with Fed. R. Civ. P. 12(b)(6) motion because they were neither explicitly referenced in nor integral part of plaintiff's complaint). Accordingly, Mrs. Perez's counsel objected to Defendants' improper use of such "evidence" at the motion to dismiss hearing. (JA 038–040).

allegations. (JA 134). Whether the "investigation" took a day, as Defendants may claim, or only a few minutes, it was apparent that Defendant Lehman had taken no action on a serious matter he had been apprised of for over six months. Mrs. Perez again responded to Defendant Lehman by email, stating that a CHS social worker facilitated a specific student's (*i.e.*, Doe #1) abortion, and that the minor student had informed Mrs. Perez of that fact. (JA 133).

Another CHS underage minor student, Doe # 2, shared with Mrs. Perez that the same CHS social worker offered to help her get an abortion when she was five months pregnant. (JA 134). In an audio recording of an interview with Doe #2, dated August 26, 2025, she related that she had become pregnant, and her mother did not know. (JA 134–35). The CHS social worker took her to the school nurse, and the nurse "offered [her] the abortion." (JA 134–35). Doe #2 stated that they said to her, "[y]ou would not be the first one, the last one, or the only one." (JA 134–35). Only after Doe #2 refused the abortion option did they help her tell her mother that she was pregnant. (JA 134–35).

The CHS staff's conduct violated Virginia law, Va. Code Ann. § 16.1-241(W), which requires parental consent for an abortion. (JA 135). These alleged facts, if proven true, constituted illegal conduct by the CHS social worker and perhaps others such as the school nurse. *See* Va. Code Ann. § 16.1-241(W) (directing

that apart from a court order, only an "authorized person" can consent to a minor's abortion).

Because of Mrs. Perez's repeated reports of this illegal conduct, she suffered numerous acts of retaliation from Defendants and FCPS officials and their counsel from November 2022 through present day. *See* (JA 135–48). These retaliatory acts include, inter alia: Defendant Lehman's personal animosity and shunning of Mrs. Perez from and after November 2022, (JA 135–36); assigning Mrs. Perez an inordinately heavy teaching load that was more burdensome than other ESOL instructors were given, (JA 136); scheming to trap Mrs. Perez in violations of CHS rules, such as putting students up to asking Mrs. Perez for rides in her vehicle, (JA 137); arbitrarily scheduling meetings and demanding responses within vacation and paid time off, (JA 137); falsely accusing Mrs. Perez of obtaining pregnancy tests for students, (JA 137); charging Mrs. Perez with insubordination and disciplining her with a one-day suspension in April 2025, (JA 137); and putting her on her triennial "Summative Evaluation" cycle in this current academic year, a year earlier than the regulations permit, (JA 137). All told, Mrs. Perez has been subjected to up to twelve disciplinary memorandums and reprimands since December 19, 2024, up to October 10, 2025 after she engaged in the protected activity of reporting illegal abortion activity on an ongoing basis. (JA 148).

The retaliation intensified in 2024–25, when Defendants Erik Healey and Assistant Principal Brown began their tenures. (JA 137). As to Defendant Brown, he engaged in no less than eleven retaliatory acts against Mrs. Perez; he falsely accused Mrs. Perez of helping a student acquire a pregnancy test on several occasions, a charge that was filed in her personnel record, (JA 137–38); he tried to manipulate and pressure students to do or say things about Mrs. Perez to get her in trouble, creating a hostile work environment for her (and the students), (JA 138); he accused Mrs. Perez of "violat[ing] Regulation 4444.1-Prevention of sexual misconduct and abuse," an assertion he read out loud in the presence of other employees, (JA 138); after hearing that she reported the unlawful abortion activity to a journalist, he declared, "Now I have to add more to Ms. Perez's Reprimand." , (JA 138–39); he locked a student (Doe #5) in his office and stated, "You are not leaving this room until you tell me the *truth* about your relationship with Ms. Perez," (JA 141); he defamed Mrs. Perez by falsely stating in a meeting that "Perez hid student Doe #3 in her classroom (Room # 217) on March 12, 2025," which accusation was also filed in her personnel file, (JA 141–142); he instructed an 18-year-old male student (Doe # 6) to ask Mrs. Perez for a ride in her personal vehicle to Costco, and report back to Defendant Brown so that he could write her up, (JA 142); he gave Mrs. Perez an unreasonable and inappropriate teaching schedule, (JA 142); he further reshuffled Mrs. Perez's teaching schedule in May 2025, (JA 143);

he pulled two brothers out of their classes to ask them why they had been texting Mrs. Perez regarding their attendance in her classes, revealing that he was monitoring her personal communications hosted on the FCPS server, (JA 143–44); and on August 25, 2025, he defamed Mrs. Perez when he falsely stated in front of her students and the substitute teacher that "Perez didn't leave lesson plans for her classes." (JA 144).

As to Defendant Healey, he defamed Mrs. Perez by claiming that "she had falsified records" and "had had an inappropriate relationship with a student [Doe #4]," a charge that was republished by other teachers and colleagues and filed in Plaintiff's personnel file, (JA 139); and he wrote a Summary Memo stating that "she blatantly disregarded a directive to review and correct her gradebook," (JA 140–41). This statement was shared in writing with other administrators, and it was also sent to her local file, as well as personnel records in Human Resources ("HR"). (JA 140–41).

As to both Defendants Healey and Brown, they falsely reported to their attorneys that "Perez instigated bullying amongst the students," (JA 144); and unjustifiably suspended Mrs. Perez for one day without pay on May 1, 2025, documenting their defamatory statements in her HR personnel record-file, and including numerous high-ranking FCPS officials in the suspension message, (JA 142–43).

As to Defendant Michelle Reid, the Superintendent of FCPS, on October 16, 2025, Defendant Reid told the entire CHS staff that "[Plaintiff] may have falsified the evidence and intentionally refused to cooperate with the original school-based investigation of her allegations in 2022," and called Mrs. Perez's allegations "wrongful and unjustified accusations." (JA 144). Defendant Reid repeated these defamatory statements in a letter to the entire FCPS system, which was broadcast to the general public on the FCPS website. King & Spalding's preliminary report to the Senate Health, Education, Labor, and Pensions ("HELP") Committee and the U.S. Department of Education ("DOE") repeated these defamatory assertions on behalf of their client, FCPS. (JA 146). FCPS published these defamatory assertions widely to the public. (JA 147). On January 9, 2026, Defendants reiterated their central defamatory assertions against Mrs. Perez by disseminating to the "CHS school community" and the public via a "Supplemental Report" to the Senate HELP Committee, the U.S. DOE and the Virginia State Police. (JA 147).

Without justification, Bill Fulton, Director of the Office of Employee Relations, placed Mrs. Perez on administrative leave via email at 9:06 pm on October 20, 2025, just minutes after Mrs. Perez made public statements regarding her allegations about the unlawful abortion trafficking activity at CHS, a matter of "public concern." (JA 146). After all the years Mrs. Perez faithfully devoted to FCPS and her students and their families, herthe once beloved became persona non grata

and her workplace had becoame an incredibly hostile environment simply because she spoke up for her students and against the unlawful abortion activity. (JA 148).

