**No. 26-1736**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

ZENAIDA PEREZ,

*Appellant*,

v.

FAIRFAX COUNTY PUBLIC SCHOOLS, School Board; MONTELL BROWN, Individually and in his official capacity as Assistant Principal of Centreville High School; CHAD LEHMAN, Individually and in his official capacity as Former Principal of Centreville High School; ERIK HEALEY, Individually and in his official capacity as Principal of Centreville High School; MICHELLE REID, Individually and in her official capacity as Superintendent of Centreville High School,

*Appellees*.

On Appeal from the United States District Court for the Eastern District of Virginia
Case No. 1:25-cv-02126-AJT-IDD

# APPELLEES' RESPONSE BRIEF

M. Sean Royall
Lucas M. Fields
Zoe M. Beiner
KING & SPALDING LLP
1700 Pennsylvania Ave., N.W.
Washington, DC 20006-4706
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
sroyall@kslaw.com
lfields@kslaw.com
zbeiner@kslaw.com

Edward Lee Isler
Micah E. Ticatch
ISLER DARE PC
Suite 650
1945 Old Gallows Road
Vienna, VA 22182
Telephone: (703) 748-2690
Facsimile: (703) 748-2695
eisler@islerdare.com
mticatch@islerdare.com

*Counsel for Appellees*

October 14, 2026

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

# DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1736 Caption: Zenaida Perez v. Fairfax County Public Schools

Pursuant to FRAP 26.1 and Local Rule 26.1,

Chad Lehman, individually and in his official capacity as Former Principal of Centreville High School
(name of party/amicus)

who is Appellee, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ M. Sean Royall Date: June 23, 2026

Counsel for: Chad Lehman



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1736 Caption: Zenaida Perez v. Fairfax County Public Schools

Pursuant to FRAP 26.1 and Local Rule 26.1,

Erik Healey, individually and in his official capacity as Principal of Centreville High School
(name of party/amicus)

who is Appellee, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ M. Sean Royall Date: June 23, 2026

Counsel for: Erik Healey



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1736 Caption: Zenaida Perez v. Fairfax County Public Schools

Pursuant to FRAP 26.1 and Local Rule 26.1,

Fairfax County School Board
(name of party/amicus)

______________________________________________

who is Appellee, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ M. Sean Royall Date: June 23, 2026

Counsel for: Fairfax County School Board



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1736 Caption: Zenaida Perez v. Fairfax County Public Schools

Pursuant to FRAP 26.1 and Local Rule 26.1,

Montell Brown, individually and in his official capacity as Assistant Principal of Centreville High School
(name of party/amicus)

who is Appellee, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ M. Sean Royall Date: June 23, 2026

Counsel for: Montell Brown



Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1736 Caption: Zenaida Perez v. Fairfax County Public Schools

Pursuant to FRAP 26.1 and Local Rule 26.1,

Michelle Reid, individually and in her official capacity as Superintendent of Centreville High School
(name of party/amicus)

who is Appellee, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ M. Sean Royall Date: June 23, 2026

Counsel for: Michelle Reid



Print to PDF for Filing

## TABLE OF CONTENTS


DISCLOSURE STATEMENT ........ i

TABLE OF CONTENTS ........ xi

TABLE OF AUTHORITIES ........ xiii

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 5

STATEMENT OF THE ISSUES ........ 5

STATEMENT OF THE CASE ........ 6

LEGAL STANDARD ........ 16

SUMMARY OF ARGUMENT ........ 18

ARGUMENT ........ 20

I. The District Court Correctly Dismissed Perez's FAWBPA Claim Against the School Board (Count II). ........ 20

- A. Perez Fails to Allege a Causal Nexus Between Her Disclosure to Lehman in Late 2022 and Her Placement on Administrative Leave in Late 2025. ........ 21
  - 1. The District Court Did Not Treat the Lack of Temporal Proximity as an "Automatic Bar." ........ 22
  - 2. Regardless, Perez's Allegations of Retaliatory Animus Are Insufficient to Support an Inference of Causation. ........ 24
- B. The School Board Is Immune from Suit Under Virginia Law. ........ 29

II. The District Court Correctly Dismissed Perez's Free Speech Claims (Counts IV-V). ........ 31

- A. Perez Failed to Allege a First Amendment Violation. ........ 33

1. Perez Does Not Allege That She Spoke as a Private Citizen on a Matter of Public Concern Prior to, at the Earliest, August 2025. ............... 34

2. The Required Balancing of Interests Here Favors the Government's Interest in Maintaining an Efficient Workplace and Does Not Support the Conclusion that Perez's Speech Was Protected. ....................................... 41

3. Even If the Speech Was Protected, Perez Still Has Not Alleged Retaliatory Treatment Caused by Her Speech. ....................................... 52

B. Even Assuming That Perez's Abortion-Related Allegations Constituted Protected Speech, an Objectively Reasonable School Administrator Would Not Have Known That Their Conduct Violated Any Clearly Established Right. ............................................... 53

CONCLUSION ........................................................................................ 66

CERTIFICATE OF COMPLIANCE ...................................................... 67

## TABLE OF AUTHORITIES

### Cases

*Acevedo v. City of Miami*,
2026 WL 2508872 (11th Cir. Aug. 26, 2026) .................................... 63

*Anderson v. Creighton*,
483 U.S. 635 (1987) .................................... 55

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................... 16

*Atkinson v. Godfrey*,
100 F.4th 498 (4th Cir. 2024) .................................... 33

*Attkisson v. Holder*,
925 F.3d 606 (4th Cir. 2019) .................................... 33

*Barbour v. Garland*,
105 F.4th 579 (4th Cir. 2024) .................................... 26, 27, 28

*Bing v. Brivo Sys., LLC*,
959 F.3d 605 (4th Cir. 2020) .................................... 38

*Bland v. Roberts*,
730 F.3d 368 (4th Cir. 2013) .................................... 55

*Borzilleri v. Mosby*,
874 F.3d 187 (4th Cir. 2017) .................................... 44

*Brickey v. Hall*,
828 F.3d 298 (4th Cir. 2016) .................................... 42, 50

*Brooks v. Arthur*,
685 F.3d 367 (4th Cir. 2012) .................................... 34, 35, 38

*Brown v. Copeland*,
2026 WL 1396219 (W.D. Va. May 19, 2026) .................................... 31

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006), .................................... 45

*Campbell v. Becton, Dickinson & Co.*,
2024 WL 1299354 (D. Md. Mar. 27, 2024) .......... 29

*Campbell v. Galloway*,
483 F.3d 258 (4th Cir. 2007) .......... 55, 56, 59, 61

*City of Tahlequah v. Bond*,
595 U.S. 9 (2021) .......... 54

*Connick v. Myers*,
461 U.S. 138 (1983) .......... 34, 40, 48

*Crouse v. Town of Moncks Corner*,
848 F.3d 576 (4th Cir. 2017) .......... *passim*

*DiMeglio v. Haines*,
45 F.3d 790 (4th Cir. 1995) .......... 43, 45, 55, 56

*District of Columbia v. Wesby*,
583 U.S. 48 (2018) .......... 54, 56

*Durstein v. Alexander*,
629 F. Supp. 3d 408 (S.D. W. Va. 2022) .......... 49, 50

*Elliott v. Commonwealth*,
593 S.E.2d 263 (Va. 2004) .......... 31

*Farrell v. Bd. of Educ. of Allegany Cnty.*,
2017 WL 1078014 (D. Md. Mar. 21, 2017) .......... 46

*Figueroa v. Butterball, LLC*,
164 F.4th 312 (4th Cir. 2026) .......... 29, 30

*Goines v. Valley Cmty. Servs. Bd.*,
822 F.3d 159 (4th Cir. 2016) .......... 7, 14, 17, 18, 45

*Grutzmacher v. Howard Cnty.*,
851 F.3d 332 (4th Cir. 2017) .......... 41

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ........ 32

*Hill v. Town of Mocksville*,
2023 WL 2929681 (4th Cir. Apr. 13, 2023) ........ 59

*Holloway v. Maryland*,
32 F.4th 293 (4th Cir. 2022) ........ 28

*Huang v. Bd. of Governors of Univ. of N.C.*,
902 F.2d 1134 (4th Cir. 1990) ........ 52, 53

*Iglesias v. Wolford*,
667 F. Supp. 2d 573 (E.D.N.C. 2009) ........ 50, 58, 59

*Jenkins v. Medford*,
119 F.3d 1156 (4th Cir. 1997) ........ 53, 54

*Kellam v. Sch. Bd. of City of Norfolk*,
117 S.E.2d 96 (Va. 1960) ........ 30

*Kirby v. City of Elizabeth City*,
388 F.3d 440 (4th Cir. 2004) ........ 61, 62

*Laurent-Workman v. Wormuth*,
54 F.4th 201 (4th Cir. 2022) ........ 21

*LeSueur-Richmond Slate Corp. v. Fehrer*,
666 F.3d 261 (4th Cir. 2012) ........ 16

*Lettieri v. Equant Inc.*,
478 F.3d 640 (4th Cir. 2007) ........ 22, 23, 24, 25, 28

*Lincoln v. Maketa*,
880 F.3d 533 (10th Cir. 2018) ........ 63

*Love-Lane v. Martin*,
355 F.3d 766 (4th Cir. 2004) ........ 64, 65

*Maciariello v. Sumner*,
973 F.2d 295 (4th Cir. 1992) ........ 42, 43, 59

*Martin v. City of Waynesboro*,
926 S.E.2d 516 (Va. Ct. App. 2026) .......... 30, 31

*Massaro v. Fairfax County*,
95 F.4th 895 (4th Cir. 2024) .......... *passim*

*McCaffrey v. Chapman*,
2017 WL 4553533 (E.D. Va. Oct. 12, 2017) .......... 32

*McCaffrey v. Chapman*,
921 F.3d 159 (4th Cir. 2019) .......... 43, 44

*McCoy v. Kanawha Cnty. Bd. of Educ.*,
2024 WL 1805005 (S.D. W. Va. Apr. 25, 2024) .......... 37, 44, 47, 48, 52

*McVey v. Stacy*,
157 F.3d 271 (4th Cir. 1998) .......... 41, 42, 64

*Pappas v. James Madison Univ.*,
2023 WL 2768425 (W.D. Va. Mar. 31, 2023) .......... 18