## SUMMARY OF ARGUMENT

Mrs. Perez's case involves an almost three-year retaliation campaign by school officials to target, defame, and unjustly discipline her, simply because she reported that CHS staff facilitated abortions for pregnant minor students without their parent/guardian's knowledge. Mrs. Perez had a right to speak on this matter of public concern and Defendants should not have retaliated against her for trying to protect the students she cared so much about and devoted her career to.

After Mrs. Perez filed her suit, the Defendants filed a motion to dismiss, which the district court improperly granted for reasons described below. Consequently, Mrs. Perez raises this appeal, asking the Court to reverse the district court's dismissal of Count II, IV and V. When ruling on a Rule (12)(b)(6) motion, a court must draw all reasonable inferences in favor of the plaintiff. *Iqbal*, 556 U.S. at 696. As such, "the relevant question is whether, assuming the factual allegations are true, the plaintiff has stated a ground for relief that is plausible." *Id*.

The district court erred in dismissing Count II pursuant to the FAWBPA on the grounds that there was insufficient temporal proximity between Mrs. Perez's protected activity and the retaliatory actions to establish causation. The Fourth Circuit has recognized that causation can be established through retaliatory animus. Thus, retaliatory animus can be sufficient to "bridge the gap" between a plaintiff's protected activity and the adverse action, despite a longer lapse of time, especially

if her employer exhibits a pattern of retaliation, harassment, or defamation that creates a hostile work environment.

Mrs. Perez's Second Amended Complaint alleges sufficient factual matter to establish causation under FAWBPA, detailing a several-year campaign of harassment against her in response to her numerous reports of a school employee facilitating abortions for minor students. Mrs. Perez sufficiently alleges that FCPS officials created a hostile work environment. Such officials harassed her, avoided her, singled her out for burdensome workloads, and ultimately intentionally ruined her professional reputation. Under the precedent of this Circuit and neighboring circuits, this is sufficient factual content to show retaliatory animus and establish causation at this stage.

The district court erred in dismissing Counts IV and V on qualified immunity grounds because Mrs. Perez alleged sufficient facts to plausibly show that Individual Defendants are not entitled to qualified immunity. Under 42 U.S.C. § 1983, Plaintiff has a remedy for the violation of her rights provided under Article 1, Section 12 of the Virginia Constitution and the First Amendment of the United States Constitution.

Individual Defendants are not protected by qualified immunity at this stage because Mrs. Perez alleged facts that substantiate a violation of her right to speak on a matter of public concern, *i.e.*, unlawful abortion activity involving pregnant minor students. Mrs. Perez's right to speak about such issues was clearly established law

in this Circuit and neighboring circuits at the time of her reports to FCPS officials. Indeed, Mrs. Perez's case shares several key facts with cases in this Circuit and other circuits that form a consensus of authority outlining the contours of her rights. Accordingly, this Court should reverse the district court's dismissal of Counts II, IV and V.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of a motion to dismiss for failure to state a claim. *Doriety for Estate of Crenshaw v. Sletten*, 109 F.4th 670, 678 (4th Cir. 2024). In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. at 679 (quoting *Iqbal*, 556 U.S. at 678). "[A] court is not permitted at [the motion to dismiss] stage of the proceedings to 'resolve contests surrounding the facts' or 'merits of a claim.'" *Doriety*, 109 F.4th at 679. (quoting *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2022)). Accordingly, "the court generally must accept the facts as alleged as true and draw all reasonable inferences in favor of the plaintiff." *Id*. (citing *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020)). Federal Rule of Civil Procedure 12(d) generally prohibits courts from considering evidence outside the pleadings on a 12(b)(6) motion unless the court treats the motion as one for summary judgment. Fed. R. Civ. P. 12(d). Rule 12(d)'s exception is not applicable to this case because it was still in the pleading stage of litigation prior to

the district court's dismissal. *See Zak*, 780 F.3d at 606 ("Consideration of extrinsic documents by a court during the pleading stage of litigation improperly converts the motion to dismiss into a motion for summary judgment. This conversion is not appropriate when the parties have not had an opportunity to conduct reasonable discovery." (internal citations omitted)). Thus, this Court, confining itself to the four corners of the complaint, must accept Mrs. Perez's allegations as true and review them for plausibility.

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFF-APPELLANT'S COUNT II BECAUSE SHE SUFFICIENTLY PLED CAUSATION UNDER VIRGINIA'S FAWBPA.

This Court should reverse the district court's dismissal of Count II of the Second Amended Complaint because Plaintiff-Appellant has pled sufficient facts showing a causal relationship between her reports of unlawful abortion activity involving minors and Defendants' decision to place her on administrative leave. As a state government employee, Mrs. Perez has whistleblower protection under Virginia's FAWBPA. Specifically, Va. Code Ann § 2.2-3011 protects state employees who act as whistleblowers from discriminatory and retaliatory actions, stating that "[n]o employer may discharge, threaten, or otherwise discriminate or retaliate against a whistle blower." Despite the Second Amended Complaint detailing the numerous and ongoing retaliatory actions Mrs. Perez endured as a result

of speaking out against unlawful abortion activity at CHS, the district court overlooked this pattern of animus, erroneously holding that Mrs. Perez failed to plead causation.

The task of establishing causation in a prima facie case of retaliation does not impose a heavy burden on an employee. "An employee may establish *prima facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Strothers v. City of Laurel*, 895 F.3d 317, 335–36 (4th Cir. 2018). The district court correctly recognized the framework for analyzing a prima facie case of causation in claims based on Title VII also applies to claims predicated on whistleblower statutes. (JA 007). Accordingly, the district court noted "a *prima facie* case of causation can be made based on circumstantial evidence including temporal proximity, deviation from normal practices, or evidence of concealment." (JA 007). The district court erred in analyzing causation on temporal proximity alone. (JA 007).

Temporal proximity is not the only route to establishing causation. *See Campbell v. Becton, Dickinson & Co.*, No. 1:22-CV-03043-ELH, 2024 WL 1299354, at *35 (D. Md. Mar. 27, 2024) ("[T]emporal proximity is not the sole avenue to establish causation. A plaintiff can 'overcome an absence of temporal

proximity' through 'evidence of recurring retaliatory animus during the intervening period.'" (quoting *Massaro v. Fairfax Cnty.*, 95 F.4th 895, 902 (4th Cir. 2024))). In other words, causation does not hinge solely on whether the adverse action occurred within the (approximately) two-month period that the Fourth Circuit has suggested as an "outer boundary" of temporal proximity. *See West v. City of Charlottesville*, No. 3:24-CV-00027, 2025 WL 256998, at *12 (W.D. Va. Jan. 21, 2025) (citing *Laurent-Workman v. Wormuth*, 54 F.4th 201, 219 (4th Cir. 2022)). Rather, this Court in *Lettieri v. Equant Inc.*, provides that a plaintiff can succeed in establishing causation if she presents sufficient retaliatory animus in the intervening period between the protected activity and the adverse action. 478 F.3d 640, 650–51 (4th Cir. 2007) (finding causation despite a *seven-month gap* between an employee's complaint and her termination by her supervisors where regular intervening events evidenced retaliatory animus); *see also Massaro*, 95 F.4th at 903 ("In *Lettieri*, the plaintiff put forth evidence that she had been subjected to recurring retaliatory animus by her employer as part of a *long-running plan* to terminate her employment.") (emphasis added)). The district court also erred in seemingly treating the retaliatory animus route to causation as intertwined with the temporal proximity route; rather, *Lettieri* considers the two paths to causation separately. *Lettieri*, 478 F.3d at 651.