*Philips v. Pitt Cnty. Mem'l Hosp.*,
572 F.3d 176 (4th Cir. 2009) .......... 17

*Pickering v. Bd. of Educ.*,
391 U.S. 563 (1968) .......... *passim*

*Porter v. Bd. of Trs. of N.C. State Univ.*,
72 F.4th 573 (4th Cir. 2023) .......... 34, 52

*Rankin v. McPherson*,
483 U.S. 378 (1987) .......... 42

*Reese v. Charleston Cnty. Sch. Dist.*,
2023 WL 5984404 (D.S.C. Sept. 14, 2023) .......... 36, 44

*Ridpath v. Bd. of Governors Marshall Univ.*,
447 F.3d 292 (4th Cir. 2006) .......... 32, 34, 42, 48, 65

*Roberts v. Glenn Indus. Grp., Inc.*,
998 F.3d 111 (4th Cir. 2021) .......... 27

*Smith v. Gilchrist*,
749 F.3d 302 (4th Cir. 2014) .................................................. 41, 42, 43

*Spatafore v. City of Clarksburg*,
2024 WL 4280959 (N.D. W. Va. Sept. 23, 2024) ................................ 40

*Stroman v. Colleton Cnty. Sch. Dist.*,
981 F.2d 152 (4th Cir. 1992) ........................................................ 34, 41

*Suarez Corp. Indus. v. McGraw*,
202 F.3d 676 (4th Cir. 2000) ........................................................ 43, 64

*Sullivan v. City of Frederick*,
2018 WL 337759 (D. Md. Jan. 9, 2018) ............................ 43, 44, 46, 64

*Supinger v. Virginia*,
259 F. Supp. 3d 419 (W.D. Va. 2017) .......................................... 39, 47

*Tutt v. Wormuth*,
2021 WL 4076729 (4th Cir. Sept. 8, 2021) ......................................... 28

*Von Gunten v. Maryland*,
243 F.3d 858 (4th Cir. 2001) .................................................. 45, 53, 63

*Watson v. Wake Cnty. Pub. Sch. Sys.*,
797 F. Supp. 3d 591 (E.D.N.C. 2025) .......................................... 24, 25

*Weintraub v. Bd. of Educ. of N.Y.C.*,
489 F. Supp. 2d 209 (E.D.N.Y. 2007) .......................................... 35, 36

*West v. City of Charlottesville*,
2025 WL 256998 (W.D. Va. Jan. 21, 2025) .................................. 28, 29

*Wood v. Bristol Va. Util. Auth.*,
661 F. Supp. 3d 538 (W.D. Va. 2023) .......................................... 21, 27

*Wyckoff v. Maryland*,
522 F. Supp. 2d 730 (D. Md. 2007) ..................................................... 43

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
780 F.3d 597 (4th Cir. 2015) ............................................................. 18

**Statutes**

28 U.S.C. § 1291 .......... 5

28 U.S.C. § 1331 .......... 5

28 U.S.C. § 1367 .......... 5

Va. Code § 2.2-3010 *et seq.* .......... *passim*

Va. Code § 40.1-27.3 .......... 15

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) .......... 17

Va. Const. art. I, § 12 .......... 31, 32

## INTRODUCTION

Plaintiff-Appellant Zenaida Perez, a high school teacher and employee of Fairfax County Public Schools ("FCPS"), portrays herself as a whistleblower and the victim of a years-long retaliation campaign in response to her purported speech on matters of public concern. Yet her own complaint tells a far different story.

In May 2022, facing an inquiry supported by a co-worker's statements into whether she violated school rules by giving a pregnancy test to a student, Perez in turn accused that same co-worker (with whom she had an apparent history of disputes) of providing students not only with "pregnancy tests," but also "pregnancy solutions"—a term she later clarified to mean secretive school-facilitated, school-funded student abortions. In November 2022, Perez told her school principal, Chad Lehman, that she had "all the pertinent information" and "evidence" "to prove [she was] right" about her abortion-related claims. Although Lehman invited her to share that information, Perez chose not to. Her own allegations suggest she consciously withheld that information (including multiple witness statements) until nearly three years later when, after an extended period of elevated tensions with school

administrators that placed her job at risk, she publicly released her "evidence" through a blogger's August 2025 reporting. Because no facts were brought forward at the time to support Perez's claims and his inquiry turned up differing accounts from others, Principal Lehman's November 2022 investigation was promptly closed. The incident appeared to be nothing more than a baseless attack on a co-worker by a disgruntled teacher who resented being questioned about her own personal interactions with students.

Between November 2022 and August 2025, Perez alleges a series of difficulties and indignities involving the actions of school administrators, some of which may have stemmed from her own questionable decisions—such as the decision to involve herself in titling, registering, and insuring a student's car. Although she now characterizes these myriad incidents as "retaliation" for her abortion-related complaint, she pleads no facts to support such a linkage. Indeed, for much of this period, the school administrators she faults with mistreating her (to the extent she identifies them by name) are not alleged to have even known of her student-abortion allegations, nor were they ever provided evidence of those allegations. Among the defendants, only Lehman allegedly was

privy to her accusations during this time period, and nothing he is alleged to have done rises to the level of cognizable retaliation.

When Perez's abortion-related allegations and "evidence" were publicly released in August 2025, they spawned multiple government investigations, as well as a detailed internal investigation. Ultimately, no inquiry substantiated Perez's claims. Yet FCPS's internal investigation identified reasons to believe that, in her zeal to prove wrongdoing by a distrusted co-worker, Perez may have violated multiple school rules and possibly also state laws.

In October 2025, FCPS placed Perez on paid administrative leave pending the outcome of a separate investigation probing her suspected misconduct, and soon thereafter she filed suit. Perez now asks this Court to allow her case to proceed on the theory that the measured step of placing her on administrative leave was the culmination of years of unlawful retaliation. The district court rightly dismissed Perez's lawsuit. On Perez's claim under the Virginia Fraud and Abuse Whistle Blower Protection Act ("FAWBPA"), Va. Code § 2.2-3010 *et seq.*, the court ruled that there was not a sufficient causal nexus between Perez's 2022 abortion accusation and the 2025 administrative leave decision, and that

this gap could not be bridged through miscellaneous workplace incidents allegedly occurring in the multi-year interim period. On her federal and state constitutional claims, the court concluded that Montell Brown, Chad Lehman, Erik Healey, and Michelle Reid (the "Individual Defendants") are each entitled to qualified immunity as no reasonable school official in these circumstances would have reason to believe that their alleged actions violated any "clearly established" right. The district court also dismissed several claims that Perez does not appeal—her remaining state-law retaliation and defamation claims, and her constitutional claims against the FCPS School Board.

The outcome of this appeal therefore turns on two settled principles. First, a whistleblower-retaliation plaintiff suing under Virginia law must plausibly plead that a statutorily cognizable employer took retaliatory action against her *because of* a protected disclosure. Second, qualified immunity protects public officials who make reasonable judgments in the "gray areas" of First Amendment balancing. Applying those principles, the district court's judgment should be affirmed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 28 U.S.C. §§ 1331, 1367. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly dismissed Perez's FAWBPA claim against the School Board (Count II), where nearly three years lapsed between her initial report and the only adverse employment action alleged, and she pleads no facts showing retaliation in the interim by the school officials to whom she complained.

2. Whether the district court correctly dismissed Perez's free speech retaliation claims (Counts IV and V) against the Individual Defendants where her speech emanated from a personal grievance with a co-worker and a reasonable school official could have believed Perez's speech interests were outweighed by the school system's interests in maintaining efficient operations and a safe environment, and that the school's actions violated no clearly established constitutional right.

## STATEMENT OF THE CASE

### A. Factual Background

Perez is a teacher at Centreville High School ("CHS"), in Fairfax County, Virginia, who has been on paid administrative leave since October 2025. JA146.[1]

In mid-2022, CHS administrators began investigating allegations that Perez improperly provided a pregnancy test to a student. JA132. Perez—"*[i]n response*" to this allegedly "false" accusation—lodged her own retaliatory complaint. *Id.* (emphasis added). On May 5, 2022, Perez "complained" to her immediate supervisor (Parker) and another assistant principal that one of the school's social workers—Carolina Diaz, the apparent source of the "false" pregnancy test allegations—had herself provided "pregnancy tests and 'pregnancy solutions'" "to minor students." *Id.* A week later, Perez sent a memo to Parker and CHS Principal Chad Lehman claiming that Diaz provided "pregnancy tests and even further support" to students. *Id.* On June 9, 2022, Perez emailed Lehman once

[1] Unless otherwise indicated, all references herein to Perez's complaint refer to the Second Amended Complaint, JA129-57.

more, claiming "we all know that the social worker helps the students to solve pregnancy situations." *Id.*

Five months later, on November 22, 2022, Perez alleges she met in person with Lehman, asserting then for the first time that Diaz had "facilitated an abortion" for a particular student outside the knowledge of the student's "legal guardian." JA132-33. Lehman had no recollection of having heard this allegation before. JA133. Perez then "re-forwarded" to Lehman her May 13 email, which vaguely referenced "pregnancy solutions" but said nothing about "facilitating abortions." *Id.* Now understanding the seriousness of Perez's claims, Lehman promptly investigated. A day later, Lehman informed Perez by email that he had spoken to Diaz and the school counselor (Ms. Villeda) and that they reported "a very different version" of events. *Id.*[2]

[2] Perez alleges that her November 22 meeting with Lehman (at 12:30 p.m.) and his follow-up email (at 1:05 p.m.) occurred the same day, suggesting that Lehman had little time to conduct a proper investigation. JA133. However, contemporaneous emails indicate that Perez's meeting with Lehman occurred the day before, on November 21, 2022. JA265-266; JA181; JA186; JA240. Because these emails are "integral" to her contention that Lehman did not investigate her allegations, JA133, and there "is no dispute about [their] authenticity," the Court may consider them. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

Perez's emailed response stated that she "ha[d] all the pertinent information about the case" and "the evidence to prove" she was "right," adding that "Mrs. Diaz," "will lie" "as usual," signaling a contentious interpersonal history. *Id.* Lehman invited Perez to "share" what "further information" she had, and "how [she] got the information." *Id.* Perez by this time was in possession of a written "statement" she personally "procured" from the student in question, "Doe #1." JA133-34. Sometime during November 2022, she also obtained an "audiotaped interview" from "Mr. S," Doe #1's "uncle and legal guardian." JA134. Perez's complaint says nothing to suggest that she revealed this "evidence" to Lehman or to anyone else within FCPS, ever. JA133.[3]

Although Perez maintains that she "reiterated" her abortion allegations "on an ongoing basis," JA131 (emphasis removed), according to her lawsuit she made no mention of these allegations to anyone else within FCPS for over two years following the November 2022 meeting (and email exchanges) with Lehman, and she continued to conceal her "evidence" until August 2025, when it was publicly disclosed "by . . .