Notably, this Court recently applied the *Lettieri* analysis to a Title VII claim that was appealed from a grant of a motion to dismiss in the District Court for the Eastern District of Virginia. In *Barbour v. Garland*, this Court found that the plaintiff alleged sufficient factual matter to plausibly show causation through a pattern of recurring retaliatory animus. 105 F.4th 579, 596 (4th Cir. 2024). This Court determined that the district court erred by treating a lack of temporal proximity as "an automatic bar to a retaliation claim." *Id*. at 597. The *Barbour* plaintiff alleged that her non-selection for employment by the DEA was retaliation for her participation in a class action lawsuit against the FBI for sexual discrimination. *Id.* at 585. Despite a lapse of eight months (May 2019 to January 2020) between Barbour filing a complaint against the FBI and her notice of non-selection, this Court found sufficient evidence of retaliatory animus to plausibly allege causation. *Id*. at 596. This was because, in the intervening 8-month period, Barbour's candidacy was fraught with frustrations and obstacles, which she alleged the DEA created in retaliation for her participation in the lawsuit. *Id.* at 593–94. These obstacles included, among other things, "obsessive" questioning by DEA background investigators about the FBI lawsuit, the abrupt and unexplained stalling of her application, and the DEA's communication of inconsistent information about the status of her application. *Id.* at 593–96.

Moreover, highly negative statements about a party's reputation or credibility can be evidence of retaliatory animus. *See Zamora v. City of Houston*, 798 F.3d 326, 333–34 (5th Cir. 2015) (finding that a reasonable jury could find retaliatory animus based on supervisors' harsh statements about their employee during an internal investigation.). Such statements or other intervening events made in the period between the protected activity and the retaliation can also "temper" an otherwise prohibitively long temporal gap, *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022) (finding that an intervening comment during a negative meeting between an employee and his supervisor prior to termination "bridged" a temporal gap of over six months between employee's complaint and his termination), even one as long as sixteen months, *see Tutt v. Wormuth*, No. 19-2480, 2021 WL 4076729, at *2 (4th Cir. Sept. 8, 2021) (holding that "additional facts" alleged in the complaint, including a supervisor's comments regarding the protected activity, were sufficient to bridge the gap between plaintiff's expression of support for his coworker's discrimination complaint and his reassignment to another program against his wishes).

Here, Mrs. Perez has alleged sufficient facts to show retaliatory animus supporting a causal relationship between her reports of unlawful abortion activity and instances of administrative retaliation. *See Lettieri*, 478 F.3d at 650. The Second Amended Complaint highlights a pattern of retaliation that commenced immediately

following Mrs. Perez's meeting with Defendant Lehman in November 2022 and continued, increasing in intensity, until she was placed on administrative leave in October of 2025. Mrs. Perez engaged in a protected activity, *see* Va. Code Ann. § 40.1-27.3 (2020), when she began reporting unlawful abortion activity involving minors (JA 132), which includes her report of Doe #1's statements to Defendant Lehman where she alleged CHS staff facilitated the minor student's abortion. (JA 132–33). She continued to make such reports to FCPS officials, state and federal agencies. (JA 143, JA 145). Notably, this Court in *Barbour* makes clear that the official complained of need not be the same one who engages in the retaliatory conduct. *See Barbour*, 105 F.4th at 596 (finding that there was a causal link between a plaintiff's lawsuit against the FBI and the DEA's subsequent refusal to hire the plaintiff). After Mrs. Perez reported the alleged illegal abortion activity to Defendant Lehman in person, he never again acknowledged her or greeted her, and even actively avoided her, despite her reputation as a respected ESOL teacher. (JA 135–36). This was just the tip of the iceberg when it came to the continued animosity and hostility Mrs. Perez would face as a result of speaking against unlawful abortion activity at CHS. In the 2023–24 school year, CHS administrators assigned Mrs. Perez an excessively burdensome workload, which was more than any other ESOL instructors were tasked with. (JA 136). These obstacles made Mrs. Perez's job extremely difficult, as she was unable to communicate with her primary supervisor

and was saddled with an unusually heavy workload. *See* (JA 135–36). Such facts suggest that Mrs. Perez was singled out because of her November 2022 report, especially when compared to Mrs. Perez' sterling performance record throughout her tenure in the Fairfax County school system. *See* (JA 135–36). This pattern of animus was so evident that Mrs. Perez's own immediate manager, George Parker, told her, "**I know what they have been doing to you**." (JA 137) (emphasis in original). These retaliatory actions are, in the context of a school environment, very similar to the forms of retaliation this Court observed in *Lettieri* and *Barbour*.

The retaliation and hostility did not stop there. Almost immediately after Defendants Healy and Brown began their tenures in the 2024–25 school year, the retaliatory conduct became more severe, frequent, and flagrant. Defendant Brown, Defendant Healy, and other FCPS officials began an ongoing campaign of defamation against Mrs. Perez, which first included false accusations that she provided pregnancy tests to students. (JA 137). After these false accusations were made and after hearing from students that Defendant Brown tried to manipulate and pressure them to do or say things about Mrs. Perez to get her in trouble, Mrs. Perez filed a complaint with the Equal Employment Opportunity Commission ("EEOC") in December 20, 2024. (JA 137–38). Shortly after filing her EEOC complaint, in January 2025, Defendant Healy continued to defame Mrs. Perez, including making false statements that she engaged in sexual misconduct under the school's code, (JA

138), that she had an inappropriate relationship with a student, (JA 138), and that she falsified records, (JA 139).[3] Such statements and aspersions are similar to what other circuits have recognized as strong evidence of retaliatory animus. *See Zamora*, 798 F.3d at 334. Furthermore, Defendant Brown's removal of two students from class to interrogate them about their relationship with Mrs. Perez, (JA 142), and his imprisonment of a student in his office, (JA 141), were a part of FCPS officials' schemes to entrap Mrs. Perez in violations of school policy, which demonstrate a singularly zealous pursuit to push Mrs. Perez out of CHS, (JA 140, 142). Given the intensity FCPS officials pursued their baseless accusations against Mrs. Perez, such treatment undoubtedly evinces an intent to target, alienate, intimidate, and harass Mrs. Perez. *See e.g., Campbell.*, 2024 WL 1299354, at *39–40 (finding that the occurrence of "several retaliatory events," which included the employer "singl[ing] out" the employee for performance review, between the protected activity and the employee's ultimate termination sufficed to show retaliatory animus despite insufficient temporal proximity). Additionally, the investigation into Mrs. Perez's claims of unlawful abortion activity involving minors, and subsequent defamatory statements and reports published by FCPS and their counsel, King & Spalding against her, in response to her reasonable reports have been unnecessarily hostile to

[3] Defendant Brown also defamed Perez in an April 2025 meeting when he falsely accused her of hiding a student in her classroom, which led to HR unjustifiably requesting a suspension for one day without pay. (JA 141–42).

Mrs. Perez, accusing her of "manipulating" and "fabricating" the statements she procured from students corroborating her allegations. (JA 147).