[3] Perez's counsel conceded at the motion to dismiss hearing that her complaint contains "no allegation" that this "evidence" "was passed on to the defendants." JA42-43.

Walter Curt" in an online blog. JA134.[4]

Much of Perez's complaint focuses on tensions (real or perceived) with school administrators over the same period during which she concealed her "evidence" of Diaz's claimed wrongdoing—tensions she now interprets as "Retaliation" for "Reporting . . . Alleged Criminal Abortion Trafficking." JA135. However, the complaint suggests this is not how she interpreted events at the time. Perez alleges that she filed an EEOC complaint in December 2024, citing "concerns about retaliation and harassment," but there is no alleged linkage between the complained-of retaliation and her abortion-related accusations. JA138. Similarly, Perez reports filing "another complaint" with the Office of Employee Relations ("OER") "stating her concerns about retaliation," yet again alleges no such linkage. JA139.

---

[4] According to the complaint, two-plus years after her November 2022 meeting with Lehman, Perez mentioned her abortion-related claims on three occasions but disclosed none of the "evidence" she alleges was in her possession corroborating those claims. *See* JA138-39 (alleging that in January 2025 she "forwarded" to Healey an email she previously sent to a journalist that referenced "abortions being facilitated for minor girls"); JA141 (alleging that in March 2025 she referenced "Diaz's actions in facilitating [a student] abortion" in an interview with attorneys from an outside law firm representing FCPS); JA143 (alleging that in May 2025 Perez told an FCPS employee relations investigator about her abortion allegations).

The perceived retaliation allegedly started soon "[a]fter" Perez's November 2022 meeting with Lehman, whom she claims "never again acknowledged her . . . in the hallways." JA135-36. That is the only "retaliatory action[]" attributed to Lehman, and the only allegation of retaliation during the 2022-23 school year.

During the 2023-24 school year, Perez claims she was assigned an unusually "burdensome" "teaching load" by other unidentified CHS administrators but was otherwise "treated . . . equitably." JA136-37.

"Later" in 2024, *i.e.*, after she received her "evaluation" for the "2023-24 academic year," JA136-37, she claims unnamed CHS administrators "began to retaliate against her" by (i) directing students "to ask . . . for rides in her vehicle"; (ii) "arbitrarily scheduling meetings and demanding responses within vacation and PTO times"; and (iii) again "accusing her of obtaining pregnancy tests for students." JA137.

According to the complaint, in the 2024-25 school year "the retaliation . . . intensified," including through "false and defamatory" accusations by Assistant Principal Brown that she purchased more pregnancy tests for students. *Id.* The complaint alleges that Brown also encouraged students to "do or say things about Perez to get her in

trouble." JA138. While Perez interprets these acts as retaliation, she does not allege that Brown knew about her previous abortion-related complaint. Nor does she explain how other CHS administrators would have known about the substance of what she privately reported to Lehman in November 2022.

Beginning in January and continuing into April 2025, Perez alleges that Brown and CHS Principal Erik Healey (Lehman's successor) made various statements denigrating her job performance and impugning her reputation. *See* JA138-42. Among other things, the complaint references "a false rumor" that "she had an inappropriate illicit relationship with a male student," a rumor Perez "believes" she can attribute to Brown and Healey. JA138. Yet the complaint acknowledges that Perez did become involved in the personal affairs of that same male student by "help[ing him] . . . get a title, registration and insurance for his car." *Id.* Perez also claims that Brown tried to trick her into violating school rules by "instruct[ing]" students to ask Perez for rides in her car. JA142. Brown also allegedly questioned students about their relationships with Perez. JA139, JA141, JA143.

On May 1, 2025, Perez alleges she was suspended without pay for one day at Brown's recommendation, after he received reports that Perez hid a student in her classroom. JA141-42. Perez further claims that, in May 2025, Brown changed her teaching assignments out of spite and asked two male students why they had been texting Perez on her personal cellphone. JA142-43. Perez's complaint seemingly acknowledges "her personal text messages" with these students, but charges that Brown was improperly "accessing" her texts after she "mistakenly" "linked" her device to FCPS networks. JA143-44. Finally, the complaint insinuates that CHS administrators, late in the 2024-25 school year, may have improperly obstructed Perez's efforts to transfer to another high school. JA142.

Several months later, in August 2025, prior to the new school year commencing, Perez in collaboration with blogger Walter Curt finally disclosed her purported "evidence" of secretive school-funded abortions to the public through an online posting on his social media blog.[5]

---

[5] Curt's blog report, which is integrally referenced in the complaint, identifies Perez as the source who provided him with the audio recordings and other evidence he reported. JA268-72.

Following Curt's reporting, the Virginia State Police launched a criminal investigation. JA147. The U.S. Department of Education ("DOEd") and the Senate Committee on Health, Education, Labor, and Pensions ("HELP Committee") also opened related inquiries. JA146-47. FCPS also engaged outside counsel to conduct a thorough internal investigation. JA145. After participating in one interview with an FCPS attorney, Perez alleges that she "refus[ed]" to provide further statements to FCPS counsel. JA146. FCPS provided its initial responses to the DOEd and Senate HELP Committee on October 16, 2025. JA161-226. The responses were publicly released the same day in a letter from FCPS Superintendent Dr. Michelle Reid, which was posted to FCPS's website. JA144; JA273-74. In addition to publicly releasing the materials, Dr. Reid met that day with "the entire CHS staff" and at that time disclosed the "interim finding[]" that Perez's abortion-related claims were "likely untrue" and that she ("the teacher who made these allegations") "may have falsified the evidence." JA144 (emphasis removed). Dr. Reid also told the staff assembly that FCPS has "an obligation to protect [its] staff from wrongful and unjustified accusations." *Id.* (emphasis removed).

While refusing to cooperate further with FCPS counsel, on October 20, 2025, Perez chose to make further "public statements" about her allegations "in a publicly broadcast Webinar hosted by Americans United for Life," on the topic of "coercion of minor girls into abortion." JA146; JA152; JA172; JA238. Later that same evening, Perez was informed by email that she was being placed on paid administrative leave. JA146; JA152. This email was sent by FCPS's OER Director Bill Fulton, JA146, whose attached letter explained that Perez was being placed on leave pending the outcome of an investigation into "concerns" that she may have engaged in "serious professional misconduct" by (i) disclosing student-identifying information without authorization; (ii) withholding information from the school during the investigation into her abortion-related allegations; (iii) procuring false or manipulated statements to support those allegations; (iv) failing to respect professional boundaries with students and their families; (v) falsely accusing other school personnel of misconduct; and/or (vi) failing to cooperate with an internal investigation. JA275-77.[6]

[6] Fulton's administrative leave communications are also "integral" to the complaint and there "is no dispute about [their] authenticity." *Goines*, 822 F.3d at 166.

### B. Procedural Background

Perez initially filed suit in state court on October 29, 2025. JA65-90. Defendants removed the case to federal court, JA94, and Perez thereafter amended her complaint. JA99-128.

On January 9, 2026, FCPS submitted a supplemental statement to DOEd and the Senate HELP Committee. JA147; JA227-63. That statement marked the completion of FCPS's internal investigation and was publicly released the same day. JA147. It confirmed that the investigation found no credible evidence supporting Perez's abortion-related claims. JA278-79.

Perez filed her Second Amended Complaint on January 20, 2026, JA96, and Defendants moved to dismiss. JA158-60. Following oral argument on March 5, 2026, the district court granted that motion on May 8, 2026, dismissing all claims with prejudice. JA1, JA15. Perez does not appeal the district court's dismissal of her defamation claims or her retaliation claim under the Virginia Whistleblower Protection Act, Va. Code § 40.1-27.3, the latter of which was brought only against the School Board. JA309-10. Nor does she challenge the dismissal of her state and federal free speech claims against the School Board, which the court

dismissed after finding that she failed to allege a policy or custom sufficient to overcome *Monell*. JA13-14; Br. 12, 32, 48 (focusing on the "Individual Defendants" alone).

As relevant to this appeal, the district court held that Perez failed to plead a cognizable FAWBPA claim because "the temporal proximity" between "the only protected activity alleged" ("her initial report to Principal Lehman in November 2022") and "the only [alleged] adverse employment action" ("her placement on paid administrative leave in October 2025") is too "attenuated" to establish a "causal relationship." JA6-8. On her state and federal free speech claims, the district court ruled that qualified immunity protects the Individual Defendants because "at all times it was reasonable for [them] to believe that Plaintiff's right to make her repeated accusations against her coworkers was not clearly established." JA12-13.

## LEGAL STANDARD

This Court reviews the dismissal of a complaint de novo. *LeSueur-Richmond Slate Corp. v. Fehrer*, 666 F.3d 261, 264 (4th Cir. 2012). Dismissal is appropriate where the plaintiff fails "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(citation omitted); Fed. R. Civ. P. 12(b)(6). In determining whether a claim is plausible, the Court "accept[s] as true all well-pleaded allegations and view[s] the complaint in the light most favorable to the plaintiff," but need not "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citation omitted).

Courts reviewing a motion to dismiss for failure to state a claim "may properly take judicial notice of matters of public record." *Id.* Courts may also consider documents that, while not attached to the complaint, "are explicitly incorporated . . . by reference" in the pleadings, provided that the document is "integral to the complaint and there is no dispute about [its] authenticity." *Goines*, 822 F.3d at 166. The purposes for which a document incorporated by reference may be considered in ruling on the adequacy of the pleadings depend in part upon "the nature of the document and why the plaintiff attached [or referenced] it." *Id.* at 167. Even where a referenced document that is integral to the complaint is not considered "for its truthfulness," it may be appropriate to consider such documents as "representing" the outcome or findings of an

investigation or the author's "view of events." *Id.* at 168.[7] *See Pappas v. James Madison Univ.*, 2023 WL 2768425, at *8 (W.D. Va. Mar. 31, 2023) (noticed documents considered as "representing" defendants' "own views of what [the plaintiff] did," not "independent facts that the court would be bound to accept as true").

## SUMMARY OF ARGUMENT

While given multiple opportunities to plead actionable claims against the School Board and Individual Defendants, Perez failed to do so. Her own complaint points to the reasons why dismissal was required.