In April 2025, Defendant Brown took away Mrs. Perez's classes for which she had already prepared, (JA 142), and later "reshuffled" her schedule again in May 2025, days after she repeated her reports of unlawful abortion activity to FCPS interviewer Mackie, (JA 143). This is once again similar to the frustration that sufficed to show retaliatory animus in *Barbour*. *See Barbour*, 105 F.4th at 593–95. Additionally, FCPS's suspension of Mrs. Perez without pay on May 1, 2025, was a clear and direct instance of retaliation against her. From that time on, Mrs. Perez was subjected to additional defamatory statements in both August and October of that year. The years' worth of retaliation and hostility all culminated to a head when FCPS placed Mrs. Perez on administrative leave on October 20, 2025, minutes after she made public statements on the news regarding her reports about the unlawful abortion activity at CHS. (JA 146). Accordingly, this ongoing and intensifying pattern of retaliatory animus alleged in Mrs. Perez's complaint is more than sufficient to establish causation between her protected activity and Defendants' adverse actions. *See Holloway*, 32 F.4th at 300; *Tutt*, 2021 WL 4076729 at *2. Mrs. Perez made numerous reports of unlawful abortion activity to FCPS officials from

2022 to 2025,[4] including her initial reports in May 2022 to FCPS officials about CHS staff providing "pregnancy solutions" to minor students, (JA 132), her report via email to Defendant Lehman in June 2022 about a social worker helping "students to solve pregnancy situations," (JA 132), her report on November 22, 2022 to Defendant Lehman about the same social worker facilitating an abortion for a minor without the legal guardian's consent, (JA 132–33), her report in March 2025 to attorneys during an unrelated investigation that Defendant Lehman covered up CHS staff's actions in facilitating an unlawful abortion, which was conveyed to FCPS counsel, (JA 141), her report in May 2025 to an FCPS investigator where she detailed the abortion allegations, (JA 143), and her report on August 11, 2025 to FCPS retained counsel where Mrs. Perez once again detailed the abortion allegations, (JA 145). Mrs. Perez suffered immense harassment and retaliation as a result of these reports, as detailed above. Yet, the district court improperly held that "nearly three years elapsed between" Mrs. Perez's protected activity and the adverse employment action, disregarding Mrs. Perez's ongoing reporting of unlawful abortion activity from 2022 to August 2025. (JA 006).

Ultimately, whatever the lapse in time may have been between Mrs. Perez's reports of unlawful abortion activity and Defendants' adverse employment actions,

---

[4] The district court improperly disregarded these reports, finding that "the only protected activity alleged" was Mrs. Perez's report to Defendant Lehman in November 2022. (JA 006).

the nearly three-year retaliation campaign launched against Mrs. Perez was more than sufficient to establish a causal nexus between her reports of unlawful abortion activity and being placed on administrative leave. For example, from the time Mrs. Perez began making her reports in 2022 until she was placed on administrative leave, she did not have a moment of peace from Defendants' retaliation. From Defendants targeting Mrs. Perez and imposing a burdensome teaching load, to their consistent attempts to entrap Mrs. Perez in situations that would lead to disciplinary action against her, Mrs. Perez suffered through a hostile work environment that left her with 12 disciplinary memorandums and reprimands, despite having a sterling performance record prior to her reports of unlawful abortion activity. Further, Defendants engaged in a "multi-front reputation-bashing" through spewing false accusations against Mrs. Perez, which impugned her character and isolated her to suffer through a hostile work environment simply because she spoke out about unlawful abortion activity. *See, e.g.*, *Wang v. Univ. of Pittsburgh*, 181 F.4th 301, 317–19 (3rd Cir. 2026) (concerning a professor who opposed school policies he reasonably thought were unlawful, which resulted in retaliation from his supervisors and colleagues by "harassing him to 'isolate[] [him] in his work environment in hopes that he would resign"). Additionally, there are reasons why, based on the facts alleged in the pleading (which must be taken as true at this stage, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)), the timeline in Mrs. Perez's situation is longer

than in other cases. The Title VII cases which support Mrs. Perez' claim under FAWBPA occurred in the context of constant employment. This Court has recognized that a lack of an opportunity for retaliation can explain a temporal gap. *Cf. Barbour*, 105 F.4th at 596. In this case, Mrs. Perez is a public school teacher, which means that she does not work during the summer, making it almost impossible for the school to take adverse action against her during the 2-to-3-month period when she is not working.

In sum, the district court erroneously disregarded the clear pattern of retaliatory animus Mrs. Perez experienced at the hands of the Defendants simply because the court believed she suffered retaliation for a longer period than the plaintiff in *Lettieri*. *See* (JA 006–007). The facts alleged in the Second Amended Complaint more than adequately establish a plausible basis for Mrs. Perez's FAWBPA claim. *Iqbal*, 556 U.S. at 677. Mrs. Perez does not ask this Court to extend *Lettieri* beyond its reasonable limits, only that it applies *Lettieri*'s "retaliatory animus" analysis to a new set of facts which are extensively similar to those that this Court has found to be sufficient to establish retaliatory animus in the past. Therefore, this Court should reverse the district court's grant of Defendants' motion to dismiss and allow Mrs. Perez's FAWBPA claim to proceed.

## II. THE DISTRICT COURT ERRED IN DISMISSING APPELLANT'S COUNT IV AND COUNT V BECAUSE PLAINTIFF-APPELLANT PLED SUFFICIENT

**FACTS TO SHOW THE DEFENDANTS VIOLATED A CLEARLY ESTABLISHED RIGHT.**[5]

This Court should reverse the district court's dismissal of Count IV and V because Mrs. Perez pled sufficient facts to demonstrate that Individual Defendants violated her clearly established right to speak on a matter of public concern and are therefore not entitled to qualified immunity.

As this Court has recognized, "[t]he government may not retaliate against a public employee who exercises her First Amendment right to speak out on a matter of public concern." *Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004). "This means, for example, that '[a] state may not dismiss a public school teacher because of the teacher's exercise of speech protected by the First Amendment." *Id*. (quoting *Stroman v. Colleton Cnty. Sch. Dist.*, 981 F.2d 152, 155–56 (4th Cir. 1992)).

[5] When a plaintiff brings a claim against a defendant under the First Amendment and under the Virginia Constitution's Article I § 12, a court will analyze these claims together, analyzing the case based upon First Amendment precedent since the "Supreme Court of Virginia has held that [this section] of the Constitution of Virginia is coextensive with the free speech provisions of the First Amendment." *Davison v. Loudoun Cnty. Bd. of Supervisors,* 267 F. Supp. 3d 702, 715 (E.D. Va. 2017) (citing *Willis v. City of Va. Beach*, 90 F. Supp. 3d 597, 607 (E.D. Va. 2015)); *see also Ibanez v. Albemarle Cnty. Sch. Bd*., 897 S.E.2d 300, 311–12 (Va. Ct. App. 2024) ("Virginia courts have historically addressed claims against government defendants based on Article I, §§ 11 and 12 on the merits.") (citing *Wilkins v. West*, 571 S.E.2d 100, 111 (Va. 2002)); *Vlaming v. W. Point Sch. Bd*., 895 S.E.2d 705 (Va. 2023)). Accordingly, the district court analyzed Plaintiff-Appellant's state and federal claims together and for the purpose of this appeal, Plaintiff-Appellant will do the same.