The district court correctly rejected Perez's efforts to overcome the three-year lapse between her initial report to Lehman in November 2022 and her placement on paid administrative leave in October 2025, a lengthy passage of time that destroys any reasonable inference of causation. The district court also rightly concluded that Perez failed to allege an unbroken chain of retaliatory conduct during the interim period

[7] *Zak v. Chelsea Therapeutics International, Ltd.*, 780 F.3d 597 (4th Cir. 2015), is distinguishable. In that case, the district court improperly took judicial notice of publicly available Securities and Exchange Commission filings, none of which was "explicitly referenced in . . . the plaintiffs' complaint." *Id.* at 607.

in an effort to bridge this extended gap, and correctly dismissed her FAWBPA claim on these grounds. This Court should affirm on that basis. The Court can also affirm on the alternative ground, as recently confirmed by the Virginia Court of Appeals, that the School Board is not an "employer" under the FAWBPA.

Perez's free speech claims are also meritless. Perez's theory is that all of her speech, including her initial reports to Lehman in 2022, involved a matter of public concern under *Pickering v. Board of Education*, 391 U.S. 563 (1968). Yet, had Perez been speaking as a private citizen on a matter of public concern, she would not have concealed her "evidence" for nearly three years—not while knowing of facts indicating "coercion of minor girls into abortions." JA152. Her own allegations point to her abortion-related complaints being baseless and retaliatory, an apparent effort to settle scores with a disliked co-worker that later spun out of control to the point of triggering national press attention and multiple government investigations, none of which substantiated her claims. This is a textbook example of why the law extends qualified immunity to supervisory public employees. The Individual Defendants were confronted here with a novel and highly

unusual situation, involving a teacher with a history of disregarding school rules and blurring professional and personal lines. Even crediting Perez's allegations and viewing them in the light most favorable to her claims, she has not alleged that her speech was entitled to constitutional protection, nor has she alleged that any of the Individual Defendants violated any "clearly established" right. For these and other reasons, dismissal of her free speech claims was appropriate, and this Court should affirm.

## ARGUMENT

### I. The District Court Correctly Dismissed Perez's FAWBPA Claim Against the School Board (Count II).

FAWBPA provides that "[n]o employer may discharge, threaten, or otherwise . . . retaliate against a whistle blower" if the "employee who discloses information about suspected wrongdoing or abuse [does so] in good faith and upon a reasonable belief that the information is accurate." Va. Code § 2.2-3011(A)-(C). This Court should affirm the district court's dismissal of Perez's FAWBPA claim because (1) she failed to allege a causal connection between her November 2022 disclosure and her placement on administrative leave in October 2025, and (2) the Virginia legislature has not waived the School Board's sovereign immunity.

### A. Perez Fails to Allege a Causal Nexus Between Her Disclosure to Lehman in Late 2022 and Her Placement on Administrative Leave in Late 2025.

Perez contends that she "was singled out because of her November 2022 report" to Lehman, Br. 20, the only protected activity alleged, yet she does not dispute that the "only adverse employment action" she allegedly suffered was "her placement on paid administrative leave in October 2025," JA6, which leaves a span of nearly three years.

Although circumstantial evidence of temporal proximity can support a prima facie case of causation in some instances, courts in the Fourth Circuit have required far closer spacing between the protected activity and adverse employment action than exists here. Indeed, Perez herself acknowledges that, within this Circuit, "approximately" a "two-month period" is the "'outer boundary' of temporal proximity." Br. 16. *See Laurent-Workman v. Wormuth*, 54 F.4th 201, 219 (4th Cir. 2022) (affirming dismissal of retaliation claim because a "two-month temporal gap" was too long to support a causal inference); *Wood v. Bristol Va. Util. Auth.*, 661 F. Supp. 3d 538, 553 (W.D. Va. 2023) (dismissing where "sixty-two days" was considered "too long," and collecting cases).

Having conceded that her allegations are far removed from what this Court's precedents would accept as "temporal proximity," Perez makes other arguments in an attempt to "'bridge the [extended] gap' between [the] protected activity and the adverse action" she alleges, Br. 11, but those arguments should be rejected for the reasons identified by the district court and additional reasons explained below.

#### 1. The District Court Did Not Treat the Lack of Temporal Proximity as an "Automatic Bar."

While conceding that she does not plead a causal link based on "temporal proximity alone," Perez argues that "a plaintiff can succeed in establishing causation if she presents sufficient retaliatory animus in the intervening period between the protected activity and the adverse action." Br. 15-16. This is the same argument Perez made below, and on appeal she relies on *Lettieri v. Equant Inc.*, 478 F.3d 640 (4th Cir. 2007). Perez faults the district court for not engaging with this argument and instead treating the absence of temporal proximity as "an automatic bar to a retaliation claim." Br. 15, 17 (cleaned up). But, as the record makes clear, the district court did nothing of the sort.

In *Lettieri*, the plaintiff offered evidence that she reported gender discrimination by her male supervisors, and that her complaints were

shared with the two men. 478 F.3d at 643-44, 649. "[T]he very next month" those same supervisors "stripped [the plaintiff] of significant job responsibilities," which "made it easier" for her supervisor to claim that the plaintiff "was not needed and should be terminated." *Id.* at 651.

Far from ignoring this argument, the district court thoughtfully engaged with it and, for good reason, found it lacking. The court first acknowledged Perez's argument that the "slow but sufficiently unbroken progression of retaliatory actions culminating in her administrative leave" satisfies the causation element and observed that "[t]his contention"—while apparently never before "extend[ed] . . . to state-law statutory claims like . . . FAWBPA"—"finds some support within the context of a Title VII claim." JA7. The court then compared Perez's allegations to those at issue in *Lettieri* and found Perez's far less compelling. Not only is "the temporal proximity between [Perez's] protected activity and her adverse employment action [] much more attenuated than in *Lettieri* (almost five times longer)," the court observed, but also "the ultimate adverse action [is] less sever[e] (administrative leave with pay as opposed to termination)," and "the school officials alleged to have engaged in conduct that Plaintiff contends

was retaliatory" were not the same officials that Perez "complained to or those she complained about." JA8. Put simply, the district court did not treat the lack of temporal proximity as "an automatic bar" to Perez's claim, Br. 17—it addressed and rejected the very theory Perez accuses the court of ignoring.

#### 2. Regardless, Perez's Allegations of Retaliatory Animus Are Insufficient to Support an Inference of Causation.

The district court's conclusion finds support well beyond *Lettieri* because Perez's allegations do not demonstrate the sort of recurring conduct that could "reasonably be viewed as exhibiting retaliatory animus" during such a lengthy lapse of time. *Lettieri*, 478 F.3d at 651. To start, in the months immediately following her November 2022 report, the only retaliatory conduct Perez alleges is Lehman's perceived failure to "acknowledge[] her . . . in the hallways." JA135-36. Even crediting Perez's perception, this is not the sort of conduct that evinces retaliation. *See Watson v. Wake Cnty. Pub. Sch. Sys.*, 797 F. Supp. 3d 591, 609 (E.D.N.C. 2025) (dismissing plaintiff's retaliation claim to the extent premised on allegations that her supervisor "looked angry" and that her co-workers "declin[ed] to have lunch with her"). Perez does not allege any

other retaliatory conduct until the 2023-24 school year, at which point she claims only that her workload was "more burdensome" compared to other ESOL teachers. JA136. She does not say which "CHS administrators" increased her workload. *Id.*

Already, Perez's allegations look nothing like the recurring animus in *Lettieri*, which began a month after the plaintiff's complaint and continued until she was fired seven months later. In *Massaro v. Fairfax County*, this Court rejected the plaintiff's attempt to show retaliatory animus based on *Lettieri* because "[t]he first act of alleged retaliation" the plaintiff identified "did not occur until eight months after [the plaintiff]'s complaint." 95 F.4th 895, 903 (4th Cir. 2024). The "gap" between the plaintiff's complaint and "the first alleged 'step' in the conspiratorial chain" was "too great" to find "continuing retaliatory conduct" that "occurred regularly." *Id.* (citation omitted). Thus, under *Massaro*, even if Lehman's failure to acknowledge Perez amounted to retaliation (it does not), the next act of retaliation Perez points to occurs at least nine months later, when she alleges that unidentified "CHS administrators" assigned her a heavier workload. JA136. The only purported explanation Perez offers for this lapse is summer vacation, Br. 25, but that still leaves

months unaccounted for, and any causal chain she may claim is clearly broken as a result.

Perez hinges her further claims of retaliatory animus primarily on Defendants Brown and Healey and their alleged actions during the next school year. Br. 20-22; JA137-44. Perez points to Brown and Healey's alleged efforts to "defame" her during that time—repurposing statements that the district court held do not evince malice or otherwise amount to defamation, JA6, as evidence of retaliatory animus. Br. 7-8, 20-21. But the complaint itself contradicts her argument that this alleged conduct had anything to do with her November 2022 disclosures to Lehman, because nowhere does Perez allege that Brown and Healey *knew* about her reports to Lehman.[8]

Perez attempts to downplay this defect, arguing that, per *Barbour v. Garland*, 105 F.4th 579 (4th Cir. 2024), "the official complained of need

---

[8] Perez argues and alleges that Healey received an email containing the "essence" of Perez's earlier abortion-related complaints in January 2025 (and forwarded it to Brown). JA43; JA138-39. But she does not allege that she ever provided Healey or Brown with the evidence she claims to have "procured" in November 2022 supporting her claims. JA133-34. Moreover, even assuming that the January 2025 email put Brown and Healey on notice of Perez's allegations, she does not rest her FAWBPA claim on this disclosure—which preceded her paid administrative leave by almost ten months.

not be the same one who engages in the retaliatory conduct." Br. 19. But the issue is not whether Perez complained *about* Brown or Healey but instead whether Brown or Healey *knew* about her disclosures *to* Lehman and then retaliated against Perez because of those disclosures. Her failure to allege as much defeats causation. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 125 (4th Cir. 2021) ("[A] prima facie case of retaliation requires that a plaintiff demonstrate that the decisionmaker imposing the adverse action have actual knowledge of the protected activity."); *Wood*, 661 F. Supp. 3d at 552 (holding that an employer's knowledge of the protected activity is "essential to a retaliation claim"). And even if Brown and Healey had known of Perez's allegations, Perez "offers no possible explanation" for why they would wait nearly two years "before launching [their] asserted plan of revenge into action." *Massaro*, 95 F.4th at 903.