When a government employee claims unlawful retaliation in violation of alleged protected speech activity under the First Amendment, the *Pickering-Garcetti* framework applies. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). This is a multi-step inquiry. A plaintiff must allege that (1) she "was speaking as a citizen upon a matter of public concern," rather than "as an employee about a matter of personal interest," (2) her interest in speaking on the matter of public concern "outweighed" defendants' interest in providing effective and efficient public service and (3) her "speech caused the disciplinary action." *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017) (internal citations omitted). The first two elements are questions of law, but the third, that of causation, is a question of fact. *Id*. at 583 (citing *Brooks v. Arthur*, 685 F.3d 367, 371 (4th Cir. 2012)). Accordingly, at the motion to dismiss hearing, the district court only addressed the first prong of the inquiry.

### A. Plaintiff-Appellant's Reports About Illegal Abortion Activity Are Matters of Public Concern

Although the district court did not rule definitively on the matter,[6] Mrs. Perez unquestionably spoke on a matter of public concern when she expressed her belief

[6] The district court appeared to view Mrs. Perez's speech as a matter of public concern, disagreeing with the Defendants' characterization of Mrs. Perez's speech

that illegal abortion activity was occurring at CHS, first to her supervisors and then to the public. As stated above, under the *Pickering-Garcetti* framework, the plaintiff must first establish that she "was speaking as a citizen upon a matter of public concern," rather than "as an employee about a matter of personal interest." *Crouse*, 848 F.3d at 583. Speech involves a matter of public concern when it involves an issue of "social, political, or other interest to a community." *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004); *see Connick v. Myers*, 461 U.S. 138, 145–46 (1983). Whether the employee spoke as a citizen on a matter of public concern requires "an effort to participate in a larger public dialogue." *Crouse*, 848 F.3d at 585. In an educational context, this Court has said that abortion is among matters of public concern, noting "topics such as . . . abortion . . . . plainly touch[] on issues of public, rather than private, concern." *Adams v. Trs. of the Univ. of N.C.-Wilmington,* 640 F.3d 550, 565 (4th Cir. 2011).

Here, Mrs. Perez's reports of illegal abortion activity are matters that touch on issues of public concern. In fact, her reports have been the subject of a Senate HELP Committee investigation, a U.S. Department of Education investigation, and a Virginia State Police criminal investigation, belying any argument that unlawful

---

as merely an internal dispute with a colleague. The court noted, "[w]hile her dispute with the guidance counselor may have been the genesis of the dispute, the allegations concerning Plaintiff's speech, much of which was directed externally, are more consistent with a form of public anti-abortion advocacy than a mere workplace squabble blown out of proportion." (JA 011).

abortion activity is not an issue of "social, political, or other interest to [the] community." Certainly, "personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern." *Stroman*, 981 F.2d at 156; *see also Connick*, 461 U.S. at 138–39. But Mrs. Perez does not allege a mere workplace disagreement or personal grievance, as the district court correctly acknowledged. *See supra* note 6. Rather, Mrs. Perez alleges that she repeatedly voiced complaints about CHS staff facilitating abortions for minors without the minors' parents or legal guardian's consent, and that Defendants responded with unlawful retaliation. (JA 131, JA 135–48). However, *arguendo*, even if prior animosity existed between Mrs. Perez and the CHS staff she complained about, a "single expression of speech" can "encompass[] both matters of public concern and matters of purely personal interest." *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 344 (4th Cir. 2017); *see also Ballou v. McElvain*, 29 F.4th 413, 429 (9th Cir. 2022) ("Some subjects *both* affect a public employee's personal interests and implicate matters of public concern." (emphasis in original)); *Harris v. Victoria Indep. Sch. Dist.*, 168 F. 3d 216, 222 (5th Cir. 1999) ("An employee's speech may contain an element of personal interest and yet still qualify as speech on a matter of public concern.").

On Defendants' 12(b)(6) motion, a court must determine whether a reasonable jury could *plausibly* reach the same characterization of the speech and the

surrounding facts that Mrs. Perez has reached. Here, the content, form, and context of Mrs. Perez' statements plausibly point to her speech as addressing a matter of public concern. Mrs. Perez alleges that her hardships, isolation, and all contentions with her employer began after raising a very serious allegation: that the school, through its employee, a social worker, and perhaps others, was assisting minor girls in receiving abortions without consent from their parent or guardian, based on personal reports from students. As in *Pickering*, Mrs. Perez sought to alert appropriate channels that concerning events were occurring "under the radar"—conduct that parents and the general public would reasonably expect to be aware of. *Cf. Pickering*, 391 U.S. at 566 (concerning a teacher's letter to a newspaper that criticized the school's handling of a bond issue and alleged that the superintendent retaliated against teachers who spoke out about it); *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 412 (1979) ("In an effort to show that its decision was justified, respondent School District introduced evidence of, among other things, a series of private encounters between petitioner and the school principal in which petitioner allegedly made 'petty and unreasonable demands' in a manner variously described by the principal as 'insulting,' 'hostile,' 'loud,' and 'arrogant.'").

The content of Mrs. Perez's speech concerned the reproductive health and welfare of minor children while the school was acting in loco parentis. *See Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022) ("While no single factor

[of the public concern analysis] is dispositive, 'content is the most important.'") (quoting *Thomas v. City of Beaverton*, 379 F.3d 802, 810 (9th Cir. 2004)). Mrs. Perez communicated her concerns through in-person meetings and emails with school administrators, investigators, and counsel. Some communications later reached the media. Although some of the speech occurred internally, Mrs. Perez followed the ordinary channels used to report serious misconduct in a school setting. Like the teacher in *Pickering*, Mrs. Perez went outside the institution only *after* internal reporting failed, and her concerns were dismissed as fabricated.

Taken together, the content, form, and context of the speech plausibly establish that Mrs. Perez spoke about student welfare and potential legal violations, not personal preferences or internal workplace grievances. The speech therefore addressed a matter of public interest, which outweighed any interest on the part of her employer in keeping the matter private. *See Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F.3d 292, 317 (4th Cir. 2006) (determining speech by a university official responsible for compliance with National Collegiate Athletic Association (NCAA) rules was a matter of public concern since the speech addressed non-compliance with NCAA standards); *Love-Lane*, 355 F.3d at 777–78 (finding an assistant principal's speech about other public school employees' use of racially discriminatory display practices was a matter of public concern). Moreover, Mrs. Perez's speech about illegal abortion activity neither affected the ability of CHS staff

"to deliver their educational services[,] nor did her speech diminish the quality of education being provided." *Love-Lane*, 355 F.3d at 779. Furthermore, even if Mrs. Perez's reports of illegal abortion activity at CHS "caused some disharmony," her speech addressed a "substantial issue of public concern" that not only was of interest to parents of CHS students, but the broader community. *Id*. As a result, Mrs. Perez's speech interests outweigh "the school system's countervailing interests."