If anything, Perez's reliance on *Barbour* highlights the paucity of her allegations. In *Barbour*, the plaintiff claimed that she was not hired by the Drug Enforcement Administration ("DEA") because of her participation in a class-action lawsuit against the Federal Bureau of Investigation ("FBI") approximately six to eight months prior. 105 F.4th

at 593. As proof of retaliatory animus, the plaintiff cited the "repeated and obsessive questioning by the DEA background investigator . . . about the FBI lawsuit and details of the sexual harassment," and the "sudden stalling of [her] DEA application" and "reopening of her background check" as soon as the DEA learned about the class-action lawsuit. *Id.* at 593-94. By contrast, Perez does not come close to alleging that her disclosure to Lehman triggered an immediate, unbroken chain of retaliatory conduct, spanning nearly three years, by officials who knew about her abortion-related disclosures.

Perez's other cited authorities are similarly unavailing. None of her cases addresses a lapse anywhere close to three years, and nearly all involve a termination—not placement on paid administrative leave. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022) (six months between employee's first complaint and his termination); *Tutt v. Wormuth*, 2021 WL 4076729, at *2 (4th Cir. Sept. 8, 2021) (fifteen to sixteen months between plaintiff's expression of support for his co-worker's discrimination complaint and his permanent reassignment to another program); *Lettieri*, 478 F.3d at 650 (seven months between complaint and termination); *West v. City of Charlottesville*, 2025 WL

256998, at *12 (W.D. Va. Jan. 21, 2025) (less than two months between accommodation request and termination); *Campbell v. Becton, Dickinson & Co.*, 2024 WL 1299354, at *39 (D. Md. Mar. 27, 2024) (less than three months between protected activity and performance improvement plan and approximately six months between protected activity and termination).

At bottom, Perez's disclosures to Lehman in November 2022 were years removed from her placement on administrative leave in October 2025. This "significant length of time . . . cuts strongly against [Perez]'s assertions of a causal nexus." *Massaro*, 95 F.4th at 902. And while "[i]t is possible, though difficult," for Perez to "overcome the absence of temporal proximity," her allegations of intermittent acts by Brown and Healey fall well short of bridging this significant temporal gap. *Id.* at 902-03.

### B. The School Board Is Immune from Suit Under Virginia Law.

This Court can also affirm dismissal of Perez's FAWBPA claim on the alternative ground that the School Board is not an "employer" within the meaning of the statute. *See Figueroa v. Butterball, LLC*, 164 F.4th

312, 319 (4th Cir. 2026) (this Court "can affirm the dismissal of a complaint on any basis fairly supported by the record" (citation omitted)).

Section 2.2-3011 of the FAWBPA prohibits retaliation by an "[e]mployer," which the statute defines as "a person supervising one or more employees, including the employee filing a good faith report, a superior of that supervisor, or an *agent* of the governmental agency." Va. Code § 2.2-3010 (emphasis added). When Defendants filed their motion to dismiss, it was "questionable whether the School Board, under the FAWBPA, could be considered an 'employer.'" Dist. Ct. Dkt. 36, Mot. to Dismiss, at 14 n.4; *see also Kellam v. Sch. Bd. of City of Norfolk*, 117 S.E.2d 96, 97 (Va. 1960) (holding, in a different context, that "[t]he basis for a school board's immunity from liability for tortious injury has been generally found in the fact that it is a governmental agency or arm of the state"). Following argument on the motion to dismiss, the Virginia Court of Appeals has since confirmed that a governmental agency, such as a school board, is not an employer under FAWBPA and is therefore immune from suit under Virginia law. *See Martin v. City of Waynesboro*, 926 S.E.2d 516, 523-26 (Va. Ct. App. 2026).

In *Martin*, the Virginia Court of Appeals held that FAWBPA "does not provide for claims against governmental agencies" because FAWBPA "separately defines the terms 'employer' and 'governmental agency.'" *Id.* at 525. Under the statute, "[a]n 'employer' is an individual person who supervises an 'employee,' whereas a 'governmental agency' is an entity for which employees and employers work." *Id.* Since FAWBPA "prohibits only an 'employer' from retaliating against an employee for whistleblowing," it "waives the sovereign immunity of only the supervisors, not the agencies." *Id.*; *accord Brown v. Copeland*, 2026 WL 1396219, at *2 (W.D. Va. May 19, 2026) ("[U]nder the FAWPA, a state or municipal employee who has been retaliated against for reporting violations of law can sue his supervisor but cannot sue the state or municipality."). Because Perez brings this claim against the School Board only, JA152-53, and the School Board is entitled to immunity, the Court can affirm on this alternative basis as well.

## II. The District Court Correctly Dismissed Perez's Free Speech Claims (Counts IV-V).[9]

[9] Because Article I, Section 12 of the Virginia Constitution is coextensive with the First Amendment, *Elliott v. Commonwealth*, 593 S.E.2d 263, 269 (Va. 2004), Perez's First Amendment (Count V) and Section 12 (Count IV) free speech claims can be addressed together, and the defects

The district court dismissed Perez's state and federal free speech claims both against the Individual Defendants and against the School Board. Perez appeals only the former ruling, challenging the applicability of qualified immunity to the Individual Defendants. The district court ruled correctly.

Qualified immunity shields government officials from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Where a motion to dismiss asserts qualified immunity, the court considers (1) whether the plaintiff "has sufficiently alleged [a] violation of a [federal] right"; and (2) if "at the time of the [defendants'] alleged conduct, this right was a clearly established one of which a reasonable person would have known." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 307 (4th Cir. 2006). A court "may address these questions in the order that would best

---

in the former extend equally to the latter. Separately, Perez's Section 12 claim fails because the Virginia Supreme Court has "never recognized an implied cause of action for damages" under Section 12, *McCaffrey v. Chapman*, 2017 WL 4553533, at *5 (E.D. Va. Oct. 12, 2017), which is the only relief Perez seeks, JA155.

facilitate the fair and efficient disposition of the case." *Atkinson v. Godfrey*, 100 F.4th 498, 504 (4th Cir. 2024).

The district court proceeded directly to the second question and thus did not resolve whether Perez sufficiently alleged a violation of any First Amendment right. JA11-13. Because Perez spills much ink on this first question, Defendants will address Perez's failure to allege a First Amendment violation before turning to her inability to show that the Individual Defendants violated any clearly established right. This Court can, of course, affirm on either ground. *See Attkisson v. Holder,* 925 F.3d 606, 622 n.7 (4th Cir. 2019), *as amended* (June 10, 2019) (affirming on qualified immunity grounds even though the district court "did not premise its dismissal ruling" on that ground).

### A. Perez Failed to Allege a First Amendment Violation.

To claim a deprivation of her First Amendment rights as a government employee, Perez must satisfy the three-prong test set forth in *Pickering*. That test requires her to allege that (1) she spoke "as a citizen [on] a matter of public concern," rather than as an employee about "a matter of personal interest"; (2) her interest in speaking on the matter of public concern "outweighed" Defendants' interest in providing an

effective public service; and (3) her speech "caused the disciplinary action." *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017) (discussing *Pickering*, 391 U.S. at 568).

### 1. Perez Does Not Allege That She Spoke as a Private Citizen on a Matter of Public Concern Prior to, at the Earliest, August 2025.

The first prong of *Pickering* requires a court to determine whether Perez spoke "as a private citizen on a matter of public concern." *Ridpath*, 447 F.3d at 316. To do so, courts scrutinize the "content, form, and context" of the employee's statements. *Brooks v. Arthur*, 685 F.3d 367, 372 (4th Cir. 2012) (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)). Critically, speech made "pursuant to the employee's duties" is not protected, *Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 582 (4th Cir. 2023), nor are "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest," *Stroman v. Colleton Cnty. Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992), or other "mere extensions" of such personal disputes, *Connick*, 461 U.S. at 148. Because "many ordinary disputes in the public workplace should be settled or resolved without calling the heavy artillery of the Constitution into play," courts do not hesitate to resolve this "threshold

question" at the motion to dismiss stage. *Brooks*, 685 F.3d at 371 (citation omitted).

Perez's speech can be divided into two categories: her internal reports to FCPS officials prior to Curt's publication of her accusations on August 5, 2025, and her public statements after that date. Beginning with the first category, Perez's own allegations preclude any conclusion that she was speaking as a private citizen when she internally reported her "pregnancy solutions" and abortion-related accusations to her direct supervisors and Principal Lehman in May and November 2022, and to others, including FCPS's counsel and an investigator (Mackie), in early 2025. JA132-33, JA141, JA143. Perez concedes that she made these reports pursuant to her official duties as a schoolteacher, "follow[ing] the ordinary channels used to report serious misconduct in a school setting." Br. 31; *see also* Dist. Ct. Dkt. 40, Opp. to Mot. to Dismiss, at 18-19 (arguing that her "statements regarding the perceived abortion trafficking . . . were in furtherance of her duty as a member of the FCPS staff"). "[W]hen," as here, "a public employee airs a complaint or grievance, or expresses concern about misconduct, to his or her immediate supervisor or pursuant to a clear duty to report . . . he or she

is speaking as an employee and *not as a citizen*." *Weintraub v. Bd. of Educ. of N.Y.C.*, 489 F. Supp. 2d 209, 219 (E.D.N.Y. 2007) (emphasis added); *see also Reese v. Charleston Cnty. Sch. Dist.*, 2023 WL 5984404, at *4 (D.S.C. Sept. 14, 2023) (finding it "probable" that an employee sent a confidential memorandum to her supervisors "within the scope of her employment"); *Massaro*, 95 F.4th at 906 (an employee's "complaint made via an internal grievance process does not reflect a matter of public concern").

The content, form, and context of Perez's statements confirm that she did not complain to Lehman—or any FCPS official—"to draw public attention to" her abortion-related concerns. *Id.* By her own admission, Perez raised her claims against Diaz as a form of retaliation "*[i]n response*" to Diaz's purportedly "false allegations" that Perez "provided a pregnancy test to a student." JA132 (emphasis added). After internally surfacing her allegations with her supervisors (Parker and Wenzel) and Lehman in 2022, Perez alleges nothing to suggest that she took any further action to draw school administrators' attention to the "pertinent information" and "evidence" she purported to "have" "prov[ing] that" she

was "right"—despite being asked by Lehman to "share" "what further information" she had and to explain "how" she "got" it. JA133.