### B. Individual Defendants Violated Plaintiff-Appellant's Clearly Established Right to Speak on a Matter of Public Concern

Mrs. Perez's right to speak about unlawful abortion activity was clearly established, foreclosing any defense of qualified immunity. Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Kentucky v. Graham*, 473 U.S. 159, 165–67 (1985). Government officials are entitled to the defense of qualified immunity unless a § 1983 claim satisfies the following two-prong test (the "qualified immunity test"): (1) the allegations underlying the claim, if true, substantiate the violation of a federal statutory or constitutional right; and (2) this violation was of a "clearly established" right "of which a reasonable person would have known." *See Mellen v. Bunting*, 327 F.3d 355, 365 (4th Cir. 2003) (quoting

*Harlow*, 457 U.S. at 818) (citing *Hope v. Pelzer*, 536 U.S. 730, 736 (2002)). "It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). Precedent is a strong indicator that something is clearly established, however, "[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741; *see also Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017) ("[A]s [the Fourth Circuit] has stated . . . the 'absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity.'" (quoting *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004))). In determining whether a right is clearly established, the court will first look to the controlling authority in their jurisdiction; however, when there are no analogous decisions from that jurisdiction, the court may look to a "'consensus of cases of persuasive authority'" from other circuits. *Booker*, 855 F.3d at 538–39 (holding that a prisoner's right to file prison grievances free from retaliation was clearly established under the weight of persuasive authority from other circuits) (quoting *Owens*, 372 F.3d at 280). "While the factual circumstances of persuasive authority need not be 'directly on point . . . ,'" the facts have to be "substantially similar enough that the 'violative nature of [the] particular conduct is clearly established.'" *Starnes v. Butler Cnty. Ct. of C.P.*, 971

F.3d 416, 432 (3d Cir. 2020) (alteration in original) (emphasis omitted) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). What matters is whether the state of the law gave the official fair warning such that the unlawfulness of the conduct would have been apparent to a reasonable official. *Hope*, 536 U.S. at 741.

Furthermore, under the *Pickering* balancing framework, whether a private individual's right to speak out on a matter of public concern is clearly established is subject to a heavily context-dependent inquiry. *See McVey v. Stacey*, 157 F.3d 271, 278 (4th Cir. 1998) ("[W]e must take into account the context of the employee's speech, including the employee's role in the government agency, and the extent to which it disrupts the operation and mission of the agency."). Additionally, under the *Twombly/Iqbal* plausibility standard for pleadings, a plaintiff need only allege sufficient factual content to show that, under the weight of the decisional consensus from this Circuit and neighboring circuits, "the outcome of the *Pickering* balance so clearly favored . . . [the plaintiff] that it would have been patently unreasonable for school officials to conclude that the First Amendment did not protect her speech." *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 516 (9th Cir. 2004) (quoting *Brewster v. Bd. of Educ.*, 149 F.3d 971, 980 (9th Cir. 1998)).

Here, the consensus of this Circuit and her neighbors makes the outcome of the *Pickering* balancing in this case appear with such "obvious clarity" as to place

the constitutional question beyond debate. *Dodge*, 56 F.4th at 784. First, the U.S. Supreme Court has already established that retaliation against a schoolteacher for speaking on a matter of public concern is a violation of the First Amendment when the balance of interests favors the plaintiff. *Pickerin*g, 391 U.S. at 563–75; *see also Blankenship v. Manchin*, 471 F.3d 523, 533 (4th Cir. 2006). Second, case law from the Fourth Circuit and neighboring circuits clearly defines the contours of Mrs. Perez's First Amendment right to speak out against the unlawful actions of other employees. The issue at the heart of this case can be appropriately framed as follows: whether a public school teacher has the right to be free from retaliation for her speech on a public matter when she, in good faith, makes a report to the school principal alleging illegal abortions being facilitated by another school employee.

*Love-Lane v. Martin* is instructive Fourth Cicuit precedent. 355 F.3d at 766. The case centered on "a superintendent who demoted an assistant principal because she spoke out against race discrimination discipline at a public school." *Id*. at 775. In *Love-Lane*, the plaintiff discovered that African-American students were disciplined more harshly than White students and would often be sent to the "time-out room." *Id*. at 770. The plaintiff raised these issues to the principal, "who refused to intervene." *Id*. at 770–71. Throughout the first year the plaintiff worked at the school, she continued to voice her concerns about the racially discriminatory disciplinary practices to the principal, which were "either rebuffed or ignored." *Id*.

at 771. After the principal continued to refuse to address the plaintiff's concerns, she began voicing her concerns in more public settings such as faculty meetings and at School Improvement Team ("SIT") meetings. *Id*. SIT meetings included employees of the school as well as parents. *Id*.

During the plaintiff's second year at the school, she began to voice her concerns about racial discrimination to the superintendent, who "indicated little concern for the racial issues" and admitted to discounting the plaintiff's concerns "because he did not agree with her assessment of the situation." *Id*. at 772. At the end of plaintiff's second year, she received a lower rating on her communication skills in her evaluation and was told by the principal that teachers found her intimidating. *Id*. The principal also recommended that the plaintiff only receive a two-year contract versus a four-year contract and advised the superintendent that she no longer wanted to work with the plaintiff. *Id*. After receiving a reprimand for an altercation with a teacher, the plaintiff filed a grievance believing the school was racially discriminating against her, which the school investigated. *Id*. However, the superintendent did not personally investigate the plaintiff's discrimination claim because he believed that plaintiff's issues with the principal did not have to do with race but "was clearly personality conflict." *Id*. at 773.

During the plaintiff's third year at the school, she informed the superintendent that she remained concerned about the discriminatory disciplinary practices the

school used on African American students and how some White teachers treated minority students improperly. *Id.* The plaintiff continued to voice these concerns, and the superintendent continued to ignore them, which resulted in the deterioration of her relationship with the principal. *Id.* In the plaintiff's third-year evaluation, the principal gave her low ratings and sent a memorandum to the superintendent stating that she considered the plaintiff's complaints about the time-out room to be disrespectful. *Id.* at 773–74. Accordingly, the superintendent assigned the plaintiff to another school to work in a nonadministrative position. *Id.* at 774. The superintendent stated that "he 'was not aware of, and did not consider' that [the plaintiff] 'had engaged in any First Amendment activities.'" *Id.* The plaintiff filed a grievance with the Board challenging her reassignment, however, the Board voted to uphold the decision. *Id.*

On appeal, this Court found that the superintendent did not have qualified immunity, noting that "*Pickering* itself, decided thirty years before [the plaintiff's] speech and demotion, made clear that the core value of the Free Speech Clause of the First Amendment . . . is so great that a public school 'teacher's exercise of [her] right to speak on issues of public importance may not furnish the basis for' an adverse employment decision against her." *Id.* at 783–84 (quoting *Pickering*, 391 U.S. at 574). Citing *Givhan* as support as well, this Court found that "by 1997 it was clearly established that [the plaintiff's] speech about race discrimination at

Lewisville involved a matter of public concern." *Id*. at 784. Notably, while this Court in *Love-Lane* acknowledged that "[w]e have said on many occasions . . . that 'only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' . . . that is subtle, difficult to apply, and not yet well-defined," the Court also clarified "[b]ut we have never said 'that a public employee's right to speak on matters of public concern could *never* be clearly established.'" *Id*. (quoting *Cromer v. Brown*, 88 F.3d 1315, 1326 (4th Cir. 1996)) (emphasis in original). The Court in *Love-Lane* then held that even though a school superintendent has a difficult job, "by 1997 a reasonable superintendent would surely be aware of a teacher's right to speak out in opposition to race discrimination against elementary school children. And a reasonable superintendent would also know that retaliation taken in response to such speech is a First Amendment violation." *Id*.