Considering that Perez claims, by November 2022, she had all the "evidence" needed to prove that "Carolina Diaz" was guilty of "facilitat[ing]" student abortions, JA132, her withholding of this "evidence" is a strong contextual clue to her mindset and intentions. *See McCoy v. Kanawha Cnty. Bd. of Educ.*, 2024 WL 1805005, at *13 (S.D. W. Va. Apr. 25, 2024) ("Courts may also look to whether the public employee herself perceived she was engaging in speech pursuant to her duties."). That evidence supposedly included a statement from Doe #1 "dated November 19, 2022" attesting that Diaz "paid for the costs" of the student's "November 2021" abortion as well as an "audiotaped interview" from Doe #1's "uncle and legal guardian." JA133-34. Presumably, if Perez were speaking as a private citizen on what she regarded as a matter of public concern, she would have done something in 2022 (or 2023, or 2024, or 2025) to bring her "evidence" of "Alleged Criminal Abortion Trafficking," JA135, to the attention of school administrators, law enforcement, or the public at large. Instead, she sat on this "evidence" for several years, choosing to release it publicly only after her

employment situation and relationships with superiors had become unbearable to her and her efforts to transfer to another school were unsuccessful.[10] JA142.

Even construed in the light most favorable to Perez, her allegations signal personal interest, not a matter of public concern, prior to the time she "went public with her reports" in August 2025. Br. 44. In *Brooks*, this Court affirmed dismissal of a retaliation claim where it was "clear" that the "gravamen" of the complaint was "a series of personal differences," despite the plaintiff's efforts to couch his complaints as pertaining to discrimination. 685 F.3d at 372-73. Likewise, in *Massaro* this Court held that an employee who "sought to improve his own station by following internal procedures" was not speaking on a matter of public concern when he complained that "he, personally, was not promoted in lieu of a woman he viewed as unqualified." 95 F.4th at 906; *id.*

[10] Perez (Br. 44) complains that the district court erred by purportedly inferring that she "fail[ed] to provide Lehman with the evidence she claimed to have," JA12, but it was Perez's burden to supply the factual allegations necessary to support her claims, and the district court was under no obligation to "speculate" to "fill in the gaps." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020). Taking her allegations as true, Perez withheld her "evidence" for years before sharing it with Curt for publication in August 2025.

(describing the plaintiff's complaint as "replete with I's and me's"); *Supinger v. Virginia*, 259 F. Supp. 3d 419, 444 (W.D. Va. 2017) (speech concerning a co-worker's behavior was not a matter of public concern, even though "cloak[ed]" as workplace "'safety' concerns"). Thus, even where speech ostensibly touches on public matters, courts must examine whether the employee's true motivation was to "draw public attention" to "an issue of social, political, or other interest to a community." *Massaro*, 95 F.4th at 906 (citation omitted). Perez's allegations, taken as a whole and even construed in the most favorable light, do not support the conclusion that in communicating her internal reports about abortion-related concerns she spoke "as a citizen [on] a matter of public concern." *Crouse*, 848 F.3d at 583.

As for the second category, the fact that Perez's allegations eventually "reached the media," Br. 31, does not automatically transform her workplace complaints into a matter of public concern. To be sure, the Court need not credit Perez's *post hoc* characterizations of her prior workplace speech as involving a matter of public concern simply because the issues eventually spilled over to the public domain. This inquiry necessarily focuses only on the "content, form, and context" of the speech

at the time it was made. *Connick*, 461 U.S. at 147-48; *cf. Spatafore v. City of Clarksburg,* 2024 WL 4280959, at *11 (N.D. W. Va. Sept. 23, 2024) (rejecting "[p]laintiff's [later] characterization" of her "Facebook comments" because the speech when made "did not relate to issues of public concern"), *aff'd*, 2026 WL 49568 (4th Cir. 2026). Despite Perez's efforts to recast herself as a crusading citizen, the reality is that she consciously (if not strategically) kept her "evidence" to herself for years, releasing it only after her tensions with school administrators reached a boiling point. Her insistence that she spoke as a private citizen on a matter of public concern when she waited nearly three years to alert the public to what she claims was an ongoing criminal enterprise involving "coercion of minor girls into abortion" is simply not credible. JA152.

Even assuming that, as of August 5, 2025, when Perez finally played her next card through the public release of her scandalous evidence, her speech finally crossed the public-concern line, her allegations make clear that this would be the first time (if ever) she was exercising any cognizable First Amendment right. And as discussed *infra*, even if Perez was speaking as a citizen on a matter of public concern to draw attention to her claims of "abortion trafficking" at CHS,

her interest in free speech did not (and cannot) outweigh Defendants' interest in overseeing safe, effective, and efficient educational operations. *See Stroman*, 981 F.2d at 158 ("Public education is recognized as one of the most important public services offered by state government.").

**2. The Required Balancing of Interests Here Favors the Government's Interest in Maintaining an Efficient Workplace and Does Not Support the Conclusion that Perez's Speech Was Protected.**

*Pickering*'s second prong requires "balancing the public employee's interest in speaking on matters of public concern against the government's interest in providing effective and efficient government through its employees." *McVey v. Stacy*, 157 F.3d 271, 278 (4th Cir. 1998). "[T]he government, as an employer, 'is entitled to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies,'" and therefore has "'an interest in regulating the speech of its employees.'" *Smith v. Gilchrist*, 749 F.3d 302, 308 (4th Cir. 2014) (quoting *McVey*, 157 F.3d at 277). Accordingly, because "the efficient functioning of government offices is a paramount public interest," it follows that "a public employee by necessity must accept certain limitations on his or her freedom." *Grutzmacher v. Howard Cnty.*, 851

F.3d 332, 342 (4th Cir. 2017) (internal quotation marks and citations omitted).

In practice, courts "must take into account the context of the employee's speech, including the employee's role in the government agency, and the extent to which it disrupts the operation and mission of the agency." *McVey*, 157 F.3d at 278; *see also Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (recognizing time, manner, and context of employee's expression as relevant to *Pickering* balancing).

The Fourth Circuit considers the following factors in balancing the parties' respective interests:

> [W]hether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

*Brickey v. Hall*, 828 F.3d 298, 304 (4th Cir. 2016) (quoting *Ridpath*, 447 F.3d at 317). In balancing the competing interests, courts "do not require the public employer to prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was reasonably to be

apprehended." *Smith*, 749 F.3d at 309 (cleaned up); *see also Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992) ("the potential for disruption" may be "self-evident" and a defendant need only show reasonable apprehension of disruption).

This balancing analysis must also account for the quantum of harm alleged. Within the Fourth Circuit, "courts have required that the nature of the retaliatory acts committed by a public employer be more than *de minimis* or trivial." *Sullivan v. City of Frederick*, 2018 WL 337759, at *5 (D. Md. Jan. 9, 2018) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)), *aff'd*, 738 F. App'x 198 (4th Cir. 2018); *see also DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995) (not all actions will support a free speech retaliation claim); *Wyckoff v. Maryland*, 522 F. Supp. 2d 730, 738 (D. Md. 2007) (dismissing First Amendment retaliation claim where the employee was merely subjected to an administrative charge). Of relevance here, "courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts" amounted to only "criticism, false accusations, or verbal reprimands." *Suarez*, 202 F.3d at 686.

Courts may, and often do, resolve this balancing in favor of defendants at the motion to dismiss stage. *See, e.g.*, *McCaffrey v. Chapman*, 921 F.3d 159, 169-70 (4th Cir. 2019) (affirming dismissal); *Borzilleri v. Mosby*, 874 F.3d 187, 193-95 (4th Cir. 2017) (same); *Sullivan,* 2018 WL 337759 (same); *McCoy*, 2024 WL 1805005, at *15-17 (dismissing complaint); *Reese*, 2023 WL 5984404, at *4-5 (same).

As the district court noted, "the parties posit different framings of the 'right' that" Perez alleges "was violated." JA12. But, even in crediting Perez's more expansive characterization, Judge Trenga concluded that "the Individual Defendants could reasonably have believed that Plaintiff's speech interests were outweighed by the school system's countervailing interests." *Id.* Applying *Pickering* balancing, this Court should arrive at the same conclusion.

To begin with, Perez alleges harm too trivial to substantiate retaliation. She does not allege termination, demotion, or any other substantial and adverse change in her duties or pay. As Judge Trenga observed, the only adverse employment action Perez alleges following her initial report to Principal Lehman in November 2022 is her placement on

paid administrative leave in October 2025. JA6.[11] Putting aside the fact that Perez's paid administrative leave came nearly three years after she allegedly surfaced her abortion-related allegations to Lehman, this Court has expressly rejected the notion that paid administrative leave is an "adverse employment action" rising to the level of a constitutional violation. *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *see also DiMeglio*, 45 F.3d at 806 ("While the [Supreme] Court [has] recognized that a failure to rehire, a denial of promotion, or a denial of a transfer, may constitute a deprivation of a valuable government benefit . . . it did not hold . . . that an employment

[11] Perez was notified of her paid administrative leave in the letter she received from OER Director Fulton. JA275-77. Perez does not challenge the letter's authenticity, and it is unquestionably "integral" to Perez's constitutional claim, as she relies on it as the central basis for alleging that she suffered a cognizable form of retaliation linked to her asserted exercise of free speech. *See* Br. 47 (describing the "administrative leave" action as the "*ultimate[]*" act of alleged retaliation) (emphasis added); *id.* at 14 (suggesting that the "retaliation" she alleges "*culminated*" with being "placed . . . on administrative leave") (emphasis added). This Court need not accept the contents of the letter as true to consider the fact that it exists and sets forth FCPS's proffered reasons for placing Perez on paid administrative leave. *Cf. Goines,* 822 F.3d at 168 ("[N]o portion of any of [plaintiff's] claims is dependent upon the truth of any statements contained in the Incident Report.").

action less onerous than those amounted to a constitutional deprivation.").

Perez's remaining allegations—including that she received disciplinary reprimands, that she was assigned a different teaching load and schedule, that she had meetings scheduled or received messages during time off, that she was given a separate one-day suspension in spring 2025 for "hiding a student in her classroom," that she was put on an evaluation cycle, and that Lehman avoided her "in the hallways"—whether viewed individually or collectively are also properly regarded as at most *de minimis*. JA135-37, JA141-43, JA146, JA148. *See, e.g.*, *Sullivan*, 2018 WL 337759, at *6 ("Plaintiff has alleged nothing more than, at worst, some criticism, false accusations, and verbal reprimands. Therefore, the Court finds that aside from failing to properly plead what actions of his employer constituted retaliatory conduct, Plaintiff has also failed to allege any conduct that would constitute more than a *de minimis* harm . . .") (cleaned up); *Farrell v. Bd. of Educ. of Allegany Cnty.*, 2017 WL 1078014, at *4-5 (D. Md. Mar. 21, 2017) (dismissing retaliation claim based on poor performance evaluations).