*Ridpath v. Board of Governors of Marshall University,* 447 F.3d at 292, and *Adams v. Trustees of the University of North Carolina-Wilmington*, 640 F.3d at 565–66, provide additional support. In *Ridpath*, the Fourth Circuit affirmed a decision rejecting the defense of qualified immunity at the Rule 12(b)(6) stage. 447 F.3d at 299–300. Ridpath was responsible for compliance with National Collegiate Athletic Association ("NCAA") rules, and he was critical of the school during the pendency

of an NCAA investigation. *Id*. at 299–302. University officials made threats against Ridpath's job in closed-door meetings. *Id.* at 302. They labeled his reassignment to a different position as "corrective action," which the court found "permanently damaged" his reputation because it "call[ed] into question his honesty, integrity and professional competence" as a school official. *Id.*; *see also id.* at 308–09 (compiling cases distinguishing non-actionable allegations of "incompetence" from statements that imply "serious character defects"). Similarly, in *Adams*, the Fourth Circuit denied qualified immunity to the defendants, finding that the underlying right of the plaintiff—"that of a public employee to speak as a citizen on matters of public concern"—was clearly established and the defendants should have known that. 640 F.3d at 565–66. The plaintiff was an associate professor who alleged that his employer, the University of North Carolina-Wilmington, discriminated and retaliated against him because he spoke about various political and social issues in columns and in his own book. *Id*. at 553. The plaintiff's columns addressed a variety of different topics, including abortion, which this Court found to be among the topics that "plainly touch[] on issues of public, rather than private, concern." *Id*. at 564.

Neighboring circuits provide guidance as well. In *Tachias v. Sanders,* the Tenth Circuit found that an individual's right to operate a Facebook page that criticized their local school free from the threat of frivolous legal action from the superintendent was clearly established, relying on precedent that bore sufficient

factual similarity (but was nonetheless *not* identical) to the case before them. 130 F.4th 836, 845 (10th Cir. 2025). In *Bevill v. Fletcher*, the Fifth Circuit denied qualified immunity to several county officials who pressured their county police department to fire one of its officers who had, in his personal capacity, signed an affidavit that impugned the moral character of defendants. 26 F.4th 270, 273–83 (5th Cir. 2022). In *Rivera-Jimenez v. Pierliusi*, the First Circuit denied qualified immunity to supervisors who engaged in retaliatory harassment, including negative work evaluations, against two employees of Puerto Rico's Department of Justice who attempted to report internal corruption to the Special Investigations Bureau of the Puerto Rico Department of Justice. 362 F.3d 87, 93–96 (1st Cir. 2004). In that case, the First Circuit found that the contours of the right at issue (the right of government employees to expose the illicit activities of their employers) was clearly established by First Circuit and Supreme Court precedent, despite factual differences between the facts of the case before them and the cases cited as authoritatively establishing the right at issue. *Id.* at 95. Finally, the Ninth Circuit held in *Dodge v. Evergreen School District #114* that a teacher's right to bring a Make America Great Again hat to school-mandated sensitivity training sessions, despite complaints from other faculty members about the hat, was clearly established under a *Pickering* balancing test because his speech touched on a matter of public concern and the school had no legitimate interest in retaliating against him by targeting him for

harassment. 56 F.4th at 784–87. The Ninth Circuit reasoned that a reasonable official would have known that targeting an employee for harassment in response to political speech would violate that employee's First Amendment rights because political speech is obviously a matter of public concern and the effect on others (i.e., the other faculty members) was merely that which ordinarily accompanies the expression of an unpopular viewpoint. *Id.* at 787.

Accordingly, Fourth Circuit precedent as well as caselaw from neighboring circuits illustrate that Mrs. Perez's constitutional right to speak on a matter of public concern was clearly established at the time of her reports from May 2022 through August 2025. Although there is no precedent from this Court that directly touches on whether a public school teacher can report illegal abortion activity free from retaliation, Mrs. Perez's case is merely a "new factual permutation," to which the "settled law" of this Circuit and her neighbors applies. *Id*. at 784. At the time of Mrs. Perez's initial reports in 2022, not only had *Pickering* been good law for decades, but *Love-Lane, Ridpath,* and *Adams* were decided in the early 2000s and 2010s, and have sufficient factual similarities. These cases dealt with a virtually identical right: the right of a public employee in an educational setting to be free from retaliation for speech concerning complaints or reports of their employers' illegal, unethical, or discriminatory practices.

Perhaps most factually similar and instructive to Mrs. Perez's case is *Love-Lane*. Like in *Love-Lane*, Mrs. Perez's case "involves much more than a personality conflict when the facts are viewed, as they must be," in her favor. Mrs. Perez's case involves school officials who targeted, defamed, and unjustly disciplined her, simply because she spoke out against unlawful abortion assistance at a public school. Also, similar to the *Love-Lane* defendants' infringement of Love-Lane's constitutional right, Mrs. Perez' public school employer violated her constitutional right to protest unlawful abortion activity at her school without fear of retaliation by her government-employer. Mrs. Perez, like Love-Lane, spent close to three years repeatedly reporting her concerns of illegal abortion activity to first her supervisors, which were continuously either dismissed or not taken seriously, and then the public. Throughout this time, Defendants continuously retaliated against Mrs. Perez. Love-Lane faced similar retaliation when the defendants gave her lower evaluation ratings, reprimands, and forced her to transfer to a nonadministrative position because she continued to speak out against practices she found dangerous and discriminatory to African American students.

However, despite this controlling precedent and the consensus among neighboring circuits, the district court erroneously adopted the Defendants' mischaracterization of Mrs. Perez's right and held that "Plaintiff's right to make her repeated accusations against her coworkers was not clearly established" and

therefore the Individual Defendants were entitled to qualified immunity. (JA 012–013). The district court supported its holding by noting that "*none of the various alleged investigations substantiated Plaintiff's claims*, and the Individual Defendants could reasonable have believed that Plaintiff's speech interests were outweighed by the school system's countervailing interests, *particularly in light of her failure to provide Lehman with the evidence she claimed to have, which she instead published years later through a report by a political blogger*." (JA 012) (emphasis added). There are numerous problems with the district court's reasoning.

First, the district court appeared to ignore the binding precedent and consensus of neighboring circuits that clearly establish Mrs. Perez's right to speak on a matter of public concern, *i.e.*, unlawful abortion activity involving pregnant minor students. Second, the district court appeared to have relied on evidence outside of Mrs. Perez's Second Amended Complaint, such as the numerous documents that the Defendants improperly included as exhibits in their Motion to Dismiss. One example is an email that Defendants' counsel referenced during oral argument, which he alleged "demonstrates the back and forth" between Mrs. Perez and FCPS officials, and that "she was asked - - she said she had evidence, she was asked, and she didn't provide anything." (JA 022). The Defendants also improperly included declarations, Senate HELP Committee submissions, U.S. Department of Education submissions, *etc.*, which as Mrs. Perez's counsel noted for the district court, "are massive