Perez also fails to plead facts sufficient to demonstrate that her right to free speech outweighed Defendants' interest in overseeing the efficient operations of Virginia's largest public school district. *See, e.g.*, *McCoy*, 2024 WL 1805005, at *15-17. Perez's speech interest is meaningfully reduced by the pleaded manner, timing, and context of the at-issue statements. Perez pleads that she raised her accusations "[i]n response to" a co-worker's allegations against her—a co-worker whom she distrusted (*i.e.*, "Mrs. Diaz . . . will lie" "as usual") and with whom she apparently had a contentious history. JA132-33. *See Supinger*, 259 F. Supp. 3d at 445 (affording less weight to speech that was "an outgrowth of personal grievances"). Perez then withheld, for years, what she regarded to be supporting "evidence" from her supervisors, after being asked by Lehman to share "what further information" she had. JA133. Consistent with this Court's holding in *Crouse*, the fact that Perez initially "*sought to conceal*" information about her complaints "lessen[s]" the "public interest in the speech" and in turn provided her superiors—who "could reasonably have surmised" that her allegations were altogether baseless—with "correspondingly broader" "freedom of action" in supervising her actions. 848 F.3d at 586 (emphasis added).

And even after Perez's "evidence" was publicly disclosed in August 2025, prompting multiple overlapping investigations, none of the investigations substantiated her claims (as Judge Trenga correctly observed, JA12), giving the Individual Defendants further reason to believe that Perez's speech interests were outweighed by the school system's countervailing interests in maintaining order amidst the serious disruptions her seemingly reckless, and by all appearances retaliatory (if not malicious and knowingly false), allegations caused.

Turning then to the government's side of the *Pickering* balancing, there can be no dispute that a public school system "has a particularly strong interest in providing" for "its students' education," and maintaining a stable, orderly school environment. *McCoy*, 2024 WL 1805005, at *17. Beyond the bedrock interest of public education, the other *Ridpath* factors also strongly favor the government. The Individual Defendants, as school administrators, have an obligation to promote harmony among school staff and to exercise supervisory discipline where warranted. The case law recognizes that a disruptive employee can "adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency."

*Connick*, 461 U.S. at 151 (citation omitted). Further, Defendants were entitled to treat speech that grows out of ongoing personal disputes as a threat to "maintaining discipline." *Crouse*, 848 F.3d at 587 ("[G]iven [plaintiffs'] ongoing disputes . . . their efforts to conceal their speech, and the challenge their conduct, if not addressed, posed to police department operations, Chief Caldwell could reasonably have viewed the department's interest in maintaining discipline as paramount in the *Pickering* balance").

Once the full implications of Perez's accusations became known—including her claim of what amounts to a years-long conspiracy involving clandestine "Criminal Abortion Trafficking" "at CHS" and her contention that Superintendent Reid, Lehman, and other senior administrators failed to "conduct[] a full and fair investigation," JA135; JA144; JA146—the Defendants' interests in protecting the integrity of the workplace and staff morale only increased. Equally importantly, Perez's accusations of "criminal" "coercion of minor girls," JA135; JA152, occurring within Fairfax County Public Schools naturally created serious concerns within the school division about parental and public accountability for the safety of students, further tipping the balance in favor of reasonable

government actions. *See Durstein v. Alexander*, 629 F. Supp. 3d 408, 426-27 (S.D. W. Va. 2022) (noting that the balance tilts heavily toward a government employer where a plaintiff's speech "threaten[s] community trust," and finding plaintiff's speech "antithetical to the Board's mission to provide a safe . . . school environment"); *Brickey*, 828 F.3d at 305 (defendant police chief "could reasonably have believed that Brickey's comments would undermine his authority in the eyes of the public and within the police department").

The school division's interests in restoring order grew even stronger when it became clear, owing to the findings of a detailed internal investigation conducted by outside legal counsel, that Perez's serious allegations were unsubstantiated. *See Iglesias v. Wolford*, 667 F. Supp. 2d 573, 588 (E.D.N.C. 2009) ("Even assuming that Iglesias'[s] initial allegations of misconduct touched on a matter of public concern, once the alleged misconduct had been *investigated and not substantiated*, the disruptive effect of her continued conduct outweighed any continued interest in her speech." (emphasis added)), *aff'd,* 400 F. App'x 793 (4th Cir. 2010). Perez alleges that, because she was subjected to purportedly false and "defamatory statements," "coworkers" became "afraid to

associate with her," causing her to be "isolated" and "damag[ing]" "her personal reputation." JA148. Yet from the vantage point of school administrators this is exactly the type of harm that Perez's actions posed to Carolina Diaz—who by all appearances was innocent of any wrongdoing but had the misfortune of having provoked Perez's ire by lending support to concerns, in early 2022, that Perez may have improperly supplied pregnancy tests to students. This reinforced a reasonable belief among senior school division leaders—most notably Superintendent Reid—that action was needed to bring the school's investigative findings to light, including the ultimate conclusion that Perez's allegations were "likely untrue," based in part on potentially "falsified . . . evidence," and subjected another school employee to "wrongful and unjustified accusations." JA144-45.

Perez's own allegations and arguments underscore how disruptive her speech was to Centreville High School and the entirety of the Fairfax County Public Schools system. She acknowledges that her accusations spawned "a Senate HELP Committee investigation, a U.S. Department of Education investigation, and a Virginia State Police criminal investigation," which speaks volumes. Br. 28. She also draws attention

to the fact that FCPS felt the need to retain outside counsel, conduct a thorough internal investigation, and publicly release the investigative findings, and that Superintendent Reid felt obligated "to meet with the entire CHS staff," and to send letters not only "to the CHS staff and families" but also "to parents and staff across the entire Fairfax County Public Schools system"—manifest disruptions all occasioned by Perez's allegations of "illegal abortions . . . taking place at CHS." JA144.

In sum, Perez's own allegations point to the conclusion that, in light of the required balancing of interests, her speech lacked First Amendment protection, providing proper grounds for dismissal. *See McCoy*, 2024 WL 1805005, at *18 (dismissing where plaintiff's "complaint and its attachments demonstrate[d] beyond doubt that the Board's interest in effective and efficient fulfillment of its responsibilities to the public outweigh plaintiff's right").

### 3. Even If the Speech Was Protected, Perez Still Has Not Alleged Retaliatory Treatment Caused by Her Speech.

Although the Court need not reach the third *Pickering* prong, Perez's allegations fall short here as well. *Pickering*'s causation requirement is "rigorous," and a "claimant must show that 'but for' the

protected expression the [state actor] would not have taken the alleged retaliatory action." *Porter*, 72 F.4th at 583-85; *cf. Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140-41 (4th Cir. 1990) (finding protected speech was not the but-for cause of the plaintiff's discharge given documented issues with the employee's professional performance).

Here, Perez cannot show that she ever suffered retaliation in the first place. As discussed above, this Court has held that placement on administrative leave with pay does *not* constitute an adverse employment action. *See Von Gunten*, 243 F.3d at 869. Perez's allegations of various *de minimis* harms likewise do not plausibly establish retaliation. Perez's failure to allege retaliatory treatment, much less retaliation causally linked to protected speech, precludes any actionable First Amendment claim.

### B. Even Assuming That Perez's Abortion-Related Allegations Constituted Protected Speech, an Objectively Reasonable School Administrator Would Not Have Known That Their Conduct Violated Any Clearly Established Right.

The district court rightly concluded that Perez failed to satisfy qualified immunity's "clearly established" prong, which taken alone was

proper grounds for dismissal. In fact, dismissal in these circumstances serves an important function, as qualified immunity "exists to give government officials a right, not merely to avoid standing trial, but also to avoid the burdens of such *pretrial* matters as discovery." *Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc) (emphasis in original; citation omitted).

In evaluating this question, it is important to first define the rule of law, or "right," alleged to be infringed. The Supreme Court has "repeatedly" instructed that, for these purposes, the right must "not [be] define[d] . . . at too high a level of generality." *City of Tahlequah v. Bond,* 595 U.S. 9, 12 (2021). Also, it is not enough that a rule is "*suggested* by then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (emphasis added). "The precedent must be clear enough that *every* reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* (emphasis added). Moreover, the "legal principle" must "clearly prohibit" the official's "conduct in the particular circumstances before him," which "requires a high 'degree of specificity.'" *Id.*

For this reason, qualified immunity is especially challenging to overcome in the First Amendment retaliation context. As this Court has made clear, "only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' that is subtle, difficult to apply, and not yet well-defined." *DiMeglio*, 45 F.3d at 806. In addition, whether a right is clearly established must be "view[ed] . . . from 'the layman's perspective,'" because ordinary people "cannot be expected to perform at the level achievable by those trained in the law." *Bland v. Roberts*, 730 F.3d 368, 393-94 & n.21 (4th Cir. 2013). The focus of the inquiry also must be placed on what a reasonable official would have known at the time their actions took place. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (the "relevant question" focuses on the "information" a "reasonable officer" would have "possessed" at the time the challenged actions occurred). This is purely an "objective . . . question"; the defendants' "subjective beliefs" "are irrelevant." *Id.*

In applying these standards, this Court has consistently defined "the right" at issue with reference to the particularized facts of the case.

Thus, for example, in *Campbell v. Galloway*, the Court asked whether it was clearly established that "a reasonable officer would have known that Campbell's rambling thirteen-page memo . . . which focused overwhelmingly on personal grievances and vague gripes about fellow officers not being very nice to her, touched on a matter of public concern." 483 F.3d 258, 271 (4th Cir. 2007). Similarly, in *DiMeglio* the Court defined the right with particularity, assessing whether the defendant "could reasonably have believed" that DiMeglio's statements made before a citizen's group, but "seemingly with the imprimatur of the Office, yet contrary to his employer's managerial decision . . . sufficiently disrupted the function of the Office as to outweigh any interests DiMeglio might have had in expressing himself on that subject" and whether it was clearly established that "a reprimand and reassignment of responsibilities constituted deprivation of a valuable government benefit." 45 F.3d at 804-06. Perez ignores this requirement, simply asserting that she has a First Amendment right to "speak on matters of public concern." JA155-56.