uncorroborated hearsay statements that the defendants want to shoehorn into the Court's consideration of the complaint." (JA 039). Mrs. Perez's counsel then cited *Zak*, F.3d at 607, which held that a district court erred in considering documents the defendant submitted with their 12(b)(6) motion. (JA 039–040). As Mrs. Perez's counsel noted during the hearing, Mrs. Perez did not rely on such documents as they were not integral to the complaint and thus the district court should not consider them. (JA 040). However, it appears that the district court did not confine itself to the four corners of the complaint and based its ruling on documents that were not integral to the complaint. Nowhere in Mrs. Perez's Second Amended Complaint, when viewing the facts in the light most favorable to her, can it be inferred that she "fail[ed] to provide [Defendant Lehman with the evidence she claimed to have," as the district court claimed. (JA 012). This is not alleged in Mrs. Perez's Second Amended Complaint. Also, whether Mrs. Perez provided statements to journalist Walter Curt (although this is also not alleged in the Second Amended Complaint) about alleged illegal abortion activity does not negate the plausibility of her claims. Mrs. Perez only went public with her reports of illegal abortion activity *after* her repeated concerns to her supervisors and FCPS officials fell on deaf ears, and she believed nothing was being done to rectify the issue and protect minor students from unlawful abortion assistance, similar to the plaintiff in *Love-Lane*. *See* (JA 132–133, JA 135–136, JA 138–139, JA 145); *see Love-Lane*, 355 F.3d at 766–801. Publicly

sharing her concerns about CHS staff facilitating abortions for minor students without their parents or guardian's consent, was therefore a lawful "effort to participate in a larger public dialogue," *see Crouse*, 848 F.3d at 585, which the district court incorrectly weighed against the plausibility of Mrs. Perez's claims.

Third, just because the Defendants disagreed with or did not believe Mrs. Perez's allegations of illegal abortion activity due to the findings of their "investigations,"[7] does not change the fact that 1) Mrs. Perez spoke on a matter of public concern when reporting unlawful abortion activity involving minors and the Defendants violated Ms. Perez's right to speak on such things, and 2) that the violation of her right was clearly established to where a reasonable person in the Defendants' positions would have known. As addressed above in Section II(A), Mrs. Perez was speaking on an issue that was of great interest to the community, particularly the welfare and reproductive health of pregnant minor students. *Pickering, Love-Lane*, *Ridpath*, and *Adams* clearly established Mrs. Perez's right to speak on such things. The cases cited from the First, Fifth, Ninth, and Tenth Circuit, also dealt with a virtually identical right: the right of a government employee to be

---

[7] Notably, this Court in *Love-Lane* still found that a reasonable superintendent in the defendant's position should still have known that retaliation taken in response to the plaintiff's speech is a First Amendment violation, even though the defendant did not believe the plaintiff's allegations about racially discriminatory practices. *Love-Lane*, 355 F.3d at 772, 781, 783. (noting that the superintendent "discounted Love-Lane's concerns . . . because he did not agree with her assessment of the situation").

free from retaliation from her employer for her protected speech on a public matter. The authorities cited recognize a right to engage in speech on a matter of public concern in the school context *(Pickering, Love-Lane, Ridpath*, *Dodge*), where the speech at issue aimed to expose the misconduct of a public official (*Ridpath*, *Rivera-Jimenez, Bevill*), and where the retaliation took the form of harassment (*Bevill*), infliction of damage to the employee's reputation (*Ridpath*), and adverse administrative action (*Rivera-Jimenez, Bevill*). To distinguish and deny the right at issue in Mrs. Perez's case despite this precedent would be to force the recognition of constitutional rights in novel factual scenarios to turn on the existence of a single, perfect, silver bullet controlling authority that is an exact match of the facts. Such approach has never been this Court's way of adjudicating rights.

The district court, appearing to accept Defendants' inaccurate framing of Mrs. Perez's right, inferred that the *Pickering* balance favors Defendants as school administrators who have an interest in dismissing "repeated accusations against coworkers." (JA 012–013). However, this interest would still fail to overcome the weight of authority favoring Mrs. Perez's right to make a good-faith report of illegal school-facilitated abortions. Notably, teachers in the Fairfax County School District are trained to report any "reasonable suspicion of sexual misconduct or abuse by another employee." (JA 284). Employees are on notice that "[r]etaliation against anyone reporting or thought to have made a report is prohibited." (JA 284). And yet,

Principle Lehman only conducted a cursory investigation of the Plaintiff's allegations, which, at the time of the November 2022 meeting, were supported by testimony from a CHS student. (JA 132).

Moreover, this Court has said that calling public attention to the deficiencies of a government program is a "critical service" that the government had no legitimate interest in opposing. *Smith v. Gilchrist*, 749 F.3d 302, 311 (4th Cir. 2014). Since defendants had no legitimate interest in harassing, defaming, and ultimately placing Plaintiff on administrative leave for speaking on a matter of public concern, the *Pickering* balance weighs so obviously in favor of Mrs. Perez that the right is clearly established, and a reasonable official would have known that their conduct violated Mrs. Perez's First Amendment right to speak on this particular issue. FCPS officials had the time and resources to orchestrate schemes to entrap Mrs. Perez in violations of the school faculty code of conduct, (JA 132), pull students out of class for interrogation, (JA 132–33), and conduct a campaign of defamation and harassment against one of its own once beloved employees, causing her to seek treatment from her medical provider for anxiety and depression, (JA 131). Mrs. Perez believes that but for her reports, Defendants would not have engaged in the retaliatory campaign to destroy her reputation and career.

Based solely on the facts alleged in the Second Amended Complaint, as stated above, Defendants' "countervailing interests" are not outweighed by Mrs. Perez's

free-speech interests. *See Oakes Farms Food & Distrib. Servs., LLC v. Sch. Dist. of Lee Cnty.,* 541 F.Supp.3d 1334, 1348 (M.D. Fla. 2021) (declining to engage in *Pickering* balancing because "Defendants' side of the *Pickering* scale was 'empty'" at the pleading stage (quoting *McCullars v. Maloy*, No. 6:17-cv-1587-Orl-40GJK, 2018 WL 1583639, at *4 (M.D. Fla. Apr. 2, 2018))); *see also Settlegoode*, 371 F.3d at 515–16. Accordingly, qualified immunity does not shield the Individual Defendants.

## CONCLUSION

Plaintiff-Appellant respectfully asks this Court to reverse the district court's grant of Defendants-Appellees' motion to dismiss and remand with instructions to allow this case to proceed to discovery pursuant to Rule 16(b) of the Federal Rules of Civil Procedure.

## REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument to aid the Court in resolving the important issues raised in this appeal.

Dated: September 14, 2026

Respectfully submitted,

/*s*/ Steven H. Aden
Steven H. Aden
*Counsel of Record*
Danielle G. Pimentel
AMERICANS UNITED FOR LIFE
1150 Connecticut Ave., N.W.,

Ste. 500
Washington, DC 20036
(703) 638-9731
Steven.Aden@aul.org
Danielle.Pimentel@aul.org

Monique A. Miles
OLD TOWNE ASSOCIATES, P.C.
201 N. Union Street, Ste. 110
Alexandria, Virginia 22314
(703) 519-6810
mmiles@oldtowneassociates.com

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because it contains 11,558 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using 14-point Times New Roman.

Dated: September 14, 2026

*/s/* Steven H. Aden
Steven H. Aden
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I certify that on September 14, 2026, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

Dated: September 14, 2026

/s/ Steven H. Aden
Steven H. Aden
*Counsel for Plaintiff-Appellant*