Perez's approach ignores this Court's and the Supreme Court's directives. *See, e.g.*, *Wesby*, 583 U.S. at 63 ("The 'clearly established'

standard . . . requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him," which "requires a high 'degree of specificity.'"). As in *Campbell* and *DiMeglio*, the right at issue must be defined in a manner that tracks with the first two *Pickering* prongs, thereby taking into account the character of the speech at issue and the government employer's countervailing interests. Accordingly, Perez must show, as a matter of law, that it was "clearly established" (1) that she had a constitutional right to make repeated, unsubstantiated accusations of criminal misconduct against a co-worker, initially using only internal complaint channels, and withholding any purported "proof" of her accusations for years until she finally made her complaints public; and (2) that placing her on paid administrative leave after her public allegations were thoroughly investigated, revealing a host of suspected violations of school rules, amounted to unlawful retaliation. On both scores, Perez's arguments fall far short.

As discussed above, it is far from clear that Perez was speaking as a citizen on a matter of public concern, and if she ever was it was not until after August 5, 2025. Yet even if this initial threshold was satisfied as of August 2025, it is far from clear that her speech following that date

was constitutionally protected, given the weighty government interests that must be balanced against her purported First Amendment interests.

Perez rightly concedes that "there is no precedent from this Court that directly touches" these specific issues. Br. 41. However, the precedent that *does* exist—discussed in detail above—strongly suggests that, in these circumstances, the government's interests in maintaining orderly and efficient educational operations and controlling the severe disruptions caused by Perez's unsubstantiated accusations against a co-worker and various suspected violations of school rules outweigh any purported First Amendment rights animating Perez's actions, with the consequence that, even after August 2025, her abortion-related speech lacked any constitutional protection.

This Court has repeatedly affirmed qualified immunity when public employers take disciplinary action against employees because the employer reasonably believed that the speech in question arose from an interpersonal dispute. For example, this Court in *Crouse* held that a police chief was entitled to qualified immunity after terminating two officers because the chief "could reasonably have viewed [the officers' actions] as surreptitious conduct designed to foment complaints and

litigation against a supervisor with whom they did not get along." 848 F.3d at 583-84. And in *Iglesias* the court concluded that the plaintiff's speech complaining of co-workers was "not [constitutionally] protected," particularly after an internal investigation showed those complaints to be "not substantiated," because "the disruptive effect of her continued conduct outweighed any continued interest in her speech." 667 F. Supp. 2d at 588-89. *See also Campbell*, 483 F.3d at 271 (it was not "clearly established" that "a reasonable officer" would have understood plaintiff's "personal grievances and vague gripes about fellow officers" to be constitutionally protected).

In this same vein, this Court has indicated that it is *not* "clearly established" that a public employee's decision to engage in an unauthorized, self-initiated investigation of her co-workers or superiors is protected conduct, especially in the context of critical public services like law enforcement and education. As the Court observed in *Maciariello*, "[a] police department has an undeniable interest in discouraging unofficial internal investigations," where the "potential for [departmental] disruption is self-evident." 973 F.2d at 299-300. *See also Hill v. Town of Mocksville*, 2023 WL 2929681, at *2 (4th Cir. Apr. 13,

2023) (holding that the "rigorous causation requirement" could not be "satisfied in light of [plaintiff's] numerous personnel complaints, infractions and other incidents, most significantly his surreptitious recording of his co-workers in violation of [departmental] policy").

Here, the complaint is replete with allegations showing the Individual Defendants could have *reasonably believed* that Perez's accusations arose out of personal grievance; those allegations lacked any basis in fact; the "evidence" cited as support for her claims (once disclosed publicly, after being concealed for nearly three years) was flawed and possibly fabricated by Perez herself; and Perez, in her quest to retaliate against a disliked and distrusted co-worker, may have violated multiple school rules—including through her actions in publicly releasing confidential student information, her failure to cooperate with an official school investigation, her concealment of evidence, and her improper and unauthorized dealings with students and a student's guardian (from whom she "procured" written and recorded statements). Perez herself admits—and the district court found—that her allegations arose "[i]n response" to an investigation into her own conduct. JA132; JA2. In addition, OER Director Fulton's administrative leave letter and FCPS's

interim and supplemental reports to the Senate HELP Committee and the DOEd—all of which are integral to Perez's complaint—serve as further confirmation of what the school division knew at the time Perez was placed on paid administrative leave. JA275-77; JA161-263.

As to Perez's post-August 2025 speech, the fact that it could be a close call whether her speech in this later period involved her speaking as a citizen on matters of public concern only reinforces the applicability of qualified immunity. Where speech is "*close enough to the ill-defined line* between private speech and speech involving matters of public concern," qualified immunity should be granted to protect officials' "reasonable" if arguably "incorrect guess[es] about how the law would apply to the facts of th[e] case." *Campbell*, 483 F.3d at 271-72 (emphasis added). *See also Kirby v. City of Elizabeth City*, 388 F.3d 440, 450-51 (4th Cir. 2004) (after ruling it was a "close" question whether plaintiff's grievance complaint and related lawsuit "involve[d] a matter of public concern" but ultimately concluding they did, this Court ruled that qualified immunity nevertheless applied because it was "*anything but clear*" that the defendants' actions violated a clearly established right

given that the matter involved such "a close and novel issue") (emphasis added).

As recounted above, Perez's allegations morphed over time, beginning with vague allusions in May 2022 to "pregnancy solutions," JA132, later being sharpened to allegations of a school "facilitated . . . abortion for a minor student" (albeit with no supporting proof), JA132-33, and eventually being presented as allegations of systematic school-funded "abortion trafficking" (supported by proof an investigation showed was likely fabricated), JA146, JA170, JA268-71. This added to the ambiguity of the situation, and as more details became available it became increasingly evident that Perez may have been acting recklessly or maliciously in making such extreme and disturbing allegations, with an apparent retaliatory motive, targeting a disliked co-worker, with highly questionable factual support and evidence that appeared to be improperly procured and that had indicia of being at least partially fabricated. From the perspective of a reasonable school administrator in these circumstances, it would have been difficult to know exactly what to make of Perez's scandalous allegations, and "anything but clear" that her speech was constitutionally protected. *Kirby*, 388 F.3d at 451.

Nor does Perez show that being placed on paid administrative leave after "refusing" to cooperate further in the school's internal investigation, JA146, amounts to retaliation. Again, this Court has made clear that "writing [an employee up] and placing her on administrative leave with pay for a short time to allow investigation of [a] matter" does not amount to an "adverse employment action." *Von Gunten*, 243 F.3d at 869. *See also, e.g.*, *Acevedo v. City of Miami*, 2026 WL 2508872, at *12 (11th Cir. Aug. 26, 2026) ("agree[ing]" that "it is *not clearly established* that suspending someone until another person—here the Commissioners—can consider termination is an adverse action") (emphasis added); *Lincoln v. Maketa*, 880 F.3d 533, 542 (10th Cir. 2018) ("[N]either we nor other circuits have established any clear guidance on where to draw the line between adverse and non-adverse paid administrative leave . . . [W]ithout any guidance, we do not regard placement on paid administrative leave as a clearly established adverse employment action.").

As to the Defendants' other challenged actions—including Healey and Brown's informal and formal performance reviews, Dr. Reid's updates to FCPS staff and families, and responses to the various

governmental investigations—the law counsels that such conduct (itself constituting speech) does not amount to retaliatory conduct. On the contrary, "courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands." *Suarez*, 202 F.3d at 686 (collecting cases); *Sullivan*, 2018 WL 337759, at *6 (holding that allegations of false and defamatory performance reviews in memoranda, negative statements in a personnel file, and an investigation into potential wrongdoing amounted to nothing more than "criticism, false accusations, [and] verbal reprimands" that fail to satisfy the *McVey* test (citation omitted)).

*Love-Lane v. Martin* is wholly inapposite. That case involved speech protesting racial discrimination, and a different test applies to such claims: Allegations of racial discrimination are presumed to be "*a matter inherently of public concern*." 355 F.3d 766, 777 (4th Cir. 2004) (citation omitted; emphasis in original). Perez makes no racial discrimination claims. Additionally, the *Love-Lane* plaintiff's conduct differed significantly from Perez's. Unlike Perez, who concealed her

"evidence" and remained silent about her allegations for lengthy periods after they were first raised, the *Love-Lane* plaintiff reiterated her complaints and the bases for them "*time and again*." *Id.* (emphasis in original). Unlike Perez, whose allegations morphed from an apparent retaliatory swipe at a co-worker to a full-blown allegation of systematic "abortion trafficking," the *Love-Lane* plaintiff was single-mindedly focused on alleged racial discrimination from the start. *Id.* at 781. And unlike the Individual Defendants, who repeatedly sought to investigate Perez's allegations only to be rebuffed by her concealment of evidence or refusals to cooperate, the defendants in *Love-Lane* were faulted for not even "hear[ing]" the plaintiff "out." *Id.* at 785.

There are similarly stark distinctions between this case and *Ridpath*, where this Court characterized the plaintiff's allegations as "crystal clear," such that "a clearer violation of constitutionally protected free speech would be difficult to fathom." 447 F.3d at 321. But here, as Judge Trenga noted, even Perez's own allegations show that "none of the various alleged investigations substantiated [her] claims." JA12.

Because Perez cannot show that the law clearly establishes that her speech was protected, or clearly establishes that Defendants' actions

were retaliatory, the district court correctly concluded that the Individual Defendants are entitled to qualified immunity.

## CONCLUSION

For the reasons stated above, the Court should affirm.

Respectfully submitted,

/s/ *M. Sean Royall*

M. Sean Royall
Lucas M. Fields
Zoe M. Beiner
KING & SPALDING LLP
1700 Pennsylvania Ave., N.W.
Washington, DC 20006-4706
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
sroyall@kslaw.com
lfields@kslaw.com
zbeiner@kslaw.com

Edward Lee Isler
Micah E. Ticatch
ISLER DARE PC
Suite 650
1945 Old Gallows Road
Vienna, VA 22182
Telephone: (703) 748-2690
Facsimile: (703) 748-2695
eisler@islerdare.com
mticatch@islerdare.com

*Counsel for Appellees*

October 14, 2026

## CERTIFICATE OF COMPLIANCE

1. This response brief complies with Fed. R. App. P. 32(a)(7)(B) because it contains 12,840 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2. This response brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